IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| IN RE: § | |
| § | Chapter 11 |
| UGHS SENIOR LIVING, INC., <u>et al.</u>, § | |
| § | Case No. 15-80399 |
| Debtors.[1] § | |
| § | Joint Administration Requested |
| § | |

**DEBTORS' MOTION FOR (I) AN ORDER (A) ESTABLISHING BID PROCEDURES RELATED TO THE SALE OF THE DEBTORS' ASSETS, (B) APPROVING FORM OF ASSET PURCHASE AGREEMENT AND BID PROTECTIONS, (C) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, AND (E) GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE PROPOSED SALE, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED <u>LEASES, AND (C) GRANTING RELATED RELIEF</u>**

**AN EXPEDITED HEARING HAS BEEN REQUESTED IN THIS MATTER ON OR BEFORE NOVEMBER 24, 2015.**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 23 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: UGHS Senior Living, Inc. (9334); TrinityCare Senior Living, LLC (1655), UGHS Senior Living Real Estate of Port Lavaca, LLC (0012), UGHS Senior Living Real Estate of Pearland, LLC (0653), UGHS Senior Living Real Estate of Knoxville, LLC (2405), UGHS Senior Living of Pearland, LLC (0704), UGHS Senior Living of Port Lavaca, LLC (0762), UGHS Senior Living of Knoxville, LLC (0826), TrinityCare Senior Living of Covington, LLC (4360),UGHS Senior Living Real Estate, LLC (5553), and TrinityCare Lighthouse of Pearland, LLC (2681).

5171468v1

**EXPEDITED RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EXPEDITED BASIS, THEN YOU WILL HAVE LESS THAN 23 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EXPEDITED CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**To the Honorable Letitia Z. Paul,
United States Bankruptcy Judge:**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") file this Motion for (I) an Order (A) Establishing Bid Procedures Related to the Sale of the Debtors' Assets, (B) Approving Form of Asset Purchase Agreement and Bid Protections, (C) Scheduling a Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, (D) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, and (E) Granting Related Relief (the "Bid Procedures Order"), and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief (the "Sale Order").

## Nature of the Motion

1.      The Debtors have negotiated an asset purchase agreement for the sale of substantially all of their assets to Cornerstone Healthcare Group Holding, Inc. (together with its affiliates and assignees, "Cornerstone") free and clear of all liens, claims, interests and encumbrances under 11 U.S.C. § 363(f) for a purchase price of $24,750,000, comprised of cash and the assumption of approximately $16 million of secured debt owed to Lancaster Pollard and guaranteed by the Department of Housing and Urban Development ("HUD"). Cornerstone's offer remains subject to higher and better bids at auction. In order to induce Cornerstone to serve as the "stalking horse" bidder in the sale process, the Debtors have agreed to certain bid

procedures and protections. The Debtors seek court approval of these procedures and bid protections as set forth below.

2. The Debtors seek the immediate entry of the Bid Procedures Order, attached hereto as **Exhibit A**, establishing the bid procedures related to an auction of the Debtors' assets, approving the form of Cornerstone's Agreement and the bid protections being granted to Cornerstone, scheduling a hearing to approve the proposed sale, and establishing notice procedures related to the assumption and assignment of executory contracts and unexpired leases.

3. In this Motion, the Debtors also seek entry of the Sale Order approving the proposed sale to Cornerstone on the terms set forth in the Agreement or to the highest and/or best bid received at auction and authorizing the assumption and assignment of certain executory contracts and unexpired leases.

## Jurisdiction

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363, and 365 and Bankruptcy Rules 2002 and 6004.

## Background

5. On November 9, 2015 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. The Debtors are directly or indirectly owned by University General Health System, Inc. ("UGHS").

6. In May 2014, UGHS engaged Dougherty & Company LLC ("Dougherty") to conduct a sale process of the Debtors' senior care living business. Following conclusion of the marketing process, UGHS selected the transaction proposal submitted by Cornerstone and, on December 12, 2014, executed an asset purchase agreement with Cornerstone (the "December 2014 Agreement").

7. On February 27, 2015, UGHS filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (Case No. 15-31086).

8. On March 31, 2015, UGHS filed a motion to approve a sale to Cornerstone based on the December 2014 APA. In light of the objections raised by several parties to the sale, it was apparent that the Debtors could not satisfy certain closing conditions in the December 2014 Agreement. Therefore, on April 22, 2015, UGHS withdrew its motion to approve a sale to Cornerstone.

9. Thereafter, the Debtors evaluated all of their options for consummating a sale of their assets.

10. The Debtors retained Chad Shandler of CohnReznick LLP ("CohnReznick") to serve as the Debtors' chief restricting officer and, on or about July 21, 2015, retained Duff & Phelps Securities, LLC ("D&P") as an investment banker to market the Debtors' assets.

11. Shortly before the Petition Date, after extensive arm's length negotiations, the Debtors reached an agreement on the terms of a revised asset purchase agreement with Cornerstone (the "Agreement"). A copy of the Agreement is attached hereto as **Exhibit B**. The Agreement will be subject to higher and better offers. In connection with the Agreement, the Debtors agreed to seek approval of a sale procedure, form of Agreement, form of notice and certain bid protections as more fully set forth below.

**The Sale Procedure, Form of Agreement and Form of Notice**

12. The Debtors seek approval of the following procedures (the "Bid Procedures"[2]):

**Asset Purchase Agreement**. The Debtors seek approval of the form of Agreement attached hereto as Exhibit B.

**Assets to be Sold**: The Debtors shall sell substantially all of their assets, described in the Agreement as the "Purchased Assets." Certain assets of the Debtors are not being sold as part of this proposed transaction, described in the Agreement as the "Retained Assets."

**Free and Clear of Any and All Claims and Interests:** Except as otherwise provided in the Agreement or another successful bidder's purchase agreement, all of the Debtors' right, title and interest in and to the Purchased Assets subject thereto shall be sold free and clear of all liens, claims and interests (collectively, the "Encumbrances") to the maximum extent permitted by Section 363 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities), with such Encumbrances to attach to the net proceeds of the sale of the Purchased Assets with the same validity and priority as such Encumbrances applied against the Purchased Assets.

**Qualified Bidders**. Only Qualified Bidders may participate in the bidding process. To become a Qualified Bidder, a potential bidder must (i) execute and deliver to the Debtors a confidentiality agreement prepared by the Debtors, (ii) deposit with an independent escrow agent to be designated by the Debtors the sum of $2,475,000 (each, the "Alternative Bidder's Deposit"), which deposit shall be refundable only as described below; (iii) submit to the Debtors an unqualified and binding bid in an amount not less than $25,990,000, along with an executed written agreement that is substantially identical to the form of the Agreement, and (iv) submit to the Debtors financial and other information, including support indicating the availability of funds to satisfy its purchase price, sufficient to allow the Debtors to make a reasonable determination as to such bidder's ability to consummate a sale as contemplated herein (each, a "Qualified Bid").

**Bid Deadline.** Qualified Bids must be delivered to counsel for the Debtors, Aaron Power, via email (apower@porterhedges.com), on or before 5:00 p.m. Central Time on January 15, 2016.

**Notice of Qualified Bidders**. On or before 5:00 p.m. Central Time on January 19, 2016, the Debtors shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received. The Debtors shall serve a copy of the notice and the corresponding bids on all Qualified Bidders by (a) facsimile or electronic mail or (b) overnight delivery.

**Stalking Horse Bidder**. The Agreement shall be deemed a Qualified Bid. Cornerstone is and shall be deemed to be a Qualified Bidder and a party in

---

[2] The foregoing is provided as a summary only. The terms of the attached order shall prevail.

interest for all purposes. If no other Qualified Bids are received, Cornerstone shall be deemed the Highest and Best Bid (as defined below) and the Debtors shall seek approval of a sale to Cornerstone on the terms of the Agreement at the Sale Hearing.

**Auction**. If one or more timely Qualified Bids are received, an open auction for the Purchased Assets will be conducted on January 20, 2016 (the "Auction"), commencing at 10:00 a.m. Central Time at the offices of Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas. Only Qualified Bidders may participate in the Auction. All Qualified Bidders, or their authorized representatives, must be physically present at the Auction. At the commencement of the Auction, the Debtors shall announce the bidding order, which shall be based on: (i) the amount of the Qualified Bidder's bid (from low to high); and (ii) if Qualified Bids are identical, the time the Qualified Bids were delivered to the Debtors (the first such received identical bid going first in the Auction); *provided, however*, that Cornerstone shall bid last in any bidding round in which it participates. Minimum overbid increments at the Auction shall be in the amount of not less than $100,000 cash (the "Minimum Overbid"). When bidding at the Auction, Cornerstone shall receive a cash "credit" in an amount equal to $990,000 (i.e., the sum of the 1% Expense Reimbursement plus the Breakup Fee). All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. Other than as set forth in this paragraph, the Debtors, in consultation with their professionals, shall conduct the Auction in accordance with the Bid Procedures Order.

**Selection of the Highest and Best Bid**. At the conclusion of the Auction, the Debtors will announce the highest and/or best Qualified Bid (the "Highest and Best Bid") and the next highest and/or best Qualified Bid (the "Back-Up Bid"). The Debtors will seek approval of the Highest and Best Bid at the Sale Hearing. If for any reason, the Qualified Bidder submitting the Highest and Best Bid fails to timely consummate the purchase of the Purchased Assets, the Debtors may seek to consummate a sale based on the Back-Up Bid without further approval by the Court. The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Purchased Assets shall remain open and in full force, including with respect to the Alternative Bidder's Deposit, until the close of a sale of the Purchased Assets to the party making the Highest and Best Bid or the party making the Back-Up Bid.

**Sale Hearing**. A hearing to approve a sale based on the Highest and Best Bid shall take place on January 21, 2016, at 1:00 p.m. in Courtroom 401, 4th Floor, 515 Rusk, Houston, Texas 77002.

**Deadline to Object to Sale**. All objections to the proposed sale must be filed on or before January 15, 2016.

**Return of Deposits**. Within three business days after the conclusion of the Auction, the Debtors shall return by check or wire the full amount of the Alternative Bidder's Deposit submitted by each party that is not selected as submitting the Highest and Best Bid or the Back-Up Bid. If the sale of the

Purchased Assets is consummated with the party submitting the Highest and Best Bid, the Alternative Bidder's Deposit of the party that is declared the Back-Up Bid shall be returned by check or wire transfer within three business days after the closing of the sale to the party submitting the Highest and Best Bid. Notwithstanding the foregoing, no bid by Cornerstone may be deemed the Back-Up Bid and the return of Cornerstone's Deposit shall be governed by the terms and conditions of the Agreement.

**Notice of Bid Procedures, Auction, and Sale Hearing**. On the next business day following the entry of an Order approving this Motion, the Debtors will serve by first-class mail a copy of the Order and a notice containing the date of the Auction, the Sale Hearing, and the deadline to file objections to the sale to: (i) all potential purchasers previously identified or solicited by the Debtors and their professionals; (ii) the Office of the United States Trustee; (iii) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any Debtor; (iv) counsel for the Official Committee of Unsecured Creditors, if any, Cornerstone and White Oak Asset Finance, LLC, (v) all parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Purchased Assets; (vi) all applicable United States, state and local regulatory, environmental or taxing authorities, recording offices and any other governmental entity which has a reasonably known interest in the Purchased Assets, including (without limitation) the Department of Health and Human Services and its Centers for Medicare and Medicaid Services, Environmental Protection Agency, Texas Department of Aging and Disability Services, Tennessee Department of Health and the Tennessee Board for Licensing Health Facilities; (vii) all non-debtor parties to the Desired 365 Contracts; (viii) the twenty (20) largest (by amount owed) unsecured creditors of each Debtor; and (ix) all parties on the most current master service list filed in this case. Such notice shall be sufficient and proper notice of the sale with respect to known interested parties.

13. The Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Agreement and the amended terms of the Debtors' post-petition financing. The Bid Procedures are the result of good faith, arm's length negotiation with Cornerstone. The Bid Procedures are transparent and represent a fair balance of the competing issues present in this case.

### Notice Relating to Potential Assumption/Assignment of Executory Contracts and Unexpired Leases

14. As part of the Sale, the Debtors seek authority to assume and assign certain executory contracts and/or unexpired leases (the "Desired 365 Contracts") to Cornerstone or

7

another successful bidder.

15. With respect to the Desired 365 Contracts, no later December 30, 2015, the Debtors will file with the Court and serve on each party to a Desired 365 Contract a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "Cure Notice"). The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to Bankruptcy Code section 365 (the "Cure Amount"), and notify each party that such party's lease or contract may be assumed and assigned to the successful bidder to be identified at the conclusion of the Auction. The Cure Notice shall not obligate Cornerstone to accept assignment of any Desired 365 Contract except as provided in the Agreement.

16. Any objection to the Cure Amount must be filed on or before January 14, 2016 (the "Cure Objection Deadline"). Any objection to the Cure Amount must state with specificity what cure the party to the Desired 365 Contract believes is required with appropriate documentation in support thereof. If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Desired 365 Contract or other document as of the date of the Cure Notice; the non-debtor party to the Desired 365 Contract shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtor party shall be forever barred, estopped and enjoined from asserting or claiming against the Debtors or Cornerstone that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Desired 365 Contract or that there is any objection or defense to the assumption and assignment of such Desired 365 Contract, including any argument that there exist conditions to assumption and assignment that must be satisfied under such Desired 365 Contract or that any required consent to assignment has not been given; and the non-debtor party to such Desired 365 Contract shall be

forever barred from objecting to the adequacy of Cornerstone's adequate assurance of future performance and that there exists any other basis on which to object to such assumption and assignment.

### Breakup Fee, Expense Reimbursement, and Minimum Overbid

17. In connection with approval of the Agreement, the Debtors seek approval of a Breakup Fee, a 1% Expense Reimbursement or 2% Expense Reimbursement (as applicable), and Minimum Overbid.  Specifically, in the event that the Debtors consummate an Alternative Transaction (as such term is defined in the Agreement), which would include a sale of the Purchased Assets to any party other than Cornerstone, or fail to conduct the Auction or the sale process for the Purchased Assets in compliance in all material respects with the Bid Procedures Order, the Debtors shall pay Cornerstone a Breakup Fee in an amount equal to 3% of the purchase price (i.e. $742,500) plus the 1% Expense Reimbursement.  In the event that Cornerstone terminates the Agreement based on a material breach of the Agreement by the Debtors, the Debtors shall be liable for and shall pay to Cornerstone the 2% Expense Reimbursement.

18. The Debtors believe that the Breakup Fee, the 1% Expense Reimbursement, the 2% Expense Reimbursement and the Minimum Overbid (collectively, the "Bid Protections") are appropriate under the circumstances as a cost of ensuring that the Debtors' bankruptcy estates maximize value for the Purchased Assets, while also providing the Debtors with the opportunity to continue their marketing efforts.  The Debtors believe that the Bid Protections are reasonable for a transaction of the type and size contemplated, and in light of the attendant risks present in this case.

19. The determination of whether a stalking horse fee/expense arrangement should be allowed is based on whether the fees and expenses are necessary to preserve the value of the

estate. *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999). Courts have evaluated such arrangements under the business judgment rule standard. *Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988); *In re Integrated Res., Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993); *see also In re Twenver, Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992). The considerations that underlie a debtor's business judgment to pay a break-up fee or expense reimbursement are relevant to the Court's determination of the request. *Id*.

20. It is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Res., Inc.*, 147 B.R. at 658. In the instant case, the proposed Bid Protections have been the product of good faith, arm's-length negotiations between the Debtors and Cornerstone. The proposed Bid Protections are within the spectrum of "break-up fees" approved by bankruptcy courts in chapter 11 cases throughout the country. *See e.g., In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y., April 8, 2004) (court approved break-up fee equal to 5% of the purchase price); *In re TransCom USA Management Co., L.P.*, Case No. 01-35158 (KKB) (Bankr. S.D. Tex., February 12, 2002) (court approved a break-up fee of more than 3.6% of the purchase price for the assets); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September 27, 2000) (court approved a break-up fee of 3.64% or $4,000,000 in connection with $110,000,000 sale).

### Request to Approve Sale Free and Clear Pursuant to 11 U.S.C. § 363(f)

21. By this Motion, the Debtors also request that the Court approve the sale of the Purchased Assets to Cornerstone or the successful bidder pursuant to Bankruptcy Code sections 105, 363 and 365. This portion of the relief is requested to be entered after the Sale Hearing,

pursuant to a form of Sale Order to be filed prior to the Sale Hearing. The Debtors submit that the sale of the Assets to Cornerstone pursuant to the Agreement, or such agreement as the Debtors may reach with the successful bidder, is in the Debtors' best interests and should be approved.

22. A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so. *See, e.g., Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063 (2d Cir. 1983); *see also In re Gulf Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009). Factors considered in approving a sale outside of plan include (i) the business justification, (ii) the amount of elapsed time since the filing date, (iii) whether the proposed bid procedures and Agreement facilitate competitive bidding, (iv) whether the assets have been aggressively marketed, (v) the likelihood that a plan will be confirmed in the near future, (vi) the effect of disposition on the future plan, and (vii) whether the assets are increasing or decreasing in value. *Id.*

23. The Debtors began a marketing process nearly 18 months ago. The Debtors, their investment bankers and professionals aggressively marketed their assets for sale before agreeing on the Agreement with Cornerstone. The disposition of the Purchased Assets will not control the terms of a future plan. The allocation of the proceeds will be determined by a plan and not by the terms of the Agreement. Further, a timely sale is important in this case in order to preserve the continuity of services to the Debtors' elderly residents.

24. The Debtors request that the Court approve the sale of the Purchased Assets free and clear of all liens, claim, and encumbrances. In evaluating such a sale, a court must balance the need for flexibility with the concern of affected creditors. *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 715 (Bankr. W.D. Tex. 1989). The Court must also determine that

creditors' lien rights are adequately protected and that the offered price is the highest price and/or best terms obtainable under the circumstances in the particular case. *Id.*; *In re Beker Indus. Corp.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y. 1986).

25. The Debtors maintain that one of the five subsections of section 363(f) will be satisfied and, therefore, the Debtors may sell the Purchased Assets free and clear of all liens, claims, and encumbrances. Specifically, the Debtors submit that any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto and/or the Debtors will obtain the consent of the party holding the lien, claim or encumbrance. Accordingly, the Debtors request that the Purchased Assets be sold to Cornerstone or the successful bidder free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the proceeds of the sale of the Purchased Assets.

### Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases

26. To enhance the value to the Debtors of the proposed sale, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Desired 365 Contracts to Cornerstone or the successful bidder. The Debtors further request that the Sale Order provide that the Desired 365 Contracts will be transferred to, and remain in full force and effect for the benefit of, Cornerstone or the successful bidder notwithstanding any provisions in the Desired 365 Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

27. Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re*

*Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

28. The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of Cornerstone or the successful bidder to perform under the Desired 365 Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of Cornerstone or the successful bidder to provide adequate assurance of future performance under the Desired 365 Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set forth above, the Debtors will give notice to all parties to the Desired 365 Contracts of their intention to assume the Desired 365 Contracts and what the Debtors believe are the Cure Amounts. Accordingly, the Court should authorize the Debtors to assume and assign the Desired 365 Contracts to Cornerstone or the successful bidder.

Accordingly, the Debtors request that the Court (i) enter the Bid Procedures Order; (ii) schedule the Sale Hearing to consider the Sale Order; and (iii) grant the Debtors other just relief.

**Dated: November 11, 2015**

                **Porter Hedges LLP**

By:    */s/* **Aaron J. Power**
        John F. Higgins
        State Bar No. 09597500
        Aaron J. Power
        State Bar. No. 24058058
        Amy L. Tellegen
        State Bar No. 24083954
        1000 Main Street, 36th Floor
        Houston, Texas 77002
        (713) 226-6000
        (713) 228-1331 (fax)

        **Counsel for Debtors and Debtors in Possession**