**ASSET PURCHASE AGREEMENT**

**by and among**

**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.,**

**THE "PURCHASERS" LISTED ON <u>ANNEX A</u> HERETO**

**and**

**THE "SELLERS" LISTED ON <u>ANNEX A</u> HERETO**

**November 10, 2015**

**EXHIBIT B**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; CONSTRUCTION .................................................................2
    Section 1.1    Definitions...........................................................................................2
    Section 1.2    Other Definitions ..............................................................................13
    Section 1.3    Construction......................................................................................14
    Section 1.4    Accounting Terms.............................................................................14

ARTICLE II PURCHASE AND SALE .............................................................................14
    Section 2.1    Purchase and Sale; Assumed Liabilities; Excluded Liabilities.......14
    Section 2.2    Further Assurances...........................................................................19

ARTICLE III PURCHASE PRICE; ADJUSTMENTS......................................................19
    Section 3.1    Purchase Price...................................................................................19
    Section 3.2    Estimated Closing Statements..........................................................20
    Section 3.3    Payment of Closing Payment ...........................................................20
    Section 3.4    Assumption of the HUD Indebtedness .............................................20
    Section 3.5    Purchase Price Adjustment. ..............................................................21
    Section 3.6    Good Faith Deposit...........................................................................22
    Section 3.7    Consents and Waivers; Further Assurances......................................23

ARTICLE IV REPRESENTATIONS AND WARRANTIES WITH RESPECT  TO THE
SELLERS.............................................................................................................................24
    Section 4.1    Organization......................................................................................24
    Section 4.2    Authorization ....................................................................................24
    Section 4.3    Absence of Restrictions and Conflicts..............................................24
    Section 4.4    Governmental Authorizations...........................................................24
    Section 4.5    Real Property. ....................................................................................25
    Section 4.6    Title to Assets; Related Matters........................................................25
    Section 4.7    Financial Statements .........................................................................26
    Section 4.8    Legal Proceedings.............................................................................26
    Section 4.9    Compliance with Law. ......................................................................26
    Section 4.10    Contracts ...........................................................................................27
    Section 4.11    Taxes and Tax Returns......................................................................28
    Section 4.12    Officers and Employees....................................................................29
    Section 4.13    Company Benefit Plans......................................................................29
    Section 4.14    Labor Relations.................................................................................30
    Section 4.15    Intellectual Property..........................................................................31
    Section 4.16    Transactions with Affiliates .............................................................31
    Section 4.17    Undisclosed Payments ......................................................................31
    Section 4.18    Supplier Relations.............................................................................31
    Section 4.19    Accounts Receivable.........................................................................32
    Section 4.20    Licenses............................................................................................32
    Section 4.21    Brokers and Finders .........................................................................32

Section 4.22    Seller Guarantees ...................................................................................32

ARTICLE V [RESERVED] ...................................................................................................33

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS............33
Section 6.1    Organization..........................................................................................33
Section 6.2    Authorization .........................................................................................33
Section 6.3    Absence of Restrictions and Conflicts...................................................33
Section 6.4    Financing................................................................................................33
Section 6.5    Legal Proceedings..................................................................................34
Section 6.6    Brokers and Finders ..............................................................................34

ARTICLE VII CERTAIN COVENANTS AND AGREEMENTS .............................................34
Section 7.1    Conduct of the Business.........................................................................34
Section 7.2    Inspection and Access to Information....................................................36
Section 7.3    Notices of Certain Events ......................................................................36
Section 7.4    Reasonable Efforts; Further Assurances ...............................................37
Section 7.5    Public Announcements; Acknowledgment of Bankruptcy Court
               Proceedings...........................................................................................38
Section 7.6    Reserved.................................................................................................39
Section 7.7    Tax Matters. ...........................................................................................39
Section 7.8    Accounts.................................................................................................40
Section 7.9    Taxes Resulting From Sales of Purchased Assets by each Applicable
               Seller .....................................................................................................40

ARTICLE VIII BANKRUPTCY COURT MATTERS ............................................................41
Section 8.1    Bankruptcy Filing; Sale Motion.............................................................41
Section 8.2    Entry of Orders ......................................................................................41
Section 8.3    Sale Order ..............................................................................................41
Section 8.4    Notice.....................................................................................................42
Section 8.5    Review of Pleadings ..............................................................................42
Section 8.6    Alternative Transaction..........................................................................42
Section 8.7    Cure Costs ..............................................................................................42

ARTICLE IX CONDITIONS TO CLOSING ........................................................................43
Section 9.1    Conditions to Obligations of the Purchasers.........................................43
Section 9.2    Conditions to Obligations of the Sellers ...............................................44

ARTICLE X CLOSING .......................................................................................................45
Section 10.1    Closing ..................................................................................................45
Section 10.2    Seller Closing Deliveries ......................................................................45
Section 10.3    Purchaser Closing Deliveries ................................................................46

ARTICLE XI TERMINATION.............................................................................................47
Section 11.1    Termination............................................................................................47
Section 11.2    Effects of Termination. .........................................................................48

ARTICLE XII MISCELLANEOUS PROVISIONS ......................................................................50
    Section 12.1    Notices ..........................................................................................50
    Section 12.2    Schedules and Exhibits .................................................................51
    Section 12.3    Binding Effect; Assignment...........................................................51
    Section 12.4    Amendment; Modification..............................................................52
    Section 12.5    Governing Law ..............................................................................52
    Section 12.6    Captions ........................................................................................52
    Section 12.7    Consent to Jurisdiction, etc...........................................................52
    Section 12.8    Severability ...................................................................................52
    Section 12.9    Counterparts..................................................................................53
    Section 12.10  Third-Party Beneficiary ................................................................53
    Section 12.11  Waiver...........................................................................................53
    Section 12.12  Integration; Release ......................................................................53
    Section 12.13  Cooperation Following the Closing ...............................................54
    Section 12.14  Survival of Representations, Warranties and Covenants................54
    Section 12.15  Waiver of Jury Trial......................................................................54
    Section 12.16  Certain Acknowledgments and Limitations....................................54

## LIST OF ANNEXES

Annex A                 Purchasers and Sellers; Purchased Assets; Assumed Liabilities
Annex B                 Desired 365 Contracts

## LIST OF EXHIBITS

Exhibit A               [Reserved]
Exhibit B               Form of Bidding Procedures Order
Exhibit C               Example Calculation of Net Working Capital
Exhibit D               Form of Sale Order
Exhibit E               Persons with Knowledge
Exhibit F               Form of Estoppel and Consent Certificate
Exhibit G               Form of Bill of Sale
Exhibit H               Form of Assumption Agreement
Exhibit I               Form of Special Warranty Deed
Exhibit J               Form of Assignment

## LIST OF SCHEDULES

Schedule 2.1(b)         Other Retained Assets
Schedule 4.1(a)         Organization
Schedule 4.1(b)         Foreign Qualifications
Schedule 4.3(a)         Required Third Party Consents
Schedule 4.3(b)         Required Governmental Consents
Schedule 4.5(a)         Real Property (Legal Description – Owned Real Property)
Schedule 4.5(b)         Real Property (Owner – Owned Real Property)
Schedule 4.5(c)         Real Property (Legal Description – Leased Real Property)
Schedule 4.5(d)         Real Property (Lessee – Leased Real Property)
Schedule 4.6(a)         Title to Assets; Related Matters
Schedule 4.6(b)(1)      Title to Assets; Related Matters (Asset Sales)
Schedule 4.6(b)(2)      Title to Assets; Related Matters (Tangible Personal Property)
Schedule 4.7(a)         Financial Statements
Schedule 4.7(b)         Financial Statements (Certain Exceptions)
Schedule 4.7(c)         Financial Statements (Certain Exceptions)
Schedule 4.8            Legal Proceedings
Schedule 4.9(a)(1)      Compliance with Law
Schedule 4.9(a)(2)      Compliance with Law – Notices
Schedule 4.9(b)         Compliance with Law (HUD Financing)
Schedule 4.10           Company Contracts
Schedule 4.11(a)        Tax Returns; Taxes
Schedule 4.12(a)        Officers and Employees
Schedule 4.12(b)        Officers and Employees (Employment Agreements)
Schedule 4.12(c)        Officers and Employees (Inactive Personnel)
Schedule 4.13(a)        Company Benefit Plans
Schedule 4.13(b)        Company Benefit Plans (280G)
Schedule 4.13(c)        Company Benefit Plans (Contractual Obligations)
Schedule 4.14           Labor Relations

Schedule 4.15(a)      Company Intellectual Property (Owned)
Schedule 4.15(b)      Company Intellectual Property (Licensed)
Schedule 4.16        Transactions with Affiliates
Schedule 4.18(a)      Supplier Relations
Schedule 4.18(b)      Supplier Relations (Exceptions)
Schedule 4.19        Accounts Receivable
Schedule 4.20(a)      Licenses
Schedule 4.20(b)      Health Care Permits
Schedule 4.21        Brokers and Finders
Schedule 4.22        Seller Guarantees
Schedule 10.2(j)      Closing Deliveries

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 10, 2015, is made and entered into by and among Cornerstone Healthcare Group Holding, Inc., a Delaware corporation (the "Purchaser Parent"), the Persons listed on Annex A hereto under the heading labeled "Purchasers" (each, a "Purchaser" and, collectively, the "Purchasers"), the Persons listed on Annex A hereto under the heading labeled "Sellers" (each, a "Seller" and, collectively, the "Sellers"), and, solely for purposes of Section 12.12, University General Health System, Inc., a Nevada corporation ("Seller Parent").  The Purchaser Parent, the Purchasers and the Sellers are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

## W I T N E S S E T H:

WHEREAS, the Sellers are collectively engaged in the business of owning and operating senior care living facilities and related business activities (the "Business");

WHEREAS, each Seller owns all right, title and interest in and to all of the Purchased Assets used or held for use by such Seller in connection with the Business;

WHEREAS, the Purchased Assets constitute all of the assets used or held for use by the Sellers or any of their respective Affiliates in the conduct of the Business as conducted as of the date hereof;

WHEREAS, the Parties, together with Seller Parent, previously entered into that certain Purchase Agreement, dated December 12, 2014, pursuant to which Sellers agreed to sell, and Purchasers agreed to purchase and acquire, the Purchased Assets (the "Prior Agreement"), which is hereby terminated on and subject to the terms and conditions set forth herein and which shall be replaced and superseded by this Agreement;

WHEREAS, the conditions precedent to closing the transactions contemplated by the Prior Agreement have not been satisfied, and the Purchaser Parent and the Purchasers assert that the Seller Parent and the Sellers have committed material breaches of the representations, warranties, covenants and agreements contained in the Prior Agreement and that such breaches have resulted in the Purchaser Parent and the Purchasers incurring substantial damages (the "Existing Damage Claims");

WHEREAS, on or about February 27, 2015, Seller Parent commenced a Chapter 11 bankruptcy case (case no. 15-31086) (the "Parent Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Texas (Houston division) (the "Bankruptcy Court");

WHEREAS, as contemplated by Section 8.1 of this Agreement, promptly following the execution of this Agreement by the Parties, each Seller shall file and commence a Chapter 11 bankruptcy case (each, a "Seller Bankruptcy Case" and, together with the Parent Bankruptcy Case, collectively, the "Bankruptcy Cases") in the Bankruptcy Court;

WHEREAS, Sellers may enter into a debtor-in-possession loan agreement (the "DIP Loan") pursuant to which Sellers will borrow funds for use in the operation of the Business pending the consummation of the transactions contemplated by this Agreement;

WHEREAS, on the terms and subject to the conditions set forth herein, the Parties desire to enter into this Agreement, pursuant to which, among other things, each Seller shall sell to the applicable Purchaser, and each such Purchaser shall purchase from each such Seller, the respective Purchased Assets listed opposite the applicable Purchaser's name on Annex A (such transaction, the "Acquisition");

WHEREAS, this Agreement, the Acquisition and the other transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of Title 11 of the United States Code (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code");

WHEREAS, concurrently with  the execution of this Agreement, the Purchasers have deposited with the Escrow Agent the Good Faith Deposit pursuant to the terms and conditions of this Agreement and the Escrow Agreement; and

WHEREAS, the Parties desire to make certain representations, warranties and agreements in connection with the Acquisition.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby subject only to the required approvals of the Bankruptcy Court, each Party hereby agrees:

## ARTICLE I
## DEFINITIONS; CONSTRUCTION

Section 1.1     Definitions.   The following terms, as used herein, have the following meanings:

"1% Expense Reimbursement"  means cash or other immediately available funds in an amount equal to the aggregate reasonable and actual out-of-pocket costs and expenses incurred by Purchasers and/or Purchaser Parent in connection with or relating to:  (a) the negotiation and drafting of the Prior Agreement and this Agreement, (b) Purchasers' and/or Purchaser Parent's due diligence investigation regarding the Purchased Assets and the Business, (c) the Bankruptcy Cases, and/or (d) the proposed acquisition by the Purchasers of the Purchased Assets (whether pursuant to the Prior Agreement or this Agreement), including all fees and expenses of counsel, accountants, consultants and other advisers and professionals; provided, however, the amount of the 1% Expense Reimbursement shall not exceed $247,500.00.

"2% Expense Reimbursement"  means cash or other immediately available funds in an amount equal to the aggregate reasonable and actual out-of-pocket costs and expenses incurred by Purchasers and/or Purchaser Parent in connection with or relating to:  (a) the negotiation and drafting of the Prior Agreement and this Agreement, (b) Purchasers' and/or Purchaser Parent's due diligence investigation regarding the Purchased Assets and the Business, (c) the Bankruptcy Cases, and/or (d) the proposed acquisition by the Purchasers of the Purchased Assets (whether

pursuant to the Prior Agreement or this Agreement), including all fees and expenses of counsel, accountants, consultants and other advisers and professionals; provided, however, the amount of the 2% Expense Reimbursement shall not exceed $495,000.00.

"365 Contracts" means all Contracts that may be assumed by the Sellers pursuant to Section 365 of the Bankruptcy Code.

"Action" means any claim, action, suit, inquiry, proceeding, audit or investigation by or before any Governmental Entity, or any other arbitration, mediation or similar proceeding.

"Affiliate" of any specified Person means any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such specified Person.

"Alternative Transaction" means (a) a sale or sales (or other direct or indirect transfer) of all or a material portion of the Purchased Assets to a third party other than the Purchasers or any of their Affiliates, (b) the sale, transfer or issuance of equity securities representing, individually or in the aggregate, a majority of the voting power of any of the Sellers that, individually or in the aggregate, own a material portion of the Purchased Assets, or (c) any merger, consolidation or other change of control transaction involving any one or more of the Sellers that, individually or in the aggregate, own a material portion of the Purchased Assets.  An Alternative Transaction shall include any such transaction occurring pursuant to a plan of reorganization or liquidation that does not contemplate the sale of the Purchased Assets to the Purchasers substantially in accordance with the terms of this Agreement.  The Parties acknowledge and agree that, notwithstanding anything in the previous sentence, none of the transactions or actions relating solely to the Retained Assets or a transaction consummated by a Chapter 7 trustee if the Bankruptcy Court has converted the Bankruptcy Cases to Chapter 7 shall be deemed to be an Alternative Transaction.

"Annex" means any annex attached to this Agreement.

"Approval Hearing" has the meaning set forth in the Bidding Procedures Order.

"Auction" has the meaning set forth in Bidding Procedures Order.

"Avoidance Actions" means, collectively, all avoidance claims and causes of action under the Bankruptcy Code or applicable state or federal Law, including all rights and avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code, as well as all rights, claims, causes of action and recoveries of Sellers under  Sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 or 724 of the Bankruptcy Code.

"Balance Sheet" means the unaudited consolidated balance sheet of the Sellers as of the Balance Sheet Date included in the Financial Statements.

"Balance Sheet Date" means July 31, 2015.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Texas and the Local Rules of the United States

Bankruptcy Court for the Southern District of Texas, each as now in effect or as hereafter amended, to the extent applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"Bidding Procedures" has the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit B, with such changes thereto that (a) (i) do not conflict with the provisions of this Agreement, and (ii) do not and will not have an adverse effect upon Purchasers or their rights under the Agreement, or (b) are acceptable to Purchasers in their sole discretion.

"Break-Up Fee" means cash or other immediately available funds in an amount equal to $742,500.00.

"Business Day" means any day except Saturday, Sunday or any day on which banks are generally not open for business in the State of Texas.

"Business Records" means all books, records, ledgers and files or other similar information of the applicable Seller (in any form or medium) related to, used or held for use in connection with the Business, including all client lists, vendor lists, correspondence, mailing lists, revenue records, invoices, advertising materials, brochures, records of operation, standard forms of documents, manuals of operations or business procedures, photographs, blueprints, research files and materials, data books, Company Intellectual Property disclosures and information, media materials and plates, accounting records, litigation files and Tax Returns with respect to the Purchased Assets (but excluding the organization documents, minute, stock record books, corporate seal and other documents and records relating to the organization, maintenance, existence and federal income taxation of any Seller or its shareholders, members or other equity owners).

"Closing" means the consummation of the transactions contemplated by this Agreement as set forth in Section 10.1 of this Agreement.

"Closing Date" means the date on which the Closing occurs.

"Closing Net Working Capital Deficit" means an amount equal to the difference between the Estimated Net Working Capital Balance minus the Closing Net Working Capital Balance; provided, however, that if such amount is a negative number, the Closing Net Working Capital Deficit shall be deemed to be zero.

"Closing Net Working Capital Surplus" means an amount equal to the difference between the Closing Net Working Capital Balance minus the Estimated Net Working Capital Balance; provided, however, that if such amount is a negative number, the Closing Net Working Capital Surplus shall be deemed to be zero.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company Benefit Plan" means each Employee Benefit Plan currently sponsored or maintained or required to be sponsored or maintained by the Seller Parent or any Seller or to which

the Seller Parent or any Seller makes, or has any obligation to make, directly or indirectly, any contributions for the benefit of current or former Seller Employees or with respect to which the Seller or any Seller Parent has, or might have, any other liabilities.

"Company Intellectual Property" means any Intellectual Property that is owned by or licensed to any Seller, including the Company Registered Intellectual Property.

"Company Real Property" means, collectively, the Leased Real Property and the Owned Real Property.

"Company Registered Intellectual Property" means all of the Registered Intellectual Property owned by, filed in the name of, or licensed to any Seller.

"Contract" means any contract, agreement, lease, license, indenture, note, bond, sale and purchase order, instrument or other commitment, whether oral or written (including any amendments or modifications thereto).

"Control" means, when used with respect to any specified Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Desired 365 Contracts, in each case as of the Closing Date and to the extent required by Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court.

"Desired 365 Contracts" means the Contracts listed on Annex B, as modified pursuant to Section 2.1(e); provided, however, that notwithstanding anything herein to the contrary, the term Desired 365 Contracts shall include the rights of all Sellers under the Management Agreement (i.e., both counterparties) and all confidentiality agreements entered into with potential purchasers of the Sellers or their assets.

"DIP Loan" has the meaning set forth in the recitals.

"Employee Benefit Plan" means, with respect to any Person, (a) each plan, fund, program, agreement, arrangement or scheme, including each plan, fund, program, agreement, arrangement or scheme maintained or required to be maintained under the Laws of a jurisdiction outside the United States of America, in each case, that is at any time sponsored or maintained or required to be sponsored or maintained by such Person or to which such Person makes or has made, or has or has had an obligation to make, contributions providing for employee benefits or for the remuneration, direct or indirect, of the employees, former employees, directors, managers, officers, consultants, independent contractors, contingent workers or leased employees of such Person or the dependents of any of them (whether written or oral), including each deferred compensation, bonus, incentive compensation, pension, retirement, stock purchase, stock option and other equity compensation plan, or "welfare" plan (within the meaning of Section 3(1) of ERISA, determined without regard to whether such plan is subject to ERISA), (b) each "pension" plan (within the meaning of Section 3(2) of ERISA, determined without regard to whether such plan is subject to ERISA), (c) each severance, retention or change in control plan or agreement,

each plan or agreement providing health, vacation, summer hours, supplemental unemployment benefit, hospitalization insurance, medical, dental or legal benefit and (d) each other employee benefit plan, fund, program, agreement, arrangement or scheme.

"Employment Agreement" means any employment contract, consulting agreement, termination or severance agreement, salary continuation agreement, change of control agreement, non-compete agreement or any other agreement respecting the terms and conditions of employment or payment of compensation, or of a consulting or independent contractor relationship in respect to any current or former officer, employee, consultant or independent contractor.

"Environment" means any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

"Environmental Laws" means all federal, state, local or foreign Laws relating to protection of the Environment and health and safety, including pollution control, product registration and Hazardous Materials.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any Person (whether incorporated or unincorporated) that, together with the Seller Parent and/or any Seller, would be deemed a "single employer" within the meaning of Section 414 of the Code.

"Escrow Agent" means Wells Fargo Bank, National Association.

"Escrow Agreement" means the Escrow Agreement, dated as of the date hereof, by and among UGHS Senior Living of Pearland, LLC, on behalf of Sellers, Purchaser Parent, on behalf of Purchasers, and the Escrow Agent.

"Excluded Company Contracts" means all contracts, leases and agreements (a) to which any Seller is a party, (b) by which any Seller or its property is subject, or (c) by which any Seller is otherwise bound, whether oral or written, other than the Desired 365 Contracts.

"Exhibit" means any exhibit attached to this Agreement.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, vacated, annulled or suspended, (ii) with respect to which no request for a stay, motion or application for reconsideration or rehearing, notice of appeal or petition for certiorari is filed within the deadline provided by applicable statute or regulation or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, and (iii) as to which the deadlines for filing such request, motion, petition, application, appeal or notice referred to in clause (ii) above have expired.

"Financial Statements" means (a) the unaudited consolidated balance sheets of the Sellers as of December 31, 2014, and the unaudited consolidated statements of income, shareholders' equity and cash flows of the Sellers for the twelve (12)-month period then ended and (b) the unaudited consolidated balance sheet of the Sellers as of the Balance Sheet Date and the unaudited consolidated statements of income, shareholders' equity and cash flows of the Sellers for the seven (7)-month period then ended.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Good Faith Deposit" has the meaning set forth in Section 3.6(a).

"Governmental Entity" means any federal, state, local or foreign government, any political subdivision thereof, or any court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency. Governmental Entity includes the Internal Revenue Service, the Department of Health and Human Services and its Centers for Medicare and Medicaid Services (formerly known as the Health Care Financing Administration) and the TDADS.

"Hazardous Materials" means any waste, pollutant, contaminant, hazardous substance, toxic, ignitable, reactive or corrosive substance, hazardous waste, special waste, industrial substance, by-product, process-intermediate product or waste, asbestos or asbestos-containing materials, lead-based paint, petroleum or petroleum-derived substance or waste, polychlorinated biphenyls, chemical liquids or solids, liquid or gaseous products, or any constituent of any such substance or waste, whether liquid, solid, semi-solid, sludge or gaseous, the management, use, handling or disposal of which is in any way governed by or subject to any applicable Law.

"Healthcare Information Law" means: (a) the Health Insurance Portability and Accountability Act of 1996; (b) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (c) any state and local Laws regulating the privacy and/or security of individually identifiable information, including state Laws providing for notification of breach of privacy or security of individually identifiable information, in each case with respect to the Laws described in clauses (a), (b) and (c) of this definition, as the same may be amended, modified or supplemented from time to time, any successor statutes thereto, any and all rules or regulations promulgated from time to time thereunder.

"Health Care Permit" means, with respect to any Person, any permit, approval, consent, authorization, license, provisional license, registration, accreditation, certificate, certification, certificate of need, qualification, operating authority, concession, grant, franchise, variance or permission from, and any other contractual obligations with, any Governmental Entity, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"HUD Indebtedness" means all indebtedness for borrowed money arising under (a) that certain loan to UGHS Senior Living Real Estate of Pearland, LLC, in the principal amount outstanding of $6,156,910.78 as of July 31, 2015; (b) that certain loan to UGHS Senior Living

Real Estate of Knoxville, LLC, in the principal amount outstanding of $6,067,162.86 as of July 31, 2015; and (c) that certain loan to UGHS Senior Living Real Estate of Port Lavaca, LLC, in the principal amount outstanding of $3,781,924.55 as of July 31, 2015.

"Indebtedness" means, with respect to the Sellers, all indebtedness, other than the HUD Indebtedness, with respect to borrowed money, including loans, deferred consideration, debts, any liabilities under acceptances, monies due under financial leases (including capitalized leases, but excluding operating leases), or for the deferred purchase price of property or services for which any Seller is liable, contingently or otherwise as obligor, guarantor, or otherwise, or in respect of which any Seller otherwise assures against loss, including bank debt, bank fees, shareholder debt and vendor debt, including, in each case above, any interest accrued thereon and prepayment or similar penalties and expenses which would be payable if such liability were paid in full as of the Closing Date.

"Intellectual Property" means any or all of the following and all rights arising out of or associated therewith: (a) all United States of America and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (b) all inventions (whether patentable or not), invention disclosures, improvements, mask works, trade secrets, proprietary information, know-how, Software, technology, technical data and customer lists, and all documentation relating to any of the foregoing anywhere in the world; (c) all works of authorship (whether copyrightable or not), all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto anywhere in the world; (d) all industrial designs and any registrations and applications therefor anywhere in the world; (e) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, trade dress, common law trademarks and service marks, trademark and service mark and trade dress registrations and applications therefor anywhere in the world; (f) all databases and data collections and all rights therein anywhere in the world; (g) all moral and economic rights of authors and inventors, however denominated, anywhere in the world; and (h) any similar or equivalent rights to any of the foregoing anywhere in the world.

"Intercompany Indebtedness" means all Indebtedness owed by any Seller to any other Seller or any Affiliate of any Seller (including the Seller Parent).

"Inventory" means all inventory, including raw and packing materials, work-in-progress, finished goods, supplies, parts and similar items used or held for use in connection with the Business.

"Laws" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, injunctions, writs, awards and decrees of, or issued by, any Governmental Entity.

"Leased Real Property" means the parcels of real property of which any Seller is the lessee (together with all fixtures and improvements thereon).

"Legal Dispute" means any action, suit, arbitration or proceeding between or among the Parties and their respective Affiliates arising in connection with any disagreement, dispute, controversy or claim arising out of or relating to this Agreement or any related document.

"Licenses" means all notifications, licenses, permits (including environmental, construction and operation permits), qualifications, franchises, certificates, approvals, exemptions, classifications, registrations and other similar documents and authorizations issued by any Governmental Entity, and applications therefor.

"Lien" means any lien (statutory or otherwise), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), Indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, pledge, security interest, preference, option, lease, license, Tax, right of first refusal or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, judgments, conditional sales or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, or any other interest (as used in any applicable section of the Bankruptcy Code, including Section 363(f)) (including (a) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (b) any assignment or deposit arrangement in the nature of a security devise, and (c) any claim based on any theory that any one or more of the Purchasers is a successor, successor in interest, continuation or substantial continuation of the Sellers or the Business), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or liquidated, material or non-material, known or unknown.

"Management Agreement" means, collectively, (i) the Management Services Agreement, dated June 13, 2005, by and between TrinityCare Senior Living, LLC and UGHS Senior Living of Knoxville, LLC, (ii) the Management Services Agreement, dated July 1, 2011, by and between TrinityCare Senior Living, LLC and UGHS Senior Living of Pearland, LLC, and (iii) the Management Services Agreement, dated January 1, 2007, by and between TrinityCare Senior Living, LLC and UGHS Senior Living of Port Lavaca, LLC, in each case, as may be amended, modified or restated from time to time.

"Material Adverse Effect" means any state of facts, change, event, effect or occurrence (when taken together with all other states of fact, changes, events, effects or occurrences) that is or are reasonably likely to be materially adverse to the financial condition, results of operations, properties, assets or liabilities (including contingent liabilities) of Sellers, taken as a whole. A Material Adverse Effect shall also include any state of facts, change, event, effect or occurrence that shall have occurred that (when taken together with all other states of facts, changes, events, effects or occurrences that have occurred) is reasonably likely to prevent the performance by any Seller of such Party's obligations hereunder or prevent or delay beyond the Termination Date the consummation of the Acquisition or the other transactions contemplated hereby. Notwithstanding anything in this definition to the contrary, to the extent that any such material adverse effect results from any of the following matters, such material adverse effect shall not be taken into account in determining whether a material adverse effect has occurred under this definition: (A) changes in financial or securities markets generally, (B) changes in general economic conditions in the United States, (C) changes in the senior care living facility industry in general, (D) actions taken or omissions made by any Seller after the date of this Agreement with the express written consent of Purchaser Parent, (E) the commencement or pendency of the Seller Bankruptcy Cases, (F) the announcement, pendency or consummation of the sale of the Purchased Assets, (G) changes in applicable Law or accounting rules that first take effect after the date hereof.

-9-

"Net Working Capital" means (a) the current assets of the Sellers that constitute Purchased Assets, including Prepaid Items but excluding cash and cash equivalents (other than reserves for the HUD Indebtedness), on a consolidated basis, less (b) the current liabilities of the Sellers that constitute Assumed Liabilities, excluding the current portion of the HUD Indebtedness, on a consolidated basis, in each case as of the close of business on the Closing Date and determined in accordance with GAAP and the guidelines set forth on Exhibit C.

"Ordinary Course" means the ordinary course of business of the Sellers, consistent with past practice; provided, however, that compliance with the Bankruptcy Code and the Bankruptcy Rules or orders of the Bankruptcy Court by Seller Parent after commencement of the Parent Bankruptcy Case or by any Seller after commencement of its Seller Bankruptcy Case shall not, in and of itself, constitute a departure from the Ordinary Course.

"Owned Real Property" means the parcels of real property of which any Seller is fee title owner (together with all fixtures and improvements thereon).

"Permitted Liens" means (a) non-monetary Liens that do not detract from the value of any underlying Purchased Asset or interfere in any material respect with the ability of Purchasers to own and operate any underlying Purchased Asset in substantially the manner as owned and operated by the Sellers immediately prior to the date of this Agreement, (b) in the case of Company Real Property, zoning, building or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, none of which, individually or in the aggregate, interfere in any material respect with the present use of or occupancy of the affected parcel by any Seller or any other Person, (c) Liens imposed by Healthcare Information Law, if any, and (d) Liens securing the HUD Indebtedness.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, trust, unincorporated organization or Governmental Entity.

"Personal Property" means all machinery, equipment, furniture, furnishings, rolling stock, tools, office supplies, vehicles, computer hardware and other tangible personal property owned or leased by the Sellers and related to, used or held for use in connection with the Business.

"Petition Date" means the date on which the Sellers commence the Seller Bankruptcy Cases.

"Prepaid Items" means all credits, cash reserves (including all reserves for the HUD Indebtedness), prepaid expenses, advance payments, security deposits, escrows and other prepaid items of the applicable Seller arising from or related to the Business; provided, however, Prepaid Items shall not include retainers or deposits incurred in connection with the Seller Bankruptcy Cases.

"Purchaser Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by the Purchaser Parent, any Purchaser or any of their respective Affiliates in connection with the transactions contemplated hereby.

"Receivables" means all receivables (including accounts receivable, loans receivable and advances) arising from or related to the Business or owed to any Seller, any other rights of any Sellers to payment from third parties, and the full benefit of all security for such receivables or rights to payment, including all receivables and rights to payment arising in respect of: (a) all assets recorded or reflected on the Balance Sheet (including assets such as Desired 365 Contracts to which no value was attributed); (b) all assets acquired by the applicable Seller since the Balance Sheet Date which, had they been held by the Seller on such date, would have been recorded or reflected on the Balance Sheet (including assets such as Desired 365 Contracts to which no value would have been attributed); and (c) all assets that would be recorded or reflected on a balance sheet of the Business as of the Closing Date prepared in accordance with GAAP, together with any unpaid financing charges accrued on any of the foregoing.

"Reference Working Capital Balance" means $1,000,000.

"Registered Intellectual Property" means all United States of America and foreign: (a) patents and patent applications (including provisional applications); (b) registered trademarks and service marks, applications to register trademarks and service marks, and trade dress, intent-to-use applications, or other registrations or applications related to trademarks and service marks and trade dress; (c) registered copyrights and applications for copyright registration; (d) domain name registrations; (e) registered mask works and applications for mask work registration; and (f) any other Intellectual Property that is the subject of an application, certificate, filing, registration or other document issued, filed with, or recorded with any federal, state, local or foreign Governmental Entity.

"Retained Assets" has the meaning set forth in Section 2.1(b).

"Rights" means all claims, causes of action, rights of recovery and rights of set-off against any Person arising from or related to the Business, the Purchased Assets or the Assumed Liabilities, including: (a) all rights under any Desired 365 Contract, including all rights to receive payment for products sold and services rendered thereunder, to receive goods and services thereunder, to assert claims and to take other rightful actions in respect of breaches, defaults and other violations thereof; (b) all rights under or in respect of any Company Intellectual Property, including all rights to sue and recover damages for past, present and future infringement, dilution, misappropriation, violation, unlawful imitation or breach thereof, and all rights of priority and protection of interests therein under the laws of any jurisdiction; and (c) all rights under all guarantees, warranties and indemnities arising from or related to the Business, the Purchased Assets or the Assumed Liabilities.

"Sale Order" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit D, with such changes thereto that (a) (i) do not conflict with the provisions of this Agreement, and (ii) do not and will not have an adverse effect upon Purchasers, their rights under the Agreement, the Purchased Assets, or the operation of the Business by Purchasers from and after the Closing, or (b) are acceptable to Purchasers in their sole discretion.

"Schedule" means any schedule attached to this Agreement.

"Seller Ancillary Documents" means any certificate, agreement, document or other instrument, other than this Agreement, to be executed and delivered by any Seller or any of their respective Affiliates in connection with the transactions contemplated hereby.

"Sellers' Knowledge" means (a) all facts known by any individual listed on Exhibit E on the date hereof after reasonable inquiry with such individual's direct reports with responsibility for the matter in question and (b) all facts that any such individual reasonably should have known on the date hereof with respect to the matters at hand if such individual had made reasonable inquiry with such individual's direct reports with responsibility for the matters in question.

"Software" means all computer software programs, together with any error corrections, updates, modifications or enhancements thereto, in both machine-readable form and human-readable form, including all comments and any procedural code.

"Supplier" means any supplier that the Sellers (or any Seller) have paid in the aggregate more than $50,000 during the twelve (12)-month period ended on July 31, 2015.

"Tax Asset" means any net operating loss, net capital loss, investment tax credit, foreign tax credit, charitable deduction or any other credit or tax attribute that could be carried forward or back to reduce Taxes (including without limitation deductions and credits related to alternative minimum Taxes).

"Tax Return" means any report, return, declaration or other information required to be supplied to a Governmental Entity in connection with Taxes, including estimated returns, amended returns, information statements and reports of every kind with respect to Taxes.

"Taxes" means all taxes, assessments, charges, duties, fees, levies and other charges from any Governmental Entity (including interest, penalties or additions associated therewith), including income, franchise, capital stock, real property, personal property, tangible, withholding, employment, payroll, social security, social contribution, unemployment compensation, unclaimed property escheat, disability, transfer, sales, bulk sales use, excise, license, occupation, registration, stamp, premium, environmental, customs duties, alternative or add-on minimum, estimated, gross receipts, value-added and all other taxes of any kind for which any Seller may have any liability imposed by any Governmental Entity, whether disputed or not, and any charges, interest or penalties imposed by any Governmental Entity.

"Termination Date" means the date prior to the Closing when this Agreement is terminated in accordance with Article XI of this Agreement.

"TDADS" means the Texas Department of Aging and Disability Services.

"TDH" means the Tennessee Department of Health.

"Transaction Documents" means this Agreement, the Sale Order, the Bidding Procedure Order, the Purchaser Ancillary Documents, the Seller Ancillary Documents and any other agreement between or among Purchaser Parent or Purchasers, on the one hand, and Sellers, on the other, as of or after the date hereof and at or prior to Closing in connection with the transactions contemplated hereby.

"Transfer of Physical Assets" means a Transfer of Physical Assets, or "TPA," as described in the HUD Handbook on Healthcare Mortgage Insurance Program Section 232 of the National Housing Act, issued May 22, 2014, as may be updated or revised by the U.S. Department of Housing and Urban Development from time to time, and any applicable Law related thereto.

"Transfer of Physical Assets Expenses" means the legal, accounting, financial advisory and other third party advisory or consulting fees and expenses incurred by any Party and its Affiliates in connection with obtaining approval pursuant to the Transfer of Physical Assets process, including all fees, early termination fees, fines, penalties, costs, expenses and liabilities related to the Transfer of Physical Assets, as well as any fees payable to Lancaster Pollard & Co., LLC and HUD for the Transfer of Physical Assets and any related attorneys' fees.

"Treasury Regulations" means the Income Tax Regulations, promulgated under the Code.

"WARN" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder and any similar state Law.

"Withholding Tax" means all applicable federal, state or local income Taxes and applicable employment (social security, unemployment insurance and Medicare) and other withholding obligations, in each case withheld from employees of the Sellers prior to Closing.

Section 1.2     Other Definitions.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Acquisition | Recitals |
| Adjusted Purchase Price | Section 7.7(c) |
| Agreement | Preamble |
| Assumed Liabilities | Section 2.1(a) |
| Bankruptcy Cases | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Closing Payment | Section 3.1(b) |
| Company Contracts | Section 4.10 |
| Estimated Closing Date Financial Statement | Section 3.2(a) |
| Estimated Working Capital Amount | Section 3.2(a) |
| Estimated Working Capital Deficit | Section 3.2(c) |
| Estimated Working Capital Surplus | Section 3.2(c) |
| Excluded Liabilities | Section 2.1(d) |
| Expiration Date | Section 11.1(d) |
| Existing Damage Claims | Recitals |
| Final Closing Date Financial Statement | Section 3.5(a) |
| Good Faith Deposit Escrow Account | Section 3.6(a) |
| Legal Proceeding | Section 4.8 |
| Parent Bankruptcy Case | Recitals |
| Parties | Preamble |

Party ...........................................................................................................Preamble
Prior Agreement ........................................................................................Recitals
Purchase Price ..........................................................................................Section 3.1(a)
Purchased Assets.......................................................................................Section 2.1(a)
Purchaser Parent.......................................................................................Preamble
Purchasers ................................................................................................Preamble
Sale Motion ..............................................................................................Section 8.1
Seller Bankruptcy Case ...........................................................................Recitals
Seller Employees .....................................................................................Section 4.12
Seller Parent ............................................................................................Preamble
Sellers.......................................................................................................Preamble

Section 1.3    Construction.   Unless the context of this Agreement clearly requires otherwise, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to any gender include the other genders, (c) the words "include," "includes" and "including" do not limit the preceding terms or words, (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (e) the terms "day" and "days" mean and refer to calendar day(s) unless Business Days are specified, (f) the terms "year" and "years" mean and refer to calendar year(s) and (g) all references in this Agreement to "dollars" or "$" shall mean United States Dollars.  Unless otherwise set forth herein, references in this Agreement to (i) any document, instrument or agreement (including this Agreement) (A) includes and incorporates all exhibits, schedules and other attachments thereto, (B) includes all documents, instruments or agreements issued or executed in replacement thereof and (C) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified or supplemented from time to time in accordance with its terms and in effect at any given time, and (ii) a particular Law means such Law as amended, modified, supplemented or succeeded, from time to time and in effect at any given time.  All Article, Section, Exhibit and Schedule references herein are to Articles, Sections, Exhibits and Schedules, as applicable, of this Agreement, unless otherwise specified.  This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if all Parties had prepared it.

Section 1.4    Accounting Terms.   All accounting terms not specifically defined herein shall be construed in accordance with GAAP, unless otherwise indicated.

**ARTICLE II**
**PURCHASE AND SALE**

Section 2.1    Purchase and Sale; Assumed Liabilities; Excluded Liabilities.

(a)    Purchase and Sale.  Subject to the terms and conditions of this Agreement, at the Closing, each Seller shall sell, transfer and deliver to the applicable Purchaser set forth on Annex A, and each such Purchaser shall purchase and acquire from each such Seller, all of such Seller's right, title and interest in, to and under the assets, properties and rights of every nature, kind and description, whether tangible or intangible, real, personal or mixed, accrued or contingent, wherever located and whether now existing or hereafter acquired, related to, used or held for use by such Seller in connection with the Business, as the same shall exist on the Closing

Date, whether or not carried or reflected on or specifically referred to in such Seller's books or financial statements or in the Schedules save and except for the Retained Assets (collectively, the "Purchased Assets"), in each case free and clear of any and all Liens (other than Permitted Liens and Assumed Liabilities), including all of such Seller's right, title and interest in, to and under the following:

            (i)      all assets recorded or reflected on the Balance Sheet (including assets such as Desired 365 Contracts to which no value was attributed);

            (ii)      all assets acquired by such Seller since the Balance Sheet Date which, had they been held by such Seller on such date, would have been recorded or reflected on the Balance Sheet (including assets such as Desired 365 Contracts to which no value would have been attributed);

            (iii)      all assets that would be recorded or reflected on a balance sheet of the Business as of the Closing Date prepared in accordance with GAAP;

            (iv)      all Receivables;

            (v)      all Desired 365 Contracts;

            (vi)      all Company Intellectual Property;

            (vii)      all Owned Real Property and all rights in respect of all Leased Real Property;

            (viii)      all Personal Property;

            (ix)      all Inventory;

            (x)      all Business Records; provided, however, that Sellers shall retain a right to have a reasonable access to and copying of (including through its representatives), at their sole cost and expense and subject to customary confidentiality obligations, the provisions within such materials related to Retained Assets or Excluded Liabilities, the Sellers' rights under the Transaction Documents, or that are reasonably required with respect to any audit, investigation or inquiry of any Governmental Entity with respect to periods prior to the Closing;

            (xi)      all Licenses;

            (xii)      all Health Care Permits;

            (xiii)      all Prepaid Items;

            (xiv)      all Rights, all Avoidance Actions against the non-debtor parties to the Desired 365 Contracts or against any Persons designated in writing by Purchasers at or prior to 5:00 p.m. local time in Houston, Texas on the third day prior to the Auction, and all proceeds thereof;

(xv)    all assets previously held by UGHS Behavioral Health Management Services, Inc. and related to, used or held for use in connection with the Business; and

(xvi)    the goodwill and going concern value and other intangible assets, if any, arising from or related to the Business.

(b)    <u>Retained Assets</u>.   Notwithstanding anything in this Agreement to the contrary, Purchasers shall not acquire, and the Sellers shall retain, the following assets (the "<u>Retained Assets</u>"):

(i)    all cash and cash equivalents, including bank accounts and retainers or deposits incurred in connection with the Seller Bankruptcy Cases, but excluding all Prepaid Items;

(ii)    the equity ownership of any subsidiary of Seller Parent or of any Seller and any account or note receivable or other receivable owed by a Seller to Seller Parent or a Seller;

(iii)    the organization documents, minute, stock record books, corporate seal and all other documents and records relating to the organization, maintenance, existence and federal income taxation of any Seller or its shareholders, members or other equity owners;

(iv)    all Tax Assets and Tax deposits (including funds held by the Sellers in respect of Withholding Taxes or estimated income taxes);

(v)    all business and financial records, books, ledgers, files, plans, documents, correspondence, lists, and reports that relate solely to Retained Assets or Excluded Liabilities;

(vi)    all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against third parties arising prior to the Closing Date with respect to the Excluded Liabilities or the Retained Assets;

(vii)    except as provided in <u>Section 2.1(a)(xiv)</u>, all Avoidance Actions (including all Avoidance Actions against any current or former Affiliates of any Seller) and all proceeds thereof;

(viii)    all Excluded Company Contracts;

(ix)    all Intercompany Indebtedness;

(x)    all of each Seller's rights under the Transaction Documents, including the Purchase Price; and

(xi)    the other assets listed on <u>Schedule 2.1(b)</u>.

(c)    <u>Assumed Liabilities</u>. In connection with the purchase and sale of the Purchased Assets pursuant to this Agreement, at the Closing, the applicable Purchaser shall

-16-

assume from the applicable Seller from which such Purchaser acquires a portion of the Purchased Assets and timely pay and duly perform, only the following liabilities and obligations related to the Business that are not Excluded Liabilities (the "Assumed Liabilities"):

(i)    all trade payables of the Sellers and all wages and salaries of Sellers' employees, in each case arising in the Ordinary Course after the Petition Date, which are not more than thirty (30) days past due as of the Closing Date, and which are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables shall not include any fees or expenses due to professional persons retained by any Seller); provided, however, Purchasers shall not assume any liabilities or obligations with respect to Withholding Taxes for Sellers' employees with respect to any period prior to Closing;

(ii)    all of the Sellers' accrued expenses and deferred income as of the Closing Date (it being understood that such liabilities shall have the meanings used and the components ascribed to such items on the Balance Sheet);

(iii)    all liabilities of such Seller under the applicable Desired 365 Contracts arising and accruing, and first coming due, following the Closing Date and only to the extent not related to any default, breach or other obligation relating to or arising prior to Closing; and

(iv)    the balance of the HUD Indebtedness that remains outstanding as of the Closing, as contemplated by Section 3.4.

(d)    Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement, any Schedule, Exhibit or Annex, any Purchaser Ancillary Document or any Seller Ancillary Document to the contrary, and regardless of any disclosure to the Purchasers or the Purchaser Parent, other than the Assumed Liabilities, neither the Purchaser Parent nor any Purchaser shall assume, agree to pay, discharge or satisfy, or otherwise have any responsibility for any liability or obligation of any Seller of any kind, character or description whatsoever, whether direct or indirect, known or unknown, absolute or contingent, matured or unmatured, insured or uninsured and currently existing or hereinafter arising, including any liability or obligation of any Seller related to the Acquisition, this Agreement or arising from the conduct of the Business or the ownership of the Purchased Assets prior to the Closing, whether or not accrued and whether or not such liability or obligation is disclosed in this Agreement or in any Schedule, Exhibit or Annex hereto (the "Excluded Liabilities").  For the avoidance of doubt, Excluded Liabilities include the following:

(i)    all Taxes arising from or with respect to the Purchased Assets or the operation of the Business that are incurred in or attributable to any period, or any portion of any period, ending on or prior to the Closing Date;

(ii)    any liability pursuant to any Environmental Law arising from or related to any action, event, circumstance or condition occurring or existing on or prior the Closing Date;

(iii)    any Indebtedness outstanding as of the Closing Date;

-17-

(iv)    any liability arising from or related to any breach, failure to perform, torts related to the performance of, violations of Law, infringements or indemnities under, guaranties pursuant to and overcharges or underpayments under, any Desired 365 Contract or Excluded Company Contract prior to the Closing Date;

(v)    any liability arising under or related to any Retained Asset;

(vi)    any liability arising from or related to any compliance or noncompliance prior to the Closing Date with any Law applicable to any Seller, the Business or the Purchased Assets;

(vii)    any liability arising from or related to any Action against any Seller, the Business or the Purchased Assets pending as of the Closing Date or based upon any action, event, circumstance or condition arising prior to the Closing Date;

(viii)    any liability incurred by a Seller or its Affiliates arising out of or relating to the negotiation and preparation of the Prior Agreement, this Agreement, the Purchaser Ancillary Documents or the Seller Ancillary Documents (including fees and expenses payable to all attorneys and accountants, other professional fees and expenses and bankers', brokers' or finders' fees for persons engaged by any Seller);

(ix)    any liability of any Seller for Taxes, including for the unpaid Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of Law), as a transferee or successor, by contract or otherwise;

(x)    all Intercompany Indebtedness;

(xi)    any liability arising from or related to any Excluded Company Contract;

(xii)    any liability arising from or related to any Company Benefit Plan;

(xiii)    all Transfer of Physical Assets Expenses;

(xiv)    all fees, fines, penalties, costs, expenses and liabilities incurred in connection with obtaining the license contemplated by Section 9.1(l), and any fees, fines, penalties, costs, expenses, liabilities or issues arising out of or associated with any non-compliance by Sellers or UGHS Senior Living of Knoxville, LLC, as applicable, on or prior to the Closing Date, with the regulations of the Tennessee Board for Licensing Health Facilities;

(xv)    any and all liabilities asserted against (or that could be asserted against) UGHS Behavioral Health Management Services, Inc.; and

(xvi)    all Cure Costs.

(e)    Revisions to Desired 365 Contract Annex.

(i)      Notwithstanding anything in this Agreement to the contrary, the Purchaser Parent may revise Annex B at any time prior to the date that is two (2) Business Days prior to the commencement of the Auction, by giving written notice to Sellers, in order to (i) exclude from the definition of Desired 365 Contracts and Assumed Liabilities, and include in the definition of Excluded Company Contracts and Excluded Liabilities, as applicable, any Contract not otherwise excluded therefrom, or (ii) include in the definition of Desired 365 Contracts and Assumed Liabilities, and exclude from the definition of Excluded Company Contracts and Excluded Liabilities, as applicable, any Contract not otherwise included therein, and the Sellers agree to give required notice to any of the non-debtor parties to any such Contract or as otherwise reasonably requested by the Purchaser Parent; provided, however, that any such exclusion or inclusion shall not serve to reduce, increase or otherwise affect the amount of the Purchase Price. Each Purchaser agrees that it will provide adequate assurance of future performance of all of the Desired 365 Contracts to be assigned to such Purchaser so that all Desired 365 Contracts can be assumed by Sellers and assigned to such Purchaser at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement.  In that regard, Purchaser Parent and each Purchaser acknowledges and agrees that they shall provide information regarding Purchaser Parent and Purchasers with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts.

(ii)      Sellers may in their sole discretion, subject to applicable Law, reject any Contract other than a Desired 365 Contract at any time; provided, however, that in the event Sellers intend to do so prior to Closing, Sellers shall notify Purchaser Parent of such intent and Purchaser Parent shall have five (5) Business Days to agree to treat such Contract as a Desired 365 Contract.  In the event Purchaser Parent does not agree in writing to treat such Contract as a Desired 365 Contract within such five Business Day period, Sellers may reject such Contract in their sole discretion at any time thereafter.

Section 2.2      Further Assurances.  Each Party shall on the Closing Date and from time to time thereafter, at any other Party's reasonable request and without further consideration, execute and deliver to such other Party such instruments of transfer, conveyance and assignment as shall be reasonably requested to transfer, convey and assign the applicable Purchased Assets or applicable Assumed Liabilities to the applicable Purchaser, and to otherwise effect the transactions contemplated by this Agreement.

## ARTICLE III
## PURCHASE PRICE; ADJUSTMENTS

Section 3.1      Purchase Price.

(a)      Subject to subsequent adjustment pursuant to Section 3.5, the aggregate purchase price to be paid at Closing by the Purchasers for the Purchased Assets (the "Purchase Price") shall be equal to $24,750,000.00, as adjusted for the following items:

(i)      minus, the Estimated Working Capital Deficit, if any; and

(ii)      plus, the Estimated Working Capital Surplus, if any.

-19-

(b)     At Closing, and in accordance with <u>Section 3.3</u>, Purchasers will pay or cause to be paid by wire transfer of immediately available funds, in exchange for the Purchased Assets, an aggregate amount equal to (such amount, the "<u>Closing Payment</u>"):

(i)     the Purchase Price;

(ii)     minus the Good Faith Deposit, which shall be payable upon the terms and subject to the conditions of <u>Section 3.5</u> and <u>Section 3.6</u>; and

(iii)     minus the outstanding balance of the HUD Indebtedness as of the Closing, which shall be assumed by Purchasers on the Closing Date.

Section 3.2     <u>Estimated Closing Statements</u>.

(a)     Not less than two (2) Business Days prior to the anticipated Closing Date, the Sellers shall deliver to the Purchaser Parent a statement (the "<u>Estimated Closing Date Financial Statement</u>"), signed by the Chief Financial Officer, the Vice President of Finance or Chief Restructuring Officer of the Sellers (on behalf and in the name of the Sellers), setting forth the Sellers' good faith estimate of the Net Working Capital (the "<u>Estimated Working Capital Amount</u>").  The Sellers shall consider in good faith such changes to the Estimated Closing Date Financial Statement, if any, as are reasonably requested by the Purchaser Parent.

(b)     In connection with the preparation of the Estimated Closing Date Financial Statement, the Purchaser Parent and its respective representatives and advisors shall have reasonable access to Sellers' books and records relating to the preparation of the Estimated Closing Date Financial Statement.

(c)     The Purchase Price at Closing will be (1) decreased dollar-for-dollar by an amount equal to the excess, if any, of the Reference Working Capital Balance over the Estimated Working Capital Amount (the "<u>Estimated Working Capital Deficit</u>") and  (2) increased dollar-for-dollar by an amount equal to the excess, if any, of the Estimated Working Capital Amount over the Reference Working Capital Balance ("<u>Estimated Working Capital Surplus</u>").

Section 3.3     <u>Payment of Closing Payment</u>.  On the Closing Date, Purchaser Parent and each Purchaser, shall, jointly and severally, cause each Purchaser to pay, to Sellers, by wire transfer of immediately available funds to the account(s) specified by the Sellers by written notice to the Purchaser Parent not less than two (2) Business Days prior to the anticipated Closing Date, cash in an aggregate amount equal to the Closing Payment, provided that any combination of Purchaser or Purchasers may pay such aggregate amount so long as the total Closing Payment is paid to Sellers; <u>provided</u>, <u>however</u>, that, subject to <u>Section 7.7(c)</u>, the portion of the Closing Payment payable to TrinityCare Senior Living, LLC by the applicable Purchaser shall be $300,000.  For the avoidance of doubt, in no event shall the sum of all amounts paid by Purchasers pursuant to this <u>Section 3.3</u> exceed an amount equal to the Closing Payment.  Subject to <u>Section 3.5</u>, the payment of the Closing Payment shall be made in full without setoff, recoupment or other reduction in amount.

Section 3.4     <u>Assumption of the HUD Indebtedness</u>.  On the Closing Date, the Purchaser Parent shall, or shall cause one or more of the Purchasers to, assume the HUD Indebtedness (it

being understood that, if the maturity of the HUD Indebtedness has been accelerated or if there are other defaults or events of default existing under the HUD Indebtedness as of the Closing, the original maturity date(s), non-default interest rate(s) and all other pre-default terms and conditions shall be reinstated and any such defaults or events of default shall be waived in connection with the assumption of the HUD Indebtedness).

Section 3.5    Purchase Price Adjustment.

(a)    Not more than sixty (60) days following the Closing Date, the Purchaser Parent shall deliver to the Sellers a statement (the "Final Closing Date Financial Statement"), signed by an authorized officer of the Purchaser Parent, setting forth the Purchaser Parent's calculation of the Net Working Capital (the "Closing Net Working Capital Balance") prepared in accordance with the guidelines set forth on Exhibit C, and the Closing Net Working Capital Deficit or the Closing Net Working Capital Surplus, if any, based on the Final Closing Date Financial Statement.

(b)    If, within forty-five (45) days after the Purchaser Parent's delivery of the Final Closing Date Financial Statement, Sellers determine in good faith that the Closing Net Working Capital Balance, Closing Net Working Capital Deficit or Closing Net Working Capital Surplus set forth in the Final Closing Date Financial Statement has not been prepared or determined in accordance with this Agreement, Sellers may give written notice to Purchaser Parent within such 45-day period (i) setting forth Sellers' proposed changes to the Closing Net Working Capital Balance, Closing Net Working Capital Deficit or Closing Net Working Capital Surplus as prepared by Purchaser Parent and (ii) specifying in reasonable detail Sellers' basis for disagreement with Purchaser Parent's preparation and determination of the Closing Net Working Capital Balance, Closing Net Working Capital Deficit or Closing Net Working Capital Surplus.  To the extent that Sellers do not express disagreement with respect to a particular item and provide notice thereof within such 45-day period, such item shall be deemed accepted by Sellers and Purchaser Parent's calculation of the Closing Net Working Capital Balance, Closing Net Working Capital Deficit and Closing Net Working Capital Surplus shall be final for all purposes hereunder.  If Purchaser Parent and Sellers are unable to resolve any disagreement between them with respect to the preparation of the Closing Net Working Capital Balance, Closing Net Working Capital Deficit or Closing Net Working Capital Surplus within 15 days after the giving of notice by Sellers to Purchaser Parent of such disagreement, if any, either Purchaser Parent or Sellers may, within five (5) Business Days following the expiration of such 15-day period or at any time thereafter, submit the dispute for hearing and resolution to the Bankruptcy Court.

(c)    In connection with the review of the proposed Final Closing Date Financial Statement, the Sellers and their respective representatives and advisors shall have reasonable access to books and records used by Purchaser Parent and Purchasers (including those books and records included as Purchased Assets) in connection with the preparation of the proposed Final Closing Date Financial Statement.

(d)    Upon the final determination of the Closing Net Working Capital Balance, Closing Net Working Capital Deficit and Closing Net Working Capital Surplus, the Parties shall make the following adjustments:

(i)     The Sellers, jointly and severally, will pay to Purchasers the Closing Net Working Capital Deficit, if any, in cash by wire transfer of immediately available funds to an account or accounts specified by Purchaser Parent, which payment will be made within five (5) Business Days following the final determination of the Closing Net Working Capital Deficit, if any; provided, however, that Purchaser Parent, in its discretion, may elect to cause Purchaser Parent and the Sellers to jointly instruct the Escrow Agent to pay to the Purchaser Parent an amount equal to the lesser of (x) the Closing Net Working Capital Deficit and (y) the Good Faith Deposit, and Sellers, jointly and severally, shall pay to Purchasers the amount of any unpaid Closing Net Working Capital Deficit after application of the Good Faith Deposit by wire transfer of immediately available funds to the account(s) designated by the Purchaser Parent.

(ii)     The Purchaser Parent and Purchasers, jointly and severally, will cause Purchasers to pay to Sellers the Closing Net Working Capital Surplus, if any, in cash by wire transfer of immediately available funds to an account or accounts specified by Sellers in writing, which payment will be made within five (5) Business Days following the final determination of the Closing Net Working Capital Surplus.

(e)     After all payments required by Section 3.5(d) shall have been made, the Purchaser Parent and the Sellers shall jointly instruct the Escrow Agent to pay to Sellers the remaining Good Faith Deposit (if any) in cash by wire transfer of immediately available funds to an account or accounts specified by Sellers.  Any payment made by Purchasers or Sellers under this Section 3.5 shall be made in full without setoff, recoupment or other reduction in amount.

Section 3.6     Good Faith Deposit.

(a)     Upon the execution of this Agreement the Purchaser Parent and Purchasers, jointly and severally, shall cause Purchasers to deposit with Escrow Agent cash in immediately available federal funds by wire transfer to an account designated by Escrow Agent, in an amount equal to $2,475,000.00 (the "Good Faith Deposit"), to be applied as provided in Section 3.5 and Section 3.6(b).  The Good Faith Deposit shall be held in escrow by Escrow Agent in a non-interest bearing account (the "Good Faith Deposit Escrow Account")  pursuant to the terms and conditions of the Escrow Agreement.  The Purchaser Parent shall, or shall cause the Purchasers to, pay one-half of the costs and expenses of the Escrow Agent, and the Sellers shall pay, jointly and severally, one-half of the costs and expenses of Escrow Agent.

(b)     The Good Faith Deposit shall (i) secure the obligations of the Parties set forth in Section 3.5 and be distributed in accordance with Section 3.5, or (ii) be paid to the Sellers as liquidated damages if this Agreement is terminated pursuant to Section 11.1(b).  Except as described in the previous sentence, the Good Faith Deposit shall be returned to the Purchasers within five (5) Business Days after any termination of the Agreement pursuant to Section 11.1 other than pursuant to Section 11.1(b).  When any amount of the Good Faith Deposit becomes payable in accordance with the terms and conditions of this Agreement, each of Purchaser Parent and UGHS Senior Living of Pearland, LLC shall execute a joint written instruction to the Escrow Agent pursuant to the Escrow Agreement directing the payment of such amount.

(c)     If this Agreement is terminated pursuant to Section 11.1(b) and the Good Faith Deposit is required to be paid to the Sellers pursuant to the terms and conditions of

ARTICLE XI, the Good Faith Deposit shall be deemed liquidated damages in favor of the Sellers and not as a penalty; it being agreed that Sellers' actual damages are impossible to estimate and that the amount of liquidated damages is a good faith estimate of the actual damages that would be suffered by the Sellers as a result of a termination of this Agreement pursuant to Section 11.1(b), and that such liquidated damages shall be in lieu of any other right or remedy of the Sellers and shall constitute the sole and exclusive remedy of the Sellers.

Section 3.7   Consents and Waivers; Further Assurances.

(a)   Nothing in this Agreement, the Purchaser Ancillary Documents or the Seller Ancillary Documents shall be construed as an agreement to assign any Purchased Asset that pursuant to applicable Law (including the provisions of the Bankruptcy Code) is not capable of being sold, assigned, transferred or delivered without the express or deemed consent or waiver of a third party or Governmental Entity unless and until such consent or waiver shall be given. Each applicable Seller shall use its respective reasonable commercial efforts, and each applicable Purchaser shall cooperate reasonably with such Seller, to obtain such consents and waivers and to resolve the impediments to the sale, assignment, transfer or delivery contemplated by this Agreement, the Purchaser Ancillary Documents or the Seller Ancillary Documents and to obtain any other consents and waivers necessary to convey to such Purchaser all of the Purchased Assets. In the event any such consents or waivers are not obtained prior to the Closing Date, each applicable Seller shall continue to use its respective reasonable commercial efforts to obtain the relevant consents or waivers until such consents or waivers are obtained (provided that such Seller shall not be required to make any payment to a third party in order to obtain the consent or waiver requested from such third party), and each applicable Seller will reasonably cooperate with the applicable Purchaser in any lawful and economically feasible arrangement to provide that such Purchaser shall receive the interest of such Seller in the benefits under any such Purchased Asset, including performance by such Seller, if economically feasible, as agent; provided that the applicable Purchaser shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent such Purchaser would have been responsible therefor hereunder if such consents or waivers had been obtained. Nothing in this Section 3.7(a) shall affect the applicable Purchaser's right to terminate this Agreement under Section 11.1 in the event that any consent or waiver as described herein is not obtained.

(b)   From time to time, whether before, at or following the Closing, each applicable Seller, at no out of pocket cost to such Seller, and each applicable Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to assure fully to the applicable Purchaser all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to such Purchaser under this Agreement, the Purchaser Ancillary Documents and the Seller Ancillary Documents and to assure fully to each applicable Seller the assumption of the liabilities and obligations intended to be assumed by the applicable Purchaser pursuant to this Agreement, the Purchaser Ancillary Documents and the Seller Ancillary Documents, and to otherwise make effective as promptly as practicable the transactions contemplated hereby and thereby.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES WITH RESPECT
## TO THE SELLERS

The Sellers, jointly and severally, hereby represent and warrant to the Purchasers as follows as of the date hereof:

Section 4.1    Organization.  Each Seller is a corporation or limited liability company, as applicable, duly formed and validly existing under the laws of the jurisdiction of incorporation or organization, as applicable, set forth on Schedule 4.1(a) and each has all requisite corporate or limited liability company, as applicable, power and authority to own, lease and operate its properties and to carry on its business as now being conducted.  Schedule 4.1(b) contains a correct and complete list of the jurisdictions in which each Seller is qualified or registered to do business as a foreign corporation or limited liability company, as applicable.

Section 4.2    Authorization.  Each Seller has the right, power, authority and capacity to execute and deliver this Agreement and, subject to the entry of the Bidding Procedure Order and the Sale Order in the Bankruptcy Cases, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The consummation of the transactions contemplated hereby have been duly authorized by all required corporate or limited liability company action on the part of each Seller.  This Agreement has been duly executed and delivered by each Seller and, subject to entry of the Bidding Procedures Order and the Sale Order in the Bankruptcy Cases, constitutes the valid and binding agreement of such Party, enforceable against it in accordance with its terms.

Section 4.3    Absence of Restrictions and Conflicts.  Subject to and taking into account the effect of entry of the Sale Order in the Bankruptcy Cases, the execution, delivery and performance of this Agreement and the Seller Ancillary Documents, the consummation of the transactions contemplated hereby and thereby, and the fulfillment of and compliance with the terms and conditions hereof and thereof, do not or will not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, permit the acceleration of any obligation under or create in any party the right to terminate, modify or cancel, (a) any term or provision of the charter documents of any Seller, (b) except as indicated on Schedule 4.3(a), any Desired 365 Contract, (c) any judgment, decree or order of any court or Governmental Entity or agency to which any Seller is a party or by which any such Person or any of their respective properties are bound or (d) in any material respect, any Law or arbitration award applicable to any Seller.  Except as indicated on Schedule 4.3(b), no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required with respect to any Seller in connection with the execution, delivery or performance of this Agreement or the Seller Ancillary Documents, or the consummation of the transactions contemplated hereby or thereby.  Prior to the date hereof, the Sellers provided (or made available) to the Purchaser Parent all information with respect to Sellers or the Business necessary to complete the Transfer of Physical Assets application.

Section 4.4    Governmental Authorizations.  The execution, delivery and performance by the Sellers of this Agreement and each other Transaction Document to which they are or will be parties and the consummation by the Sellers of the transactions contemplated hereby and thereby require no action by or in respect of, or filing with or notification to, any Governmental Entity

other than appropriate pleadings and notices with the Bankruptcy Court and the approval by the Bankruptcy Court.

Section 4.5    Real Property.

(a)    Schedule 4.5(a) sets forth a correct and complete legal description of the Owned Real Property.

(b)    Upon entry of the Sale Order by the Bankruptcy Court, the applicable Seller, as listed on Schedule 4.5(b), will have good and marketable fee simple title to the Owned Real Property.

(c)    Schedule 4.5(c) sets forth a correct and complete legal description of the Leased Real Property.

(d)    Upon entry of the Sale Order by the Bankruptcy Court, the applicable Seller, as listed on Schedule 4.5(d), will have a valid leasehold interest in the Leased Real Property, and the leases granting such interests will be in full force and effect.

(e)    No portion of the Company Real Property, or any building or improvement located thereon, violates any Law in any material respect, including those Laws relating to zoning, building, land use, environmental, health and safety, fire, air, sanitation and noise control.  Except for the Permitted Liens and Liens that will be released at or prior to the Closing, no Company Real Property is subject to (i) any decree or order of any Governmental Entity (or, to the Sellers' Knowledge, threatened or proposed order) or (ii) any rights or way, building use restrictions, exceptions, variances, reservations or limitations or any nature whatsoever.

(f)    The improvements and fixtures on the Company Real Property are in good operating condition, ordinary wear and tear excepted, and are adequate and suitable for the purposes for which they are presently being used.  To the Sellers' Knowledge, none of the buildings and improvements owned or used by any Seller is constructed of, or contains as a component part thereof, any asbestos or asbestos-containing materials.  There is no condemnation, expropriation or similar proceeding pending or, to the Sellers' Knowledge, threatened against any of the Company Real Property or any improvement thereon.  The Company Real Property constitutes all of the real property utilized by the Sellers in the operation of the Business.

Section 4.6    Title to Assets; Related Matters.

(a)    Except as set forth on Schedule 4.6(a), each Seller has good, valid and marketable title to all of the Purchased Assets to be sold by such Seller pursuant to this Agreement.  At the Closing, the Sellers shall have and convey to Purchasers, and Purchasers shall acquire, good, valid and marketable title in and to each of the Purchased Assets free and clear of any and all Liens (other than Permitted Liens and Assumed Liabilities).  The Purchased Assets will constitute all property and assets of the Sellers immediately prior to the Closing (other than the Retained Assets) and, immediately following the Closing, will constitute all of the assets necessary to conduct the operations of the Business in the Ordinary Course.

(b)      All equipment and other items of tangible personal property and assets included in the Purchased Assets (i) are in good operating condition, ordinary wear and tear excepted, and (ii) conform in all material respects to all Laws applicable thereto.  There is no material defect with any of such equipment, tangible personal property or assets, other than ordinary wear and tear.  No Person other than the applicable Seller owns any equipment or other tangible personal property or assets situated on the premises of any Seller, except for the leased items that are subject to personal property leases.  Except as set forth on Schedule 4.6(b)(1), since the Balance Sheet Date, no Seller has sold, transferred or disposed of any assets, other than consumption or sales of inventory in the Ordinary Course.  Schedule 4.6(b)(2) sets forth a correct and complete fixed asset report listing each material item of tangible personal property of each Seller (including leased personal property) that is reflected on the Balance Sheet.

Section 4.7      Financial Statements.  The Financial Statements are attached as Schedule 4.7(a) hereto.  Except as expressly set forth on Schedule 4.7(b), the Financial Statements have been prepared from the books and records of the Sellers.  Each balance sheet included in the Financial Statements (including the related notes and schedules) fairly presents in all material respects the consolidated financial position of the Sellers, as of the date of such balance sheet, and each statement of income and cash flows included in the Financial Statements (including any related notes and schedules) fairly presents in all material respects the consolidated results of operations and changes in cash flows of the Sellers for the periods set forth therein (except as expressly set forth therein or as disclosed on Schedule 4.7(c)).

Section 4.8      Legal Proceedings.  Except (a) as set forth on Schedule 4.8, (b) the Bankruptcy Cases, and (c) any matters that will otherwise be resolved by the Sale Order without any liability or restriction applicable to (or adverse effect on) Purchasers or the Purchased Assets, there is no Legal Dispute pending or, to the Sellers' Knowledge, threatened against, relating to or involving any Sellers or any of the Purchased Assets before any Governmental Entity or arbitrator that, if finally determined adversely, is reasonably likely, individually or in the aggregate, to have a Material Adverse Effect.

Section 4.9      Compliance with Law.

(a)      Except as set forth on Schedule 4.9(a)(1), each Seller is in compliance in all material respects with all applicable Laws (including applicable Laws relating to zoning, the Environment and the health and safety of employees and contractors), except to the extent compliance is excused or stayed by the Bankruptcy Code or by order of the Bankruptcy Court.  Except as set forth on Schedule 4.9(a)(2), (i) no Seller has received any written notice that it is under investigation with respect to, and, to the Sellers' Knowledge, no Seller is now under investigation with respect to, any material violation of any applicable Law or other requirement of a Governmental Entity, (ii) no Seller is a party to, or bound by, any order, judgment, decree, injunction, rule or award of any Governmental Entity or arbitrator, and (iii) each Seller has filed all material reports and has all material Licenses relating to the Business required to be filed with any Governmental Entity on or prior to the date hereof.

(b)      Except as set forth on Schedule 4.9(b), each Seller is in compliance in all material respects with all agreements, contracts, rules, standards and regulations applicable to it as

a result of it or one or more of its Affiliates obtaining or assuming the benefit of HUD/FHA insured financing.

(c)     Each Seller and its respective operations are in compliance in all material respects with all Healthcare Information Laws.

Section 4.10   Contracts.   Schedule 4.10 sets forth a correct and complete list of the following Contracts to which any Seller is a party, by which any Seller or any of their respective property (including the Purchased Assets) is subject, or by which any Seller is otherwise bound, whether oral or written (the "Company Contracts") (other than the Employment Agreements set forth on Schedule 4.12(b) and the Company Benefit Plans set forth on Schedule 4.13(a):

(a)     all Contracts evidencing or relating to all or any portion of the HUD Indebtedness;

(b)     all Contracts relating to the Leased Real Property or other leases or licenses involving any properties or assets (whether real, personal or mixed, tangible or intangible);

(c)     all Contracts for capital expenditures or the acquisition or construction of fixed assets requiring the payment by any Seller of an amount in excess of $50,000;

(d)     all Contracts that, after giving effect to the entry of the Sale Order by the Bankruptcy Court, will provide for an increased payment or benefit, or accelerated vesting, upon the execution hereof, or the Closing, or in connection with the transactions contemplated hereby;

(e)     all Contracts for the cleanup, abatement or other actions in connection with any Hazardous Materials, the remediation of any existing environmental condition or relating to the performance of any environmental audit or study;

(f)     all Contracts granting to any Person an option or a first refusal, first-offer or similar preferential right to purchase or acquire any Purchased Assets;

(g)     all Contracts with any agent, distributor or representative that are not terminable without penalty on thirty (30) days' or less notice;

(h)     all Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty, license fee, franchise fee or similar payment;

(i)     all Contracts and licenses to which any Seller is a party (i) with respect to Intellectual Property licensed or transferred by any Seller to any third party (other than non-exclusive end-user licenses granted by any Seller to customers in the Ordinary Course) or (ii) pursuant to which a third party has licensed or transferred any Intellectual Property to any Seller;

(j)     all Contracts providing for the indemnification or holding harmless of any officer, director, employee or other Person;

(k)      all joint venture or partnership Contracts and all other Contracts providing for the sharing of any profits;

(l)      all Contracts entered into involving the sale or purchase of the assets of a Seller for a purchase price of more than $50,000, other than the Prior Agreement and other than in the Ordinary Course, or a merger, consolidation, business combination or similar transaction;

(m)      all customer Contracts (excluding work orders and purchase orders individually providing revenue to any Seller of an amount less than $50,000) for the provision of goods or services by any Seller;

(n)      all supply Contracts (excluding work orders and purchase orders individually requiring any Seller to spend an amount less than $50,000) for the provision of goods or services for any Seller; and

(o)      all existing Contracts (other than those described in subsections (g) through (n) of this Section 4.10) (i) involving an annual commitment or annual payment to or from any Seller of more than $50,000 individually or (ii) that is material to the Sellers as a whole.

Prior to the date hereof, true, correct and complete copies of all Company Contracts have been provided (or made available) by the Sellers to the Purchaser Parent.  Subject to the entry of the Sale Order in the Bankruptcy Cases, the Company Contracts are legal, valid, binding and enforceable in accordance with their respective terms with respect to the applicable Seller, and, to the Sellers' Knowledge, each other party to such Company Contracts.  No Seller or Affiliate of any Seller is participating in any discussions or negotiations with any third party regarding any material and adverse modification of or amendment to any Company Contract.  Schedule 4.10 identifies with an asterisk each Company Contract set forth therein that requires, after giving effect to the applicable provisions of Sections 363 and 365 of the Bankruptcy Code, the consent of the other party thereto to avoid any breach, default or violation of such Contract or other instrument in connection with the transactions contemplated hereby.

Section 4.11   Taxes and Tax Returns.  Except as set forth on Schedule 4.11:

(a)      All Tax Returns required to have been filed by or with respect to the Sellers have been filed (taking into account any extension of time to file granted or obtained) and such Tax Returns are true, correct and complete in all material respects;

(b)      Sellers have provided Purchaser Parent with true and correct copies of assessments of *ad valorem* taxes for the 2014 tax year;

(c)      Other than Taxes of the Sellers the payment of which is prohibited or stayed by the Bankruptcy Code, all material Taxes required to have been paid by or with respect to the Sellers have been paid;

(d)      There are no Tax Liens on any assets of the Sellers, other than Liens for Taxes not yet due and payable or Liens that will be released at or prior to Closing; and

(e)     The Sellers have not received any written notice of any pending or threatened assessment of Taxes, or any audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of the Sellers.

Section 4.12   Officers and Employees.   Schedule 4.12(a) contains a correct and complete list of (a) all of the officers of each Seller, specifying their position, annual rate of compensation, work location, length of service, and other benefits provided to each of them, respectively, and (b) all of the employees (whether full-time, part-time or otherwise) and independent contractors of each Seller providing services with respect to the Purchased Assets as of the date hereof (the "Seller Employees"), specifying their position, status, annual salary, hourly wages, work location, length of service, other benefits provided to each of them, respectively, consulting or other independent contractor fees, together with an appropriate notation next to the name of any officer or other employee on such list who is subject to any written Employment Agreement or any other written term sheet or other document describing the terms or conditions of employment of such employee or independent contractor or of the rendering of services by such independent contractor.   Except as set forth on Schedule 4.12(b), no Seller is a party to or bound by any Employment Agreement or any other written term sheet or other document with respect to the terms or conditions of employment of any Person.   The Sellers has provided (or made available) to the Purchaser Parent true, correct and complete copies of each Employment Agreement to which any Seller is a party, or by which any of them is otherwise bound.   Each such Employment Agreement is legal, valid, binding and enforceable in accordance with its respective terms with respect to any Seller, as applicable.   There is no existing default or breach of any Seller, as applicable, under any Employment Agreement (or event or condition that, with notice or lapse of time or both could constitute a default or breach) and, to the Sellers' Knowledge, there is no such default (or event or condition that, with notice or lapse of time or both, could constitute a default or breach) with respect to any third party to any Employment Agreement.   No Seller has received a claim from any Governmental Entity to the effect that any Seller has improperly classified as an independent contractor any Person listed on Schedule 4.12(a).   No Seller has made any verbal commitments to any officer, employee, former employee, consultant or independent contractor of any Seller or any other Person employed by or providing services with respect to the Purchased Assets with respect to compensation, promotion, retention, termination, severance or similar matters in connection with the transactions contemplated hereby.   Except as indicated on Schedule 4.12(c), the Seller Employees are active on the date hereof.

Section 4.13   Company Benefit Plans.

(a)     Each Company Benefit Plan is identified in Schedule 4.13(a), and the Sellers have provided (or made available) a true, correct and complete copy of each such plan to the Purchaser Parent together with the most recent report filed with respect to such plan with any Governmental Entity.

(b)     Except as disclosed on Schedule 4.13(b):

(i)     No Company Benefit Plan is subject to Title IV of ERISA, and no Company Benefit Plan is described in Section 413(c) of the Code or Section 3(40) of ERISA.  The terms of each Company Benefit Plan as currently in effect that purports to be qualified under Section 401(a) of the Code and any trust which is a part of any such Company Benefit Plan are

subject to a favorable determination letter or opinion letter from the Internal Revenue Service, and each such Company Benefit Plan has been operated and administered in accordance with all Laws (including ERISA and the Code) in all material respects. The terms of each other Company Benefit Plan satisfy the requirements of Laws (including ERISA and the Code) in all material respects, and each such Company Benefit Plan has been operated and administered in accordance with all Laws (including ERISA and the Code) in all material respects. Each Seller, as applicable, have timely satisfied all reporting and disclosure obligations under Laws (including ERISA and the Code) in all material respects with respect to the Company Benefit Plans.  Neither any Seller nor any ERISA Affiliate thereof has any liability (directly or indirectly, contingent or otherwise) under any Employee Benefit Plan that is subject to Title IV of ERISA other than a Company Benefit Plan. There have been no prohibited transactions (as described in Section 406 of ERISA or Section 4975 of the Code) with respect to any Company Benefit Plan which have not been corrected in full with respect to which any Tax or penalty is due or which are not otherwise exempt under Section 4975(d) of the Code or Section 408 of ERISA.  If the benefits under a Company Benefit Plan are funded through a trust, the fair market value of the assets of such trust equal or exceed the liabilities of such plan.  If the benefits under a Company Benefit Plan are funded through insurance contracts, such contracts are in full force and effect and all premiums have been paid when due. Each Seller has made full and timely payment of all amounts which are required to be paid as contributions to each Company Benefit Plan.  No Company Benefit Plan provides for medical or life insurance benefits following a termination of employment except as required under Part 6 of Title I of ERISA, and each Seller has complied in all material respects with the healthcare continuation coverage requirements of Part 6 of Title I of ERISA.  Except as set forth in Schedule 4.13(b), there is no contract, agreement, plan or arrangement with any Person which provides for any payment to any employee by any Seller, which payment would fail to be deductible by reason of Section 280G of the Code or which would exceed the deduction limits under Section 404 of the Code.  Except as set forth in Schedule 4.13(c), no Seller has any contractual obligation to maintain any Company Benefit Plan for any period of time or to make contributions from its general assets at a fixed rate to such plan (other than premium payments for an insurance contract which are set on a year-to-year basis and matching contributions as provided in the 401(k) plan in which any employee of any Seller is eligible to participate), and the applicable Seller can terminate any Company Benefit Plan at any time in accordance with its terms.

Section 4.14   Labor Relations.  Except as set forth in Schedule 4.14: (a) no Seller is a party to any collective bargaining agreement, contract or legally binding commitment to any trade union or employee organization or group in respect of or affecting employees; (b) no Seller is currently engaged in any negotiation with any trade union or employee organization; (c) no Seller has engaged in any unfair labor practice within the meaning of the National Labor Relations Act, and there is no pending or, to the Sellers' Knowledge, threatened complaint regarding any alleged unfair labor practices as so defined; (d) there is no strike, labor dispute, work slowdown or stoppage pending or, to the Sellers' Knowledge, threatened against any Seller; (e) there is no grievance or arbitration proceeding arising out of or under any collective bargaining agreement which is pending or, to the Sellers' Knowledge, threatened against any Seller; (f) no Seller has experienced any work stoppage; (g) no Seller is the subject of any union organization effort; (h) there are no claims pending or, to the Sellers' Knowledge, threatened against any Seller related to the status of any individual as an independent contractor or employee; and (i) each Seller has complied in all material respects with WARN.  No Seller has misclassified any Person as (i) an independent contractor rather than as an employee, with respect to any employee leased from

another employer, or (ii) an employee exempt from state, federal, provincial or other applicable overtime regulations.

Section 4.15    Intellectual Property.

(a)    Schedule 4.15(a) sets forth a list of all Company Intellectual Property that is owned or purported to be owned by any Seller.  The applicable Seller owns all right, title and interest to the Company Intellectual Property listed on Schedule 4.15(a), free and clear of all Liens.

(b)    Schedule 4.15(b) identifies each item of Intellectual Property that any Seller uses pursuant to a written license or agreement, other than off-the-shelf agreements for commercially available software having a total cost of less than $1,000 annually.  With respect to each such item of Intellectual Property listed on Schedule 4.15(b): (i) the license or agreement covering the item is legal, valid, binding, enforceable against the applicable Seller, and in full force and effect, subject to the entry of the Sale Order in the Bankruptcy Cases; (ii) no Seller is in breach or default of the license or agreement; and (iii) no Seller has granted any sublicenses with respect to the license or agreement.

(c)    To the Sellers's Knowledge, the operation of the Business is not infringing or violating the Intellectual Property rights of any other Person in any material respect, (ii) no proceeding is pending or, to the Sellers' Knowledge, threatened in writing against any Seller in respect of any Company Registered Intellectual Property or asserting that any Seller is infringing or violating the Intellectual Property right of any Person and (iii) no Seller has received any written notice from any Person asserting any such infringement or violation.

Section 4.16    Transactions with Affiliates.  Except as set forth on Schedule 4.16, no officer or director of any Seller or any Affiliate of any Seller, no Person with whom any such officer or director has any direct or indirect relation by blood, marriage or adoption, in each case within the first or second degree of consanguinity or affinity (such Person, a "Family Member"), no entity in which any such officer, director or Family Member owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than one percent (1%) of the capital stock of which is beneficially owned by all such officers, directors and Persons in the aggregate), no Affiliate of any of the foregoing and no Affiliate of any Seller has entered into or is otherwise bound by: (a) any Contract, arrangement or understanding with, or relating to, any Seller or the properties or assets of any Seller; (b) any loan, arrangement, understanding, agreement or contract for or relating to any Seller or the properties or assets of any Seller; or (c) any property (real, personal or mixed), tangible or intangible, used or currently intended to be used by any Seller.

Section 4.17    Undisclosed Payments.  None of (a) the Sellers, (b) any of their respective officers or directors, or (c) anyone acting on behalf of any of them, has made or received any payment in respect of the Sellers or the Business not in compliance with applicable Law in all material respects in connection with or in any way relating to or affecting any Seller.

Section 4.18    Supplier Relations.  Schedule 4.18(a) contains a correct and complete list of the names and addresses of the Suppliers, and the amount of purchases from each such Supplier

during the twelve (12)-month period ended on the Balance Sheet Date, which schedule is correct and complete in all material respects.

Section 4.19   Accounts Receivable.

(a)   The Sellers have delivered to the Purchaser Parent a correct and complete schedule of the Receivables showing the amount of each Receivable and an aging of amounts due thereunder as of a date no more than three (3) Business Days prior to the date hereof, which schedule is correct and complete in all material respects as of that date.  All Receivables reflected on the Estimated Closing Date Financial Statement (net of any reserves shown thereon) (i) will be existing, (ii) represent monies properly due and owing for goods sold and delivered or services rendered in the Ordinary Course, and (iii) subject to entry of the Sale Order by the Bankruptcy Court, will not be subject to any refund or adjustment or any defense or right of set-off arising prior to the entry of the Sale Order by the Bankruptcy Court.

Section 4.20   Licenses.

(a)   Schedule 4.20(a) is a correct and complete list of all material Licenses held by each Seller.  To the Sellers' Knowledge, the applicable Seller owns or possesses all material Licenses that are necessary to enable it to carry on its operations as presently conducted.  All such Licenses are valid, binding and in full force and effect.  To the Sellers' Knowledge, the applicable Seller has taken all necessary action to maintain each such License.

(b)   Each Seller holds all Health Care Permits necessary for it to own, lease, sublease and operate its assets and to conduct its business or operations (including the Business) as presently conducted.  All such Health Care Permits are in full force and effect and there is no default under, violation of, or other noncompliance with the terms and conditions of any such Health Care Permit in any material respect.  No material condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, has resulted or would result in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of any Health Care Permit.  To Sellers' Knowledge Governmental Entity has taken or intends to take, action to suspend, revoke, terminate, place on probation, restrict, materially limit, adversely modify or not renew any Health Care Permit of any Seller.  Schedule 4.20(b) sets forth an accurate, complete and current list of all material Health Care Permits.

Section 4.21   Brokers and Finders.  Except as set forth on Schedule 4.21, no Seller or any Affiliate, officer, member, director or employee thereof has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.  The Sellers are solely responsible for the fees and expenses of the broker(s) set forth on Schedule 4.21.

Section 4.22   Seller Guarantees.  Except as otherwise disclosed on Schedule 4.22, no Seller has guaranteed any material obligations of any other Seller under any guarantee, letter of credit, bid bond or performance bond.

## ARTICLE V
## [RESERVED]

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Purchaser Parent and each Purchaser hereby jointly and severally represents and warrants to the Sellers as follows:

Section 6.1    Organization.  Such Purchaser is duly organized, validly existing and in good standing under the laws of the State of Texas and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

Section 6.2    Authorization.  Such Purchaser has full power and authority to execute and deliver this Agreement and the Purchaser Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by such Purchaser of this Agreement and the Purchaser Ancillary Documents to which it is a party, the performance by such Purchaser of its obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein have been duly and validly authorized by all necessary corporate or limited liability company action, as applicable, on the part of such Person.  This Agreement has been and, as of the Closing Date, the Purchaser Ancillary Documents to which such Person is a party shall be, duly executed and delivered by such Person and do or shall, as the case may be, constitute the valid and binding agreements of such Person, enforceable against such Person in accordance with their respective terms, subject to applicable bankruptcy, insolvency and other similar Laws affecting the enforceability of creditors' rights generally, general equitable principles and the discretion of course in granting equitable remedies.

Section 6.3    Absence of Restrictions and Conflicts.   The execution, delivery and performance of this Agreement and the Purchaser Ancillary Documents to which such Purchaser is a party, the consummation of the transactions contemplated hereby and thereby and the fulfillment of, and compliance with, the terms and conditions hereof and thereof do not or shall not (as the case may be), with the passing of time or the giving of notice or both, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, or permit the acceleration of any obligation under, (a) any term or provision of the charter documents of such Purchaser, (b) any contract to which such Purchaser is a party, (c) any judgment, decree or order of any Governmental Entity to which such Purchaser is a party or by which such Purchaser or any of its properties is bound or (d) any statute, law, rule or regulation applicable to such Purchaser unless, in each case, such violation, conflict, breach, default, loss of benefit or accelerated obligation would not, either individually or in the aggregate, have a material adverse impact on the ability of such Purchaser to consummate the transactions contemplated hereby or by the Purchaser Ancillary Documents to which such Purchaser is a party.

Section 6.4    Financing.  As of the date of this Agreement and from and after the date of this Agreement continuously through the time at which Purchasers pay the Closing Payment pursuant to Section 3.3, Purchasers and Purchaser Parent, collectively, have sufficient cash, committed and available lines of credit or other sources of committed and available funds to enable

-33-

Purchasers to perform all of their respective obligations under this Agreement and the other Transaction Documents to which Purchasers are or will be a party, including to pay the Purchase Price in accordance with the terms of this Agreement.

Section 6.5    <u>Legal Proceedings</u>.  There is no Legal Dispute pending or, to the knowledge of Purchaser Parent or Purchasers, threatened against Purchaser Parent or any Purchaser, or to which Purchaser Parent or any Purchaser is a party before any Governmental Entity or arbitrator, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of the Purchaser Parent and Purchasers to timely consummate the transactions contemplated by this Agreement.

Section 6.6    <u>Brokers and Finders</u>.  None of Purchaser Parent, any Purchaser or any of their Affiliates, officers, members, directors or employees has employed any broker, finder or investment banker or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with the transactions contemplated hereby.

**ARTICLE VII**
**CERTAIN COVENANTS AND AGREEMENTS**

Section 7.1    <u>Conduct of the Business</u>.

(a)    For the period commencing on the date hereof and ending on the Closing Date, each Seller shall, except (1) as expressly required or expressly provided for by this Agreement or any other Transaction Document, including the DIP Loan, (2) as required by applicable Law or any Governmental Entity, including applicable provisions of the Bankruptcy Code, or to the extent prohibited by the provisions of the Bankruptcy Code or Bankruptcy Rules, or (3) as otherwise consented to in writing by the Purchaser Parent:

(i)    conduct the Business only in the Ordinary Course, except as otherwise prohibited under this <u>Section 7.1</u>;

(ii)    use commercially reasonable efforts to preserve intact its goodwill and business organization, keep its officers and employees available to the Purchasers, and preserve its relationships and goodwill with customers, distributors, suppliers, employees and other Persons having business relations with it, in each case in the Ordinary Course;

(iii)    maintain its existence and good standing in its jurisdiction of organization and in each jurisdiction in which the ownership or leasing of its property or the conduct of its business requires such qualification;

(iv)    maintain in existing condition and repair, in the Ordinary Course consistent with past practices, all buildings, offices, living centers and other structures located on the Company Real Property, and all equipment, fixtures and other tangible personal property located on the Company Real Property, in all cases, that constitute Purchased Assets;

(v)    not dispose of or permit to lapse any right to the use of any patent, trademark, trade name, service mark, license or copyright of any Seller (including any of the Company Intellectual Property), or dispose of or disclose to any Person, any trade secret, formula,

process, Software, technology or know-how of any Seller not a matter of public knowledge prior to the date hereof;

(vi)      not (i) sell or transfer any Purchased Asset, except in the Ordinary Course, (ii) write-off any guaranteed check, note or account receivable, except in the Ordinary Course, (iii) cancel any debt or waive any claim or right that is a Purchased Asset, or (iv) except as provided in Schedule 7.1(a)(vi), make any commitment for any capital expenditure to be made on or following the date hereof in excess of $10,000 in the case of any single expenditure or $25,000 in the case of all capital expenditures, in each case other than as expressly requested by HUD;

(vii)     not increase in any manner the base compensation of, or enter into any new bonus or incentive agreement or arrangement with, any of its employees, officers, directors or consultants, except in the Ordinary Course; provided, however, that no Seller shall take any action described in this Section 7.1(a)(vii) with respect to (i) any manager, officer or director of any Seller or (ii) any Person whose annualized compensation is $100,000 or more or whose annual compensation for the twelve (12)-month period following the date hereof is expected to be $100,000 or more;

(viii)    not pay or agree to pay any additional pension, retirement allowance or other employee benefit under any Company Benefit Plan to any of its employees or consultants, whether past or present, except in the Ordinary Course; provided, however, that no Seller shall take any action described in this Section 7.1(a)(viii) with respect to (i) any manager, officer or director of any Seller or (ii) any Person whose annualized compensation is $100,000 or more or whose annual compensation for the twelve (12)-month period following the date hereof is expected to be $100,000 or more;

(ix)      not adopt, amend or terminate any Company Benefit Plan or increase the benefits provided under any Company Benefit Plan, or promise or commit to undertake any of the foregoing in the future;

(x)       not enter into a collective bargaining agreement or any contract, arrangement or understanding that, if in effect on the date hereof, would have been required to have been disclosed pursuant to Section 4.16;

(xi)      not amend or terminate any existing Employment Agreement or enter into any new Employment Agreement;

(xii)     maintain supplies and inventory at levels that are in the Ordinary Course;

(xiii)    continue to extend customers credit, collect accounts receivable and pay accounts payable and similar obligations in the Ordinary Course;

(xiv)     perform in all material respects all of its obligations under, and not default or suffer to exist any event or condition that with notice or lapse of time or both could constitute a default under, each Company Contract (except those being contested in good faith and defaults caused by the commencement of the Seller Bankruptcy Cases) and not enter into, assume

or amend any contract or commitment that is or would be a Company Contract, other than in the Ordinary Course;

(xv)    not pay, discharge or satisfy any claim, liability or obligation (absolute, contingent or otherwise) other than the payment, discharge or satisfaction in the Ordinary Course of claims, liabilities and obligations reflected or reserved against in the Balance Sheet or incurred in the Ordinary Course;

(xvi)   maintain in full force and effect and in the same amounts policies of insurance comparable in amount and scope of coverage to that now maintained by or on behalf of each Seller;

(xvii)  maintain its books and records on a basis consistent with the Sellers' past practice; and

(xviii) not authorize, or commit or agree to take, any of the foregoing actions that are prohibited by this <u>Section 7.1</u>.

(b)     In connection with the continued operation of each Seller during the period commencing on the date hereof and ending on the Closing Date, the Sellers shall confer in good faith on a regular and frequent basis with the Purchaser Parent regarding operational matters and the general status of on-going operations of the Sellers.  Each Seller hereby acknowledges that the Purchaser Parent does not and shall not waive any right it may have hereunder as a result of such consultations.

Section 7.2    <u>Inspection and Access to Information</u>.

During the period commencing on the date hereof and ending on the Closing Date, as applicable, each Seller shall, and shall cause each of their respective officers, directors, managers, employees, auditors and agents (excluding their legal counsel) to (i) provide the Purchaser Parent and its accountants, investment bankers, counsel, environmental consultants and other authorized representatives customary access, during reasonable hours and under reasonable circumstances, to any and all of its premises, employees (including executive officers), properties, contracts, commitments, books, records and other information (including Tax Returns filed and those in preparation), and (ii) furnish (or make available) to the Purchaser Parent and its authorized representatives, promptly upon request therefor, any and all financial, technical and operating data and other information reasonably pertaining to the Business, the Purchased Assets, the Assumed Liabilities or transactions contemplated hereby; <u>provided</u>, <u>however</u>, that in no event shall any Person be obligated to provide (A) any information the disclosure of which would cause the loss of any legal privilege available to any Person relating to such information, or (B) access for any invasive environmental testing of any property and no Party shall be entitled to conduct any invasive environmental testing at, on or under any property.  Any investigation pursuant to this <u>Section 7.2</u> shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business.

Section 7.3    <u>Notices of Certain Events</u>.  The applicable Seller shall promptly notify the Purchaser Parent of:

(a)     any change or event that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect on or otherwise result in any representation or warranty of the Sellers (or any one or more of them) hereunder being inaccurate in any material respect;

(b)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated hereby;

(c)     any notice or other communication from any Governmental Entity in connection with the transactions contemplated hereby;

(d)     any action, suit, claim, investigation or proceeding commenced or, to the Sellers' Knowledge, threatened against, relating to or involving or otherwise affecting any Seller that, if pending on the date hereof, would have been required to have been disclosed pursuant to Section 4.8 or that relates to the consummation of the transactions contemplated hereby; and

(e)     (i) the damage or destruction by fire or other casualty of any asset or part thereof of any Seller or (ii) any asset or part thereof becoming the subject of any proceeding (or, to the Sellers' Knowledge, any threatened proceeding) for the taking thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action.

Section 7.4     Reasonable Efforts; Further Assurances; Cooperation.  Subject to the terms and conditions of this Agreement and subject to applicable provisions of the Bankruptcy Code or Bankruptcy Rules, Sellers, Purchaser Parent and Purchasers each agree to use their respective reasonable, good faith efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the transactions contemplated hereby as soon as practicable, but in any event on or prior to the Expiration Date, including: (i) finalizing, executing and delivering all Transaction Documents prior to the Closing; (ii) preparing and filing as promptly as practicable with any Governmental Entity or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents; (iii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Entity or other third party that are necessary, proper or advisable; (iv) cooperating in good faith with each other Party and its officers, directors, employees, agents, counsel, accountants and other designees in connection with any step required to be taken as a part of its obligations hereunder, including the following:

(a)     Each Party promptly shall make all filings and submissions and shall take all other actions necessary, proper or advisable under applicable Laws to obtain any required approval of any Governmental Entity with jurisdiction over the transactions contemplated hereby (except that the Purchaser Parent shall not have any obligation to take or consent to the taking of any action required by any such Governmental Entity that is reasonably likely to adversely affect any Seller or the Acquisition or the other transactions contemplated by this Agreement or the Purchaser Ancillary Documents), including, in the case of the applicable Seller(s), promptly filing with the TDADS a request to approve the transfer of the Purchased Assets to be sold pursuant to this Agreement by such Seller.  Each Party shall furnish all information required for any

application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated hereby.  Each of the Parties shall cooperate with the other in promptly filing any other necessary applications, reports or other documents with any Governmental Entity having jurisdiction with respect to this Agreement and the transactions contemplated hereby, and in seeking necessary consultation with and prompt favorable action by such Governmental Entity.  Notwithstanding any provision of this Agreement to the contrary, neither the Purchaser Parent nor any Purchaser shall be required under the terms of this Agreement to dispose of or hold separate all or any portion of the businesses or assets of such Person or any of its Affiliates or the Sellers in order to remedy or otherwise address the concerns (whether or not formally expressed) of any Governmental Entity under any antitrust statute or regulation.

(b)      In the event any Legal Dispute by any Governmental Entity or other Person is commenced that questions the validity or legality of the Acquisition or any other transaction contemplated hereby or seeks damages in connection therewith, the Parties shall (i) cooperate and use all commercially reasonable efforts to defend against such claim, action, suit, investigation or other proceeding, (ii) in the event an injunction or other order is issued in any such Legal Dispute, use all commercially reasonable efforts to have such injunction or other order lifted, and (iii) cooperate reasonably regarding any other impediment to the consummation of the transactions contemplated hereby.

(c)      The Sellers shall give all notices to third parties and use their commercially reasonable efforts (in consultation with the Purchaser Parent) to obtain all third-party consents that are (i) from Governmental Entities having the right by Law (after giving effect to preemption by the Bankruptcy Code) to approve the transactions contemplated hereby, including the consents listed on Schedule 4.3(a), or (ii) required, to the Sellers' Knowledge and after giving effect to the applicable provisions of Sections 363 and 365 of the Bankruptcy Code, to avoid a breach of or default under any Desired 365 Contract in connection with the consummation of the transactions contemplated hereby.

(d)      Each applicable Seller, on the one hand, and the Purchaser Parent and each applicable Purchaser, on the other hand, shall give prompt notice to the other Parties of (i) the occurrence, or failure to occur, of any event, the occurrence or failure of which would be reasonably likely to cause any representation or warranty of such Party contained herein to be untrue or inaccurate at any time from the date hereof to the Closing Date or that will or may result in the failure to satisfy any condition specified in ARTICLE IX and (ii) any failure of such Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by any of them hereunder.  Each Seller hereby acknowledges that neither the Purchaser Parent nor any Purchaser does or shall waive any right it may have hereunder as a result of such notifications.

(e)      Each Party shall, and shall cause each applicable Affiliate of such Party to, do all things required by such Person pursuant to this Agreement.

Section 7.5     Public Announcements; Acknowledgment of Bankruptcy Court Proceedings.  Subject to its legal obligations, including issuing or causing publication of any press release or public announcement to the extent that such disclosure is required by any applicable Law, each Seller shall consult with the Purchaser Parent regarding the timing and content of all announcements regarding this Agreement or the transactions contemplated hereby to the financial

community, Governmental Entities, employees, customers, suppliers or the general public and shall use reasonable efforts to agree upon the text of any such announcement prior to its release.

(b)     The Parties acknowledge that the Parties are subject to that certain Confidentiality and Non-Disclosure Agreement, dated as of June 19, 2014, by and between Highland Capital Management, L.P., an Affiliate of the Purchaser Parent, and the Seller Parent (the "Confidentiality Agreement").  Notwithstanding anything to the contrary in the Confidentiality Agreement, to the extent of any conflict between the provisions of the Confidentiality Agreement and the terms hereof, the terms hereof shall prevail.  The Parties acknowledge and agree that this Agreement will be filed with the Bankruptcy Court, will be distributed as an exhibit to potential bidders, and that any such disclosures shall not violate this section.  The Parties also agree that such disclosure or any other permitted disclosure in Section 7.5(a) shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Notwithstanding the foregoing, this Section 7.5 shall not in any way limit, to the extent required by applicable Law, the disclosure of information by the Seller Parent or the Sellers in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

Section 7.6     **[Reserved.]**

Section 7.7     Tax Matters.

(a)     Cooperation on Tax Matters.  The Purchasers agree (i) to retain all books and records with respect to Tax matters pertinent to any Seller relating to any Taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the Sellers, any extensions thereof) of the respective Taxable periods, and (ii) to give the Sellers reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the Sellers so request, the Purchaser Parent shall allow the Sellers to make copies of such books and records at Sellers' expense.  The Purchaser and the Sellers agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

(b)     Certain Taxes.  All transfer, documentary, sales, use, stamp, registration and other similar Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid by the Sellers when due.  Each Seller agrees to timely sign and deliver such certificates or forms as may be  necessary or appropriate to establish an exemption from (or otherwise reduce), or make a report with respect to, such Taxes, including a Texas "Statement of Occasional Sale", as requested by Purchaser Parent.

(c)     Allocation of Purchase Price.  The Purchaser Parent and the Sellers shall allocate the Purchase Price payable to each Seller, as adjusted pursuant to ARTICLE III (as so adjusted, the "Adjusted Purchase Price"), among the Purchased Assets acquired from such Seller.  The Purchaser Parent shall prepare and submit such allocation to the Sellers in writing within sixty (60) days after the determination of the final Closing Net Working Capital Balance.  If, within thirty (30) days after receiving such allocation, the Sellers notify the Purchaser Parent that the

Sellers dispute any item(s) reflected thereon and includes therewith Sellers' proposed changes to such allocation, the Purchaser Parent shall consider such comments in good faith. Purchaser Parent and Sellers shall reasonably cooperate to resolve any differences in the proposed allocation as soon as reasonably practicable. The allocation made pursuant to this Section 7.7(c) shall be modified as appropriate in accordance with Section 7.7(c)  to reflect any adjustments in the Adjusted Purchase Price made following the Closing in accordance with this Agreement. The Parties will prepare and file all Tax Returns in a manner consistent with such allocation of the Adjusted Purchase Price, and neither any Party nor any of such Party's Affiliates shall take any Tax position that is inconsistent with such allocation of the Adjusted Purchase Price unless required to do so by applicable Law. The allocation made pursuant to this Section 7.7(c) shall be for Tax purposes only and shall not be an allocation of the Purchase Price among the Sellers for purposes of distributions pursuant to the Bankruptcy Cases or any plan of liquidation in connection therewith, nor shall the allocation made pursuant to this Section 7.7(c) have any effect on any other distribution or disbursement of monies to secured or unsecured creditors in any of the Bankruptcy Cases. The Parties acknowledge and agree that responsibility for making the Closing Payment will be allocated as the Purchaser Parent sees fit among the Purchasers based upon the Purchased Assets to be acquired by each Purchaser, but shall be funded into a single account of Sellers for the convenience of Sellers.

Section 7.8    Accounts.

(a)    Effective as of the Closing Date and subject to the terms and conditions hereof, each Seller hereby irrevocably constitutes and appoints the Purchaser Parent as its true and lawful attorney-in-fact with full power of substitution (i) to collect in a reasonable manner consistent with reasonable past practice for the account of the applicable Purchaser any Purchased Assets and (ii) to institute and prosecute all proceedings that the Purchaser Parent or any Purchaser may in its sole discretion deem proper in order to enforce any right, title or interest in, to or under the Purchased Assets, and to defend or compromise any and all actions, suits or proceedings in respect of the Purchased Assets.

(b)    All payments and reimbursements received by any Seller in connection with or arising out of the Purchased Assets or the Assumed Liabilities after the Closing shall be held by such Seller in trust for the benefit of the applicable Purchaser and, promptly upon receipt by any Seller of any such payment or reimbursement, such Seller shall pay over to the applicable Purchaser the amount of such payment or reimbursement without right of setoff.

(c)    All payments and reimbursements received by any Purchaser in connection with or arising out of the Retained Assets or the Excluded Liabilities after the Closing Date shall be held by such Purchaser in trust for the benefit of the applicable Seller and, promptly upon receipt by such Purchaser of any such payment or reimbursement, shall pay over to the applicable Seller the amount of such payment or reimbursement without right of setoff.

Section 7.9    Taxes Resulting From Sales of Purchased Assets by each Applicable Seller. Sellers shall be solely responsible for the payment or satisfaction of any Taxes resulting from or payable in connection with the sale of the Purchased Assets pursuant to this Agreement, regardless of the Person on whom such Taxes are imposed by applicable Law, and Purchasers and Purchaser Parent shall have no liability or obligation whatsoever with respect to such Taxes.

## ARTICLE VIII
## BANKRUPTCY COURT MATTERS

Section 8.1    Bankruptcy Filing; Sale Motion.  Not later than two (2) Business Days following the execution of this Agreement, the Sellers shall each file a voluntary Chapter 11 petition for relief with the Bankruptcy Court.  Not later than one (1) Business Day following the commencement of the Seller Bankruptcy Cases, the Sellers shall file a motion seeking the entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order (the "Sale Motion") and shall use their commercially reasonable efforts to have the Bankruptcy Court issue and enter such orders as soon as practicable following the date of filing such motion (it being acknowledged and agreed that the Sellers shall seek an expedited hearing date for the hearing to consider entry of the Bidding Procedures Order, but not for the Approval Hearing).  Each of the Parties agrees to use its commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. After the Sale Motion has been filed with the Bankruptcy Court, the Sellers shall not withdraw the Sale Motion.

Section 8.2    Entry of Orders.  Sellers shall cause the Bidding Procedures Order to be entered in the Bankruptcy Cases within fifteen (15) days of the Petition Date and shall cause the Sale Order to be entered in the Bankruptcy Cases within seventy (70) days of the Petition Date. From and after the date of entry of the Bidding Procedures Order, Sellers shall comply in all respect with the Bidding Procedures Order and Sellers shall use their good faith, best efforts, to oppose any motion or proceeding seeking to amend, modify, reverse, dismiss or vacate the Bidding Procedures Order.

Section 8.3    Sale Order.  The Sale Order shall provide, among other things, that pursuant to Sections 105, 363 and 365 of the Bankruptcy Code: (a) this Agreement is assumed by the Sellers pursuant to Section 365 of the Bankruptcy Code, and this Agreement and the transactions contemplated hereby are approved; (b) Purchasers shall have and acquire at the Closing good, valid and marketable title to the Purchased Assets and the Purchased Assets shall be sold and conveyed to Purchasers free and clear of any and all Liens (except for Permitted Liens and the Assumed Liabilities) pursuant to Section 363(f) of the Bankruptcy Code; (c) the Sellers shall assume and assign to Purchasers all of the Desired 365 Contracts as of the Closing Date; (d) the Sellers shall, on or before the Closing Date, pay the Cure Costs to the appropriate parties as ordered by the Bankruptcy Court so as to permit the assumption and assignment of all Desired 365 Contracts; (e) the Desired 365 Contracts shall be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Purchasers, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (f) Purchasers are acquiring the Purchased Assets free and clear of the Excluded Liabilities and providing for a full release of Purchasers with respect to the Excluded Liabilities; (g) the results of the Auction, if any, are approved; (h) Purchasers shall be found to be "good faith" purchasers within the meaning of Section 363(m) of the Bankruptcy Code; and (i) the Bankruptcy Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Bankruptcy Rules 6004(g) and 6006(d).

Section 8.4    Notice.  The Sellers shall provide timely written notice of this Agreement, the proposed sale of the Purchased Assets, and the Sale Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all non-debtor parties to the Desired 365 Contracts; (c) all Persons who have asserted any Liens (other than Permitted Liens) in or upon any of the Purchased Assets; (d) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any Seller; (e) all other Persons who have filed a notice of appearance and demand for service of papers in the Bankruptcy Cases under Bankruptcy Rule 2002; (f) all Governmental Entities exercising jurisdiction with respect to environmental matters affecting or relating to the Purchased Assets; (g) the twenty (20) largest (by amount owed by such Seller to such creditor) unsecured creditors of each Seller; (h) the Department of Health and Human Services and its Centers for Medicare and Medicaid Services, TDADS, TDH and the Tennessee Board for Licensing Health Facilities; and (i) any other Persons required by the Bankruptcy Court, requested by the Purchasers, or otherwise required by any applicable Law.

Section 8.5    Review of Pleadings.  The Sellers shall provide Purchasers with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by the Sellers and relating to this Agreement or the transactions contemplated hereby prior to the filing thereof in the Bankruptcy Cases.  All motions, applications and supporting papers prepared by the Sellers and relating (directly or indirectly) to Purchasers' "good faith" determination to enter into this Agreement or the transactions contemplated hereby must be acceptable in form and substance to Purchasers, in their reasonable discretion.

Section 8.6    Alternative Transaction.  From and after the date the Bidding Procedures Order is entered by the Bankruptcy Court and until the end of the Auction, if any, the Sellers are permitted, and are permitted to cause their representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Purchasers and their affiliates, agents and representatives) in connection with any Alternative Transaction; provided, however, that any such solicitation may occur only in accordance with the Bidding Procedures Order.  In addition, the Sellers may supply information relating to the Purchased Assets to prospective purchasers; provided, however, that no non-public information may be furnished until the Sellers receive an executed agreement from any such Person containing customary non-disclosure provisions; provided, further, that any such non-disclosure agreement does not contain provisions that prohibit the Sellers from complying with the provisions of this Agreement.  The Sellers shall notify Purchasers within twenty-four (24) hours after receipt of any proposal with respect to any Alternative Transaction and shall deliver to Purchasers by email transmission or same day courier service true and complete copies of all documents related to (or evidencing) any such offer.  The Sellers shall keep Purchasers informed on a reasonably prompt basis of the status of any such proposal or offer.  From and after the date of entry of the Sale Order and until the Closing Date or the date upon which this Agreement is terminated in accordance with its terms, neither the Sellers nor any of their Affiliates or representatives shall discuss, solicit, negotiate, enter into, or consummate any Alternative Transaction.

Section 8.7    Cure Costs.  As promptly as practicable following the date hereof, the Sellers shall use commercially reasonable efforts to determine the Cure Costs under each 365 Contract so as to permit the assumption and assignment of all Desired 365 Contracts pursuant to

Section 365 of the Bankruptcy Code in connection with the transactions contemplated hereby. In connection with the assumption and assignment of the Desired 365 Contracts, at or prior to the Closing, the Sellers shall have sole responsibility for curing any defaults under the Desired 365 Contracts by payment of any Cure Costs, and Purchasers shall have no liability for any Cure Costs. Purchasers shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Desired 365 Contracts.

**ARTICLE IX**
**CONDITIONS TO CLOSING**

Section 9.1     Conditions to Obligations of the Purchasers. The obligations of each of the Purchasers to consummate the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing of each of the following additional conditions:

(a)     Injunction. There shall be no effective injunction, writ or preliminary restraining order or any order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the Acquisition may not be consummated as provided herein, no proceeding or lawsuit shall have been commenced and remain pending by any Governmental Entity or third party for the purpose of obtaining any such injunction, writ or preliminary restraining order and no written notice shall have been received from any Governmental Entity indicating an intent to restrain, prevent, materially delay or restructure the transactions contemplated hereby.

(b)     Governmental Consents. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, all Governmental Entities required in connection with the execution, delivery or performance hereof shall have been obtained or made and shall be in full force and effect, including any required consent of each of TDADS and TDH to the transfer of the Purchased Assets, and Purchasers shall have obtained all Licenses (or shall have received reasonable assurances in writing that all Licenses will be issued post-Closing with an effective date commencing as of the Closing) required in connection with the ownership of the Purchased Assets and/or the conduct of the Business from and after the Closing.

(c)     Representations and Warranties. Other than for changes specifically contemplated or permitted by this Agreement or any other Transaction Document, the representations and warranties set forth in ARTICLE IV shall have been correct and complete in all material respects as of the date hereof and shall be correct and complete in all material respects as of the Closing Date as though made on and as of the Closing Date (except to the extent that any representation of warranty is made with respect to a specific date, in which case such representation or warranty shall be true and correct in all material respects as of such specific date), except that those representations and warranties that by their terms are qualified by materiality shall be correct and complete in all respects.

(d)     Performance of Obligations of the Sellers. Each Seller shall have performed in all material respects all covenants and agreements required to be performed by each of them hereunder at or prior to the Closing.

(e)     No Material Adverse Effect.  Between the date hereof and the Closing Date, there shall not have occurred any Material Adverse Effect.

(f)     Consents.  The Sellers shall have obtained and delivered to the Purchaser Parent, in form reasonably satisfactory to the Purchaser Parent, written consents of the third parties to those Desired 365 Contracts marked with an asterisk on Schedule 4.10, and all such consents shall be in full force and effect on and following the Closing.

(g)     Ancillary Documents.  The Sellers shall have delivered, or caused to be delivered, to the Purchaser Parent the documents listed in Section 10.2.

(h)     Bankruptcy Court Orders.  (i) The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and (ii) as of the Closing Date, each such order shall be in full force and effect, shall not then be stayed, and shall not have been vacated, reversed, modified or amended without Purchasers' prior written consent (which may be given or withheld in the sole discretion of the Purchasers).

(i)     Estoppel and Consent Certificates.  The Sellers shall have delivered to the Purchaser Parent an Estoppel and Consent Certificate, substantially in the form attached hereto as Exhibit F to the extent required by Item 42 under the Transfer of Physical Assets application, as applicable, executed by the landlord of each parcel of Leased Real Property.

(j)     Estimated Closing Date Financial Statement. The Sellers shall have delivered to the Purchaser Parent the Estimated Closing Date Financial Statement at least two (2) Business Days prior to the Closing Date.

(k)     Transfer of Physical Assets.  Each of Lancaster Pollard & Co., LLC and HUD shall have approved the Transfer of Physical Assets and consented to the assumption by the Purchasers of the HUD Indebtedness as contemplated by Section 3.4 of this Agreement, and such approvals and consents shall be in full force and effect.

(l)     Tennessee Board for Licensing Health Facilities.  The Sellers or UGHS Senior Living of Knoxville, LLC, as applicable, shall have (i) obtained a license for 109 assisted living beds at the assisted living facility operated by UGHS Senior Living of Knoxville, LLC in Knoxville, Tennessee, or received reasonable assurances from the Tennessee Board for Licensing Health Facilities that a license for 109 assisted living beds will be issued in due course, and (ii) met all requirements and filed, or provided assistance to Purchasers who shall have filed, all necessary documentation with the Tennessee Board of Licensing Health Facilities requesting an increase in the licensed beds to 120 assisted living beds at the assisted living facility operated by UGHS Senior Living of Knoxville, LLC in Knoxville, Tennessee.

Section 9.2     Conditions to Obligations of the Sellers.  The obligations of each Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing of each of the following additional conditions:

(a)     Injunction.  There shall be no effective injunction, writ or preliminary restraining order or any order of any nature issued by a Governmental Entity of competent jurisdiction to the effect that the Acquisition may not be consummated as provided herein.

-44-

(b)      Governmental Consents. All consents, approvals, orders or authorizations of, or registrations, declarations or filings with, any Governmental Entity required in connection with the execution, delivery or performance hereof shall have been obtained or made and shall be in full force and effect, including any required consent of each of TDADS and TDH to the transfer of the Purchased Assets.

(c)      Representations and Warranties.   Other than for changes specifically contemplated or permitted by this Agreement or any other Transaction Document, the representations and warranties of the Purchasers contained in ARTICLE VI shall have been true and correct in all material respects as of the date hereof and shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except to the extent that any representation of warranty is made with respect to a specific date, in which case such representation or warranty shall be true and correct in all material respects as of such specific date), except that those representations and warranties that by their terms are qualified by materiality shall be true and correct in all respects.

(d)      Performance of Obligations by the Purchaser Parent and the Purchasers. The Purchaser Parent and each Purchaser shall have performed in all material respects all covenants and agreements required to be performed by each of them hereunder at or prior to the Closing.

(e)      Ancillary Documents.  Each Purchaser shall have delivered, or caused to be delivered, to the Sellers the documents listed in Section 9.2.

(f)      Transfer of Physical Assets.  Each of Lancaster Pollard & Co., LLC and HUD shall have approved the Transfer of Physical Assets and consented to the assumption by the Purchasers of the HUD Indebtedness as contemplated by this Agreement, and such approvals and consents shall be in full force and effect.

(g)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order substantially in the form set forth as Exhibit C hereto, with any changes thereto reasonably satisfactory to the Sellers.

## ARTICLE X
## CLOSING

Section 10.1    Closing.  The Closing shall occur at 10:00 a.m., Texas time, on the third (3rd) Business Day following the satisfaction or waiver of the conditions set forth in Article IX that are contemplated to be satisfied prior to the Closing, or on such other date as the Parties may agree.  The Closing shall take place at such place as the Parties may agree.

Section 10.2    Seller Closing Deliveries.  At the Closing, the Sellers shall deliver, or cause to be delivered, to the Purchaser Parent and/or the applicable Purchaser, the following:

(a)      a certificate executed by an authorized officer of the Sellers as to compliance with the conditions set forth in Section 9.1(c), (d) and (e);

(b)      a Bill of Sale, substantially in the form attached hereto as <u>Exhibit G</u>, executed by each Seller;

(c)      a counterpart of the Assumption Agreement, substantially in the form attached hereto as <u>Exhibit H</u>, executed by each Seller;

(d)      a special warranty deed to convey to each applicable Purchaser each parcel of Owned Real Property, substantially in the form attached hereto as <u>Exhibit I</u> with such changes as may be required for the particular jurisdiction in which the Owned Real Property is located, executed by each applicable Seller;

(e)      an instrument of assignment of the Desired 365 Contracts, substantially in the form attached hereto as <u>Exhibit J</u>, executed by each applicable Seller;

(f)      a certificate by the Secretary or any Assistant Secretary of the Sellers or other duly authorized officer, dated the Closing Date, as to the good standing of each Seller in their respective jurisdiction of incorporation or organization and in each other jurisdiction where any such Person is qualified to do business;

(g)      [reserved];

(h)      a certificate of non-foreign status of each Seller that complies with Treasury Regulation Section 1.1445-2(b)(2);

(i)      each document listed on <u>Schedule 10.2(i)</u>, executed by each applicable Seller and each applicable counterparty thereto;

(j)      releases, termination statements and/or satisfactions executed by or on behalf of third parties evidencing the release of all Liens (other than Permitted Liens) affecting the Purchased Assets, in each case, in form and substance reasonably acceptable to Purchasers; and

(k)      all other documents required to be entered into by any Seller pursuant hereto or reasonably requested by the Purchaser Parent or any Purchaser, as applicable, as may be reasonably necessary or desirable to convey, as applicable, the Purchased Assets to applicable Purchaser as set forth on <u>Annex A</u>, or to otherwise consummate the Acquisition and the other transactions contemplated hereby.

Section 10.3   <u>Purchaser Closing Deliveries</u>.  At the Closing:

(a)      Purchasers shall have delivered, or caused to be delivered, to the Sellers, an aggregate amount equal to the Closing Payment, paid and delivered in accordance with <u>Section 3.3</u>;

(b)      the Purchaser Parent shall have delivered, or caused to be delivered, to the Sellers, a certificate of an authorized officer of the Purchaser Parent as to compliance with the conditions set forth in <u>Section 9.2(c)</u> and <u>(d)</u>.

(c)      the Purchaser Parent shall have delivered, or caused to be delivered, to the Sellers, a certificate by the Secretary or any Assistant Secretary of the Purchaser Parent, dated the Closing Date, as to (i) the good standing of the Purchaser Parent and each Purchaser in its jurisdiction of incorporation and (ii) the effectiveness of the resolutions of the board of directors of the Purchaser Parent and each applicable Purchaser authorizing the execution, delivery and performance hereof by the Purchaser Parent or such Purchaser, as applicable, passed in connection herewith and the transactions contemplated hereby;

(d)      each Purchaser shall have delivered a counterpart of the Assumption Agreement, substantially in the form attached hereto as Exhibit I, executed by such Purchaser; and

(e)      each of the Purchaser Parent and each Purchaser shall have delivered, or caused to be delivered, to the applicable Seller, all other documents required to be entered into or delivered by the Purchaser Parent or such Purchaser, as applicable, as may be reasonably necessary or advisable to consummate the Acquisition and the other transactions contemplated hereby, at or prior to the Closing pursuant hereto.

**ARTICLE XI**
**TERMINATION**

Section 11.1    Termination.  This Agreement may be terminated:

(a)      in writing by mutual consent of the Purchaser Parent and the Sellers;

(b)      by written notice from the Sellers to the Purchaser Parent, in the event the Purchaser Parent or any Purchaser (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it at or prior to the Closing or (ii) materially breaches any of its representations and warranties contained herein, which failure or breach is not cured within ten (10) days following the Sellers having notified the Purchaser Parent of its intent to terminate this Agreement pursuant to this Section 11.1(b);

(c)      by written notice from the Purchaser Parent to the Sellers, in the event any Seller (i) fails to perform in any material respect any of its agreements contained herein required to be performed by it at or prior to the Closing or (ii) materially breaches any of its representations and warranties contained herein, which failure or breach is not cured within ten (10) days following the Purchaser Parent having notified the Sellers of its intent to terminate this Agreement pursuant to this Section 11.1(c);

(d)      by written notice by the Sellers to the Purchaser Parent, or the Purchaser Parent to the Sellers, as the case may be, in the event the Closing has not occurred on or prior to the date that is 150 days after the Petition Date (the "Expiration Date") for any reason other than delay or nonperformance of the Party seeking such termination; provided, however, in the event that all conditions set forth in ARTICLE IX that are contemplated to be satisfied prior to the Closing are satisfied or waived, on or prior to the date that is 150 days after the Petition Date, other than the condition set forth in Section 9.1(b) with respect to obtaining the required consent of each of TDADS and TDH to the transfer of the Purchased Assets, the Expiration Date shall be automatically extended until the date that is 180 days after the Petition Date;

(e)     by written notice from the Purchaser Parent to the Sellers, if (i) any Bankruptcy Case is converted to a case or cases under Chapter 7 of the Bankruptcy Code, or (ii) any trustee or examiner is appointed in any one or more of the Bankruptcy Cases;

(f)     by written notice from the Purchaser Parent to the Sellers, if (i) the Bidding Procedures Order shall not have been entered by the Bankruptcy Court by the close of business on the day that is fifteen (15) days after the Petition Date, or (ii) following its entry, the Bidding Procedures Order shall fail to be in full force and effect or shall have been vacated, stayed, reversed, modified or amended in any material respect without the prior written consent of the Purchasers;

(g)     by written notice from the Purchaser Parent to the Sellers, if (i) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on the day that is seventy (70) days after the Petition Date, or (ii) following its entry, the Sale Order (A) shall fail to be in full force and effect or shall have been vacated, stayed or reversed, or (B) shall have been modified or amended in any respect without the prior written consent of the Purchasers;

(h)     by written notice from the Purchaser Parent to the Sellers, if one or more Sellers: (i) execute a definitive agreement with a third party (other than Purchasers) providing for an Alternative Transaction, or (ii) file a plan of reorganization or liquidation that does not provide for the consummation of the transactions contemplated by this Agreement; or

(i)     automatically upon consummation of an Alternative Transaction.

Notwithstanding the foregoing, (1) Sellers shall not be permitted to terminate this Agreement pursuant to this <u>Section 11.1</u> if they are in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the condition to closing set forth in clauses (b) or (c) of <u>Section 9.1</u> shall not be satisfied or (B) such breach or failure to perform or comply by Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred, and (2) Purchaser Parent and Purchasers shall not be permitted to terminate this Agreement pursuant to this <u>Section 11.1</u> if Purchaser Parent or any Purchaser is in breach of any of its respective representations and warranties or shall have failed to perform or comply with any of its respective covenants and agreements such that either (A) the condition to closing set forth in clauses (b) or (c) of <u>Section 9.2</u> shall not be satisfied or (B) such breach or failure to perform or comply by Purchaser Parent or any Purchaser is the primary cause of the occurrence of any event giving Purchaser Parent or Purchasers a right to terminate this Agreement or the failure of the Closing to have occurred.

Section 11.2     <u>Effects of Termination</u>.

(a)     If this Agreement is terminated pursuant to <u>Section 11.1(a)</u>, <u>Section 11.1(d)</u>, <u>Section 11.1(e)</u> or <u>Section 11.1(f)</u> and such termination did not result from and was not caused by a breach or failure to perform by any Party hereunder: (i) such termination shall be without liability of any Party to any other Party to this Agreement, (ii) this Agreement shall thereafter become void and have no effect, except as otherwise set forth in this Agreement, and (iii) the Good Faith Deposit shall be returned to Purchasers.

(b)      Notwithstanding any other provision of this Agreement, the Sellers shall, jointly and severally, pay to Purchasers cash in immediately available funds in the following amounts under the following conditions:

(i)      an aggregate amount equal to the Break-Up Fee and the 1% Expense Reimbursement in the event, and only in the event, that any of the following shall have occurred:

(1)      an Alternative Transaction shall have been consummated; or

(2)      the Sellers shall have failed to conduct the Auction or the sale process in compliance in all material respects with the Bidding Procedures.

(ii)      an aggregate amount equal to the 2% Expense Reimbursement in the event, and only in the event, that the Agreement is terminated pursuant to Section 11.1(c).

(c)      In the event that the Break-Up Fee and 1% Expense Reimbursement are payable pursuant to Section 11.2(b), (A) the Break-Up Fee and 1% Expense Reimbursement shall be paid out of the proceeds received from the closing of the Alternative Transaction, (B) no Lien of any Person shall attach to the portion of the proceeds representing the Break-Up Fee and 1% Expense Reimbursement, and (C) for the avoidance of doubt, the 2% Expense Reimbursement shall not be payable pursuant to Section 11.2(b)(ii).  If the Break-Up Fee and 1% Expense Reimbursement or the 2% Expense Reimbursement otherwise become due and payable, they shall be paid to Purchasers within three (3) days of the event triggering payment of the Break-Up Fee and 1% Expense Reimbursement or the 2% Expense Reimbursement (as the case may be) and shall be treated as an allowed administrative expense claim in the Bankruptcy Cases.  The provisions of this Section 11.2(c) and Section 11.2(b) shall survive any termination of this Agreement pursuant to Section 11.1.  The Break-Up Fee and 1% Expense Reimbursement and the 2% Expense Reimbursement, payable under the circumstances provided in this Section 11.2(b), shall be the exclusive remedy of Purchaser Parent and Purchasers and their Affiliates for any termination of this Agreement pursuant to Section 11.1.  THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL DAMAGES SUFFERED BY PURCHASER PARENT AND PURCHASERS AS A RESULT OF SELLERS' FAILURE TO COMPLETE THE SALE OF THE PURCHASED ASSETS PURSUANT TO THIS AGREEMENT, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES WHICH PURCHASER PARENT, PURCHASERS AND THEIR AFFILIATES WOULD INCUR AS A RESULT OF SUCH FAILURE.  THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO PURCHASER PARENT AND PURCHASERS.  EACH PARTY HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS WHATSOEVER TO CONTEST THE VALIDITY OF THE LIQUIDATED DAMAGE PROVISIONS FOR ANY REASON

WHATSOEVER, INCLUDING THAT SUCH PROVISION WAS UNREASONABLE UNDER CIRCUMSTANCES EXISTING AT THE TIME THIS AGREEMENT WAS MADE.

(d)     In the event that this Agreement is terminated by Sellers pursuant to Section 11.1(b), the Sellers shall be entitled to receive the Good Faith Deposit, as the Sellers' liquidated damages and as the Sellers' sole remedy for Purchasers' and/or Purchaser Parent's breach hereunder, and Purchaser Parent and the Sellers shall jointly instruct the Escrow Agent to pay to Sellers the Good Faith Deposit in cash by wire transfer of immediately available funds to an account or accounts specified by Sellers.   THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL DAMAGES SUFFERED BY SELLERS AS A RESULT OF PURCHASERS' AND/OR PURCHASER PARENT'S FAILURE TO COMPLETE THE PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THIS AGREEMENT, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION REPRESENT A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLERS AND THEIR AFFILIATES WOULD INCUR AS A RESULT OF SUCH FAILURE.   THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLERS.   EACH PARTY HEREBY AGREES TO WAIVE ANY AND ALL RIGHTS WHATSOEVER TO CONTEST THE VALIDITY OF THE LIQUIDATED DAMAGE PROVISIONS FOR ANY REASON WHATSOEVER, INCLUDING THAT SUCH PROVISION WAS UNREASONABLE UNDER CIRCUMSTANCES EXISTING AT THE TIME THIS AGREEMENT WAS MADE.

(e)     In the event of termination of this Agreement pursuant to this ARTICLE XI, Section 3.6, Section 7.5, Section 12.1, Section 12.5, Section 12.6, Section 12.7 Section 12.10, Section 12.12 and this Section 11.2 all shall survive the Termination Date.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

Section 12.1   Notices.   All notices, communications and deliveries required or made hereunder must be made in writing signed by or on behalf of the Party making the same and shall be delivered personally or by a national overnight courier service or by registered or certified mail (return receipt requested) (with postage and other fees prepaid) or by email transmission (so long as a receipt of such email is requested and received) as follows:

| | |
|---|---|
| To the Purchaser Parent or any Purchaser: | c/o Cornerstone Healthcare Group Holding, Inc. 2200 Ross Avenue, Suite 5400 Dallas, Texas 75201 Attn: David Smith, Chief Executive Officer Email: dsmith@chghospitals.com |
| with copies to: | King & Spalding LLP 1180 Peachtree Street, N.E. Atlanta, Georgia 30309-3521 Attn: Raymond E. Baltz, Jr. Email: rbaltz@kslaw.com |
| | King & Spalding LLP 1180 Peachtree Street, N.E. Atlanta, Georgia 30309-3521 Attn: Paul Ferdinands Email: pferdinands@kslaw.com |
| To any Seller: | c/o UGHS Senior Living, Inc. 7501 Fannin Street Houston, Texas 77054 Attn: Edward T. Laborde Email: elaborde@ughs.net |
| with a copy to: | Porter Hedges LLP 1000 Main Street, 36th Floor Houston, Texas  77002 Attn:  John F. Higgins Email: jhiggins@porterhedges.com |

or to such other representative or at such other address of a Party as such Party may furnish to the other Parties in writing.  Any such notice, communication or delivery shall be deemed given or made (a) on the date of delivery, if delivered in person, or (b) on the first Business Day following timely delivery to a national overnight courier service or (c) on the fifth Business Day following it being mailed by registered or certified mail or (d) upon receipt of email transmission if such receipt is confirmed during normal business hours or on the first Business Day following receipt if such receipt is confirmed outside of normal business hours.

Section 12.2   <u>Schedules and Exhibits</u>.   The Schedules and Exhibits are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full herein.

Section 12.3   <u>Binding Effect; Assignment</u>.   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, directly or indirectly, including by operation of law, by any Party without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that the Purchaser Parent and each of the Purchasers may, without the consent of any of the Sellers, (a) assign any or all of its

rights and interests hereunder to one or more of its Affiliates (in which case, the applicable assignor nonetheless shall remain responsible for the performance of all of its obligations hereunder), (b) designate one or more of its Affiliates to perform its obligations hereunder (in which case, the applicable designor nonetheless shall remain responsible for the performance of all of its obligations hereunder), (c) collaterally assign this Agreement to its lenders for collateral security purposes and (d) assign this Agreement to a subsequent purchaser of all or a substantial portion of the Purchaser Parent, any Purchaser or the Purchased Assets (in which case the Purchaser Parent or the applicable Purchaser nonetheless shall remain responsible for the performance of all of its obligations hereunder).

Section 12.4    Amendment; Modification.  This Agreement may be amended, modified or supplemented at any time only by written agreement of the Parties.

Section 12.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Texas (regardless of the Laws that might otherwise govern under applicable principles of conflicts of laws thereof) as to all matters, including matters of validity, construction, effect, performance and remedies.

Section 12.6    Captions.  The titles, captions and table of contents contained herein are inserted herein only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

Section 12.7    Consent to Jurisdiction, etc.  Each Party hereby irrevocably consents and agrees that any Legal Dispute shall be brought only to the exclusive jurisdiction of the Bankruptcy Court, the Federal District Court for the Southern District of Texas, Houston Division, or if either of the foregoing courts determines that it does not have, or abstains from exercising, jurisdiction over a Legal Dispute, any court of competent jurisdiction sitting in Harris County, Texas, and each Party hereby consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient forum.  During the period a Legal Dispute is pending before a court, all actions, suits or proceedings with respect to such Legal Dispute or any other Legal Dispute, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each Party hereby waives, and shall not assert as a defense in any Legal Dispute, that (a) such Party is not subject thereto, (b) such action, suit or proceeding may not be brought or is not maintainable in such court, (c) such Party's property is exempt or immune from execution, (d) such action, suit or proceeding is brought in an inconvenient forum or (e) the venue of such action, suit or proceeding is improper.  A final judgment in any action, suit or proceeding described in this Section 12.7 following the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Laws.

Section 12.8    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so

long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

Section 12.9   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or email transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 12.10   Third-Party Beneficiary.  Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any Person other than the Parties, their successors or permitted assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement, or result in such Person being deemed a third-party beneficiary of this Agreement.

Section 12.11   Waiver.  Any agreement on the part of a Party to any extension or waiver of any provision hereof shall be valid only if set forth in an instrument in writing signed on behalf of such Party.  A waiver by a Party of the performance of any covenant, agreement, obligation, condition, representation or warranty shall not be construed as a waiver of any other covenant, agreement, obligation, condition, representation or warranty.  A waiver by any Party of the performance of any act shall not constitute a waiver of the performance of any other act or an identical act required to be performed at a later time.

Section 12.12   Integration; Release.

(a)   This Agreement and the documents executed pursuant hereto supersede all negotiations, agreements and understandings among the Parties with respect to the subject matter hereof (except for that certain Confidentiality and Non-Disclosure Agreement, dated as of June 19, 2014, by and between Highland Capital Management, L.P., an Affiliate of the Purchaser Parent, and the Seller Parent, which the Parties agree will terminate as of the Closing), including the Prior Agreement, and constitute the entire agreement among the Parties with respect thereto.  Upon execution of this Agreement by all Parties, the Prior Agreement shall be deemed terminated; provided, however, notwithstanding anything to the contrary in this Agreement, the Parties agree that the Existing Damage Claims shall survive the termination of the Prior Agreement and shall not be extinguished, released or waived by such termination or the execution of this Agreement, except as provided in Section 12.12(b).

(b)   Seller Parent, Sellers, Purchaser Parent and Purchasers agree that, if the Bankruptcy Court enters the Bidding Procedures Order and such order becomes a Final Order, then effective as of the date the Bidding Procedures Order becomes a Final Order, Purchaser Parent and each Purchaser, for itself and its Affiliates, successors and assigns (the "Releasing Parties"), hereby releases and forever discharges Seller Parent and each Seller and their respective Affiliates, subsidiaries, successors and assigns, as well as each and every officer, director, member,

manager, employee, agent and representative thereof (collectively, the "Seller Released Parties"), from the Existing Damage Claims and from any and all claims, demands, causes of action, obligations, debts, restitution, damages and liabilities of any nature whatsoever, at law or in equity, pursuant to or arising in connection with a claim under the Prior Agreement, including for any breach of the representations, warranties, covenants or agreements in the Prior Agreement, whether or not presently known, suspected or claimed, which any Releasing Party had, now has, claims to have or may have in the future against the Seller Released Parties which relate directly or indirectly to, arising from or are based in whole or in part on the Prior Agreement or the termination thereof. THE PARTIES INTEND THAT THIS RELEASE SHALL APPLY REGARDLESS OF WHETHER ANY SUCH CLAIMS, DEMANDS, CAUSES OF ACTION, OBLIGATIONS, DEBTS, RESTITUTIONS, DAMAGES OR LIABILITIES ARE CAUSED OR ARE ALLEGED TO BE CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE, NEGLIGENT MISREPRESENTATION, BREACH OF CONTRACT OR OTHER LEGAL DUTY OF THE PARTY RELEASED.

Section 12.13 Cooperation Following the Closing. Following the Closing, each Party shall deliver to the other Parties such further information and documents and shall execute and deliver to the other Parties such further instruments and agreements as any other Party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other Party the benefits hereof.

Section 12.14 Survival of Representations, Warranties and Covenants. The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof. Each of the covenants of the Parties contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant in accordance with this Agreement or, if time for performance of such covenant is specified in this Agreement, 90 days following the expiration of the time period for such performance, and (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; provided, however, that if a written notice of claim with respect to any covenant to be performed after Closing is given prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 12.15 Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL DISPUTE ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

Section 12.16 Certain Acknowledgments and Limitations.

(a) Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the transactions contemplated by this Agreement are limited to those specifically set forth in this Agreement and the other Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other

Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.  Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable.  Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation or otherwise.

(b)     **PURCHASER PARENT AND PURCHASERS AGREE THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE IV</u> OR <u>ARTICLE V</u> OF THIS AGREEMENT, NONE OF THE SELLERS OR ANY OF THEIR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO PURCHASER PARENT OR PURCHASERS OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND.**

(c)     **EXCEPT AS OTHERWISE SPECIFIED, THE PURCHASED ASSETS AND BUSINESS OF SELLERS ARE BEING ACQUIRED BY PURCHASERS AT THE CLOSING AS A RESULT OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND SHALL BE ACQUIRED BY PURCHASERS ON AN "<u>AS IS</u>, <u>WHERE IS</u>" BASIS AND IN THEIR THEN PRESENT CONDITION, AND PURCHASER PARENT AND PURCHASERS SHALL RELY SOLELY UPON THEIR OWN EXAMINATION THEREOF.  IN ANY EVENT, EXCEPT AS EXPLICITLY SET FORTH HEREIN, NONE OF THE SELLERS OR ANY OF THEIR REPRESENTATIVES, AS THE CASE MAY BE, HAS MADE OR IS MAKING ANY REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE VALUE OF ANY PURCHASED ASSET OR THE BUSINESS BEING SO ACQUIRED, OR ANY WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR QUALITY, WITH RESPECT TO ANY OF THE TANGIBLE ASSETS BEING SO ACQUIRED, OR AS TO THE CONDITION OR WORKMANSHIP THEREOF, OR AS TO THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT.**

(d)     **SELLERS AGREE THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY PURCHASER PARENT AND PURCHASER THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE VI</u> OF THIS AGREEMENT, NONE OF PURCHASER PARENT, PURCHASERS OR ANY OF THEIR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO SELLERS OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND.**

(e)     **NO PERSON HAS BEEN AUTHORIZED BY SELLERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO SELLERS, THEIR BUSINESS OR OPERATIONS OR ASSETS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.**

(f)   **NO PERSON HAS BEEN AUTHORIZED BY PURCHASER PARENT OR PURCHASERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO PURCHASER PARENT, PURCHASERS, THEIR BUSINESSES OR OPERATIONS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.**

(g)   **OTHER THAN FOR FRAUD, INTENTIONAL MISREPRESENTATION, OR WILLFUL MISCONDUCT, UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE TO ANY OTHER PARTY TO THIS AGREEMENT FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, REMOTE OR SPECULATIVE DAMAGES ARISING OUT OF ANY ACTUAL OR ALLEGED BREACH OF THIS AGREEMENT, AND NO CLAIM SHALL BE MADE OR AWARDED AGAINST ANY PARTY TO THIS AGREEMENT THEREFOR.**

\* \* \* \* \*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed, as of the date first above written.

<u>**PURCHASER PARENT:**</u>

**CORNERSTONE HEALTHCARE
GROUP HOLDING, INC.**

By: _____

Name: David Smith
Title: Chief Executive Officer

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed, as of the date first above written.

<div style="display:flex">

**PURCHASERS:**

CHG Senior Living, LLC

By: _David 7 Smit_____
Name: David Smith
Title: Vice President

CHG Senior Living Real Estate of Port Lavaca, LLC

By: _David 7 Smith_____
Name: David Smith
Title: Vice President

CHG Senior Living Real Estate of Pearland, LLC

By: _David 7 Smith_____
Name: David Smith
Title: Vice President

CHG Senior Living Real Estate of Knoxville, LLC

By: _David 7 Smith_____
Name: David Smith
Title: Vice President

CHG Senior Living of Pearland, LLC

By: _David 7 Smith_____
Name: David Smith
Title: Vice President

CHG Senior Living of Port Lavaca, LLC

By: _David 7 Smith_____
Name: David Smith
Title: Vice President

**SELLERS:**

TrinityCare Senior Living, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

UGHS Senior Living Real Estate of Port Lavaca, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

UGHS Senior Living Real Estate of Pearland, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

UGHS Senior Living Real Estate of Knoxville, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

UGHS Senior Living of Pearland, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

UGHS Senior Living of Port Lavaca, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

</div>

*[Signature Page to Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed, as of the date first above written.

**PURCHASERS:**                                  **SELLERS:**

CHG Senior Living, LLC                          TrinityCare Senior Living, LLC

By: _____                     By: _____
Name: David Smith                               Name: Chad J. Shandler
Title: Vice President                           Title: Chief Restructuring Officer

CHG Senior Living Real Estate of Port           UGHS Senior Living Real Estate of Port
Lavaca, LLC                                      Lavaca, LLC

By: _____                     By: _____
Name: David Smith                               Name: Chad J. Shandler
Title: Vice President                           Title: Chief Restructuring Officer

CHG Senior Living Real Estate of                UGHS Senior Living Real Estate of
Pearland, LLC                                    Pearland, LLC

By: _____                     By: _____
Name: David Smith                               Name: Chad J. Shandler
Title: Vice President                           Title: Chief Restructuring Officer

CHG Senior Living Real Estate of                UGHS Senior Living Real Estate of
Knoxville, LLC                                    Knoxville, LLC

By: _____                     By: _____
Name: David Smith                               Name: Chad J. Shandler
Title: Vice President                           Title: Chief Restructuring Officer

CHG Senior Living of Pearland, LLC              UGHS Senior Living of Pearland, LLC

By: _____                     By: _____
Name: David Smith                               Name: Chad J. Shandler
Title: Vice President                           Title: Chief Restructuring Officer

CHG Senior Living of Port Lavaca, LLC           UGHS Senior Living of Port Lavaca, LLC

By: _____                     By: _____
Name: David Smith                               Name: Chad J. Shandler
Title: Vice President                           Title: Chief Restructuring Officer

*[Signature Page to Purchase Agreement]*

**PURCHASERS:**

CHG Senior Living of Knoxville, LLC

By: _____
Name: David Smith
Title: Vice President

CHG Senior Living of Covington, LLC

By: _____
Name: David Smith
Title: Vice President

CHG Senior Living Properties, LLC

By: _____
Name: David Smith
Title: Vice President

CHG Lighthouse of Pearland, LLC

By: _____
Name: David Smith
Title: Vice President

**SELLERS:**

UGHS Senior Living of Knoxville, LLC

By: _____
Name: _____
Title: _____

TrinityCare Senior Living of Covington, LLC

By: _____
Name: _____
Title: _____

UGHS Senior Living Real Estate, LLC

By: _____
Name: _____
Title: _____

TrinityCare Lighthouse of Pearland, LLC

By: _____
Name: _____
Title: _____

**PURCHASERS:**

CHG Senior Living of Knoxville, LLC

By: _____
Name: David Smith
Title: Vice President

CHG Senior Living of Covington, LLC

By: _____
Name: David Smith
Title: Vice President

CHG Senior Living Properties, LLC

By: _____
Name: David Smith
Title: Vice President

CHG Lighthouse of Pearland, LLC

By: _____
Name: David Smith
Title: Vice President

**SELLERS:**

UGHS Senior Living of Knoxville, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

TrinityCare Senior Living of Covington, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

UGHS Senior Living Real Estate, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

TrinityCare Lighthouse of Pearland, LLC

By: _____
Name: Chad J. Shandler
Title: Chief Restructuring Officer

[*Signature Page to Purchase Agreement*]

For the sole purpose of acknowledging and agreeing to
the release by Purchaser Parent and Purchasers of their
claims under the Prior Agreement pursuant to the terms
of Section 12.12:

**UNIVERSITY GENERAL HEALTH SYSTEM, INC.**

By: _____

Name: Edward T. Laborde, Jr.

Title:  General Counsel

*[Signature Page to Purchase Agreement]*

**Annex A**

| Purchaser | Seller | Purchased Assets | Assumed Liabilities |
|---|---|---|---|
| CHG Senior Living, LLC | TrinityCare Senior Living, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living Real Estate of Port Lavaca, LLC | UGHS Senior Living Real Estate of Port Lavaca, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living Real Estate of Pearland, LLC | UGHS Senior Living Real Estate of Pearland, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living Real Estate of Knoxville, LLC | UGHS Senior Living Real Estate of Knoxville, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living of Pearland, LLC | UGHS Senior Living of Pearland, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living of Port Lavaca, LLC | UGHS Senior Living of Port Lavaca, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living of Knoxville, LLC | UGHS Senior Living of Knoxville, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living of Covington, LLC | TrinityCare Senior Living of Covington, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Senior Living Properties, LLC | UGHS Senior Living Real Estate, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |
| CHG Lighthouse of Pearland, LLC | TrinityCare Lighthouse of Pearland, LLC | All Purchased Assets used or held for use by such Seller in connection with the Business | All Assumed Liabilities of such Seller |

**EXHIBIT B**
**(Form of Bidding Procedures Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **UGHS SENIOR LIVING, INC., et al.,** | § | |
| | § | **Case No. 15-_____** |
| Debtors.[1] | § | |
| | § | **Joint Administration Requested** |
| | § | |

**ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE DEBTORS WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF THE ASSETS COMPRISING THEIR SENIOR CARE LIVING BUSINESS; AND (B) APPROVING BID PROCEDURES GOVERNING THE PROPOSED SALE, INCLUDING PAYMENT OF EXPENSE REIMBURSEMENTS AND BREAKUP FEE**

Upon consideration of the Debtors' expedited motion dated November ___, 2015 (the "Motion"),[2] for entry of (i) an order approving a sale and bidding process as hereinafter described to be used in connection with the proposed sale of the assets (the "Assets") comprising the business of owning and operating senior care living facilities and related business activities conducted by the Debtors (the "Business"), and (ii) an order approving the sale by the Debtors of the Assets to Cornerstone Healthcare Group Holding, Inc. (collectively with its affiliates, "Cornerstone") or to the bidder submitting the highest or best bid for the Assets in connection with the sale and bidding process; and a hearing regarding the Motion having been held on November ___, 2015 (the "Bid Procedures Hearing"); and based upon all of the evidence

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: UGHS Senior Living, Inc. (9334); TrinityCare Senior Living, LLC (1655), UGHS Senior Living Real Estate of Port Lavaca, LLC (0012), UGHS Senior Living Real Estate of Pearland, LLC (0653), UGHS Senior Living Real Estate of Knoxville, LLC (2405), UGHS Senior Living of Pearland, LLC (0704), UGHS Senior Living of Port Lavaca, LLC (0762), UGHS Senior Living of Knoxville, LLC (0826), TrinityCare Senior Living of Covington, LLC (4360),UGHS Senior Living Real Estate, LLC (5553), and TrinityCare Lighthouse of Pearland, LLC (2681).

[2] Except as otherwise provided in this Order, capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

proffered or adduced at the Bid Procedures Hearing; and after consideration of any memoranda, objections, or other pleadings filed in connection with the Bid Procedures Hearing; and after consideration of the arguments of counsel made at the Bid Procedures Hearing; and upon the entire record of these cases; and it appearing that the approval of the Bid Procedures as requested in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:

A.     The form and manner of notice of the Bid Procedures and the Bid Procedures Hearing shall be, and hereby are, approved as sufficient and adequate notice.  No other or further notice in connection with the entry of this Order is or shall be required.

B.     The Bid Procedures were proposed by the Debtors in good faith with the goal of maximizing the value of the Business and the Assets for the benefit of all creditors of their estates.

C.     Approval of the 1% Expense Reimbursement (as defined below), 2% Expense Reimbursement (as defined below) and Breakup Fee (as defined below) and entry of this Order is (i) a necessary and appropriate inducement to Cornerstone (1) to make an initial offer which will serve as a "floor" for further bidding, (2) to enter into the Agreement and consummate the transactions contemplated thereby, and (3) to waive and release the Existing Damage Claims (as defined in the Agreement), and (ii) a condition precedent to closing the transactions contemplated by the Agreement.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is granted to the extent set forth in this Order.  Any objections to the Motion that have not been resolved or withdrawn are hereby overruled on the merits.  The following "Bid Procedures" are hereby approved and shall be used in connection with the proposed sale of the Assets:

(i)      Initial Overbid.  Any party (other than Cornerstone) that is interested in acquiring the Assets must submit an "Initial Overbid" in conformance with this Order by not later than 5:00 p.m. local time in Houston, Texas on January 15, 2016 (the "Overbid Deadline").  Any such Initial Overbid must:

(a)      Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Agreement) with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Agreement, except with higher and better consideration; (ii) containing terms and conditions otherwise no less favorable to the Debtors' estates than the terms and conditions in the Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (iii) provide for consideration to the Debtors in an amount equal to or greater than the sum of (1) the consideration payable by Cornerstone under the Agreement, plus (2) cash in an amount equal to $1,240,000; (iv) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's obligation to purchase the Assets other than those included in the Agreement; and (v) provide that the overbidder shall purchase all or substantially all of the Assets;

(b)      Include a cashiers' or certified check in the aggregate amount of the Deposit (i.e., $2,475,000), payable to an independent escrow agent to be designated by the Debtors (it being understood that deposits may also be sent by wire transfer of immediately available funds) which shall be refundable if (i) the bid is not selected as the Prevailing Bid or the Back-Up Bid, or (ii) the bid is selected as the Back-Up Bid and the sale to the Prevailing Bid closes;

(c)      To the extent not previously provided to the Debtors, be accompanied by evidence satisfactory to the Debtors in their commercially reasonable discretion that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid at the Auction; and

3

(d)     Be submitted to counsel to the Debtors, Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, Attention:  Aaron J. Power (email: apower@porterhedges.com), so as to be received not later than the Overbid Deadline.

(ii)     Bids in Lots.  Qualified Bids may include any portion of the Debtors' Assets.  In the event that a Qualified Bidder seeks to acquire less than substantially all of the Debtors' assets, there is no minimum bid amount necessary to be a Qualified Bid; provided that the Auction will not take place unless the aggregate of such Qualified Bids for less than all of the Assets is equal to or greater than the sum of (1) the consideration payable by Cornerstone under the Agreement, plus (2) cash in an amount equal to $1,240,000.

(iii)     Notice of Qualified Bidders.  On or before 5:00 p.m. Central Time on January 19, 2016, the Debtors shall file a notice with the Court identifying all Qualified Bidders and attaching copies of all bids that were timely received.  The Debtors shall serve a copy of the notice and the corresponding bids on all Qualified Bidders by (a) facsimile or electronic mail or (b) overnight delivery.

(iv)     Auction.  In the event the Debtors timely receive a conforming Initial Overbid from a prospective purchaser as described above (a "Qualified Bidder"), then the Debtors will conduct an auction with respect to the sale of the Assets on January 20, 2016, beginning at 10:00 a.m. local time, at the offices of Debtors' counsel, Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, or at such other location as may be designated by the Debtors (the "Auction").  Only Qualified Bidders may participate in the Auction.  All Qualified Bidders, or their authorized representatives, must be physically present at the Auction.  At the Auction, Qualified Bidders and Cornerstone (it being understood that Cornerstone shall be deemed to be a Qualified Bidder) may submit successive bids in cash increments of at least $100,000 greater than the prior bid for the purchase of the Assets until there is only one offer that the Debtors determine (in the exercise of their reasonable discretion), subject to Court approval, is the highest or best offer for the Assets (the "Prevailing Bid") and one offer is the second highest or second best offer for the Assets (the "Back-Up Bid"); provided, however, that Cornerstone may not be deemed the Back-Up Bid.  When bidding at the Auction, Cornerstone shall receive a cash "credit" in an amount equal to $990,000 (i.e., the sum of the 1% Expense Reimbursement plus the Breakup Fee).  All bidding for the Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing.  If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Agreement.  In determining the Prevailing Bid, consideration will be given to, among other things: (a) the number, type and nature of any changes to the Agreement requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such

modifications or delay; (c) the total consideration to be received by the Debtors; (d) the likelihood of the bidder's ability to close a transaction and the timing thereof; and (e) the net benefit to the Debtors' estates.   At the Auction, Cornerstone shall have the right to (i) submit further bids along with a markup of the Agreement; and (ii) at any time, request that the Debtors announce, subject to any potential new bids, the then current Prevailing Bid and, to the extent Cornerstone requests, use reasonable efforts to clarify any and all questions Cornerstone may have regarding the Debtors' announcement of the then current Prevailing Bid.  After the Auction has concluded, the Debtors shall present to the Court for consideration and approval at the Sale Hearing the Prevailing Bid.

(v)     <u>Sale Hearing</u>.  The Sale Hearing will be conducted at 1:00 p.m. local time, on January 21, 2016**,** at the United States Bankruptcy Court, 515 Rusk Street, Courtroom 401, Houston, Texas 77002, at which time the Debtors shall present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

If for any reason, the Qualified Bidder submitting the Prevailing Bid fails to timely consummate the purchase of the Assets, the Debtors may seek to consummate a sale based on the Back-Up Bid without further approval by the Court.  The Back-Up Bid and the obligation of the party submitting such bid to consummate the purchase of the Assets shall remain open and in full force, including with respect to the deposit, until the close of a sale of the Assets to the party making the Prevailing Bid or the party making the Back-Up Bid.

(vi)    <u>Highest and/or Best Bid</u>.  At all times during the sale process, the Debtors shall retain the right to determine, in their reasonable discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Debtors may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the Cornerstone bid, as reflected in the Agreement) that, in the Debtors' reasonable discretion, the Debtors determine is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bid Procedures, (iii) from a bidder that does not have substantial experience acquiring, owning and managing projects that are substantially similar to the Business, or (iv) otherwise contrary to the best interests of the Debtors, their estates or their creditors.

(i)     <u>Sale Implementation</u>.  Following the approval of the Prevailing Bid at the Sale Hearing, the Debtors will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s)

contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

2.        Objections (if any) to approval of any Prevailing Bid or to approval of any proposed sale of the Assets, shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be filed with the Court and served upon each of the following so as to be actually received on or before 5:00 p.m. (local time in Houston, Texas) on January 15, 2016: (i) counsel to the Debtors, Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, Attention:  John F. Higgins, Esq. (email: jhiggins@porterhedges.com), and (ii) counsel to Cornerstone, King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia 30309, Attention: Paul Ferdinands, Esq. (email: pferdinands@kslaw.com).   Any objection not filed and served in accordance with this paragraph 2 shall be deemed waived and shall be forever barred.

3.        The failure of any third party to file and serve an objection to the sale as ordered and directed herein shall be deemed the consent of such party to the granting of the Motion and the sale and transfer of the Assets.

4.        On or before December 30, 2015, the Debtors will file with the Court and serve on each non-debtor party to an executory contract or unexpired lease a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "Cure Notice"). The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to Bankruptcy Code section 365 (the "Cure Amount"), and notify each non-debtor party that such party's lease or contract may be assumed and assigned to Cornerstone or to the successful bidder to be identified at the conclusion of the Auction.

5.     Any objection to the Cure Amount must be filed on or before January 14, 2016 (the "Cure Objection Deadline").  Any objection to the Cure Amount must state with specificity what cure the non-debtor party to the executory contract or unexpired lease believes is required with appropriate documentation in support thereof. If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any executory contract, unexpired lease or other document as of the date of the Cure Notice; the non-debtor party to the executory contract or unexpired lease shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtor party shall be forever barred, estopped and enjoined from asserting or claiming that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such contract or lease or that there is any objection or defense to the assumption and assignment of such contract or lease, including any argument that there exist conditions to assumption and assignment that must be satisfied under such contract or lease or that any required consent to assignment has not been given.

6.     The Debtors (jointly and severally) are authorized and directed to pay to Cornerstone in cash or other immediately available funds (a) an amount equal to the sum of the Breakup Fee and the 1% Expense Reimbursement in the event that any of the following shall have occurred (i) an Alternative Transaction shall have been consummated, or (ii) the Debtors shall have failed to conduct the Auction or the sale process for the Assets in compliance in all material respects with the Bid Procedures or the other provisions of this Order, or (b) an amount equal to the 2% Expense Reimbursement in the event the Agreement is terminated by Cornerstone pursuant to Section 11.1(c) of the Agreement. For the avoidance of doubt,

Cornerstone shall be entitled to receive the amounts in clause (a) or clause (b), as applicable, but under no circumstances shall Cornerstone be entitled to both amounts.

7.     In the event that the Breakup Fee and 1% Expense Reimbursement are payable pursuant to clause (6)(a)(i) of the preceding paragraph, (a) the Breakup Fee and 1% Expense Reimbursement shall be paid out of the proceeds received from the closing of the Alternative Transaction, and (b) no lien of any third party shall attach to the portion of the proceeds representing the Breakup Fee and 1% Expense Reimbursement.

8.     If the Breakup Fee and 1% Expense Reimbursement or the 2% Expense Reimbursement become due and payable, they shall be paid to Cornerstone (without further order of the Court) within three (3) days of the event triggering payment of the Breakup Fee and 1% Expense Reimbursement or the 2% Expense Reimbursement (as the case may be) and shall be treated as allowed administrative expense claims in the Debtors' bankruptcy cases.

9.     The Bid Procedures (including the Breakup Fee and 1% Expense Reimbursement or the 2% Expense Reimbursement, as applicable) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets, and will confer actual benefits upon the Debtors' estates.  The Bid Procedures (including payment of the Breakup Fee and 1% Expense Reimbursement or the 2% Expense Reimbursement, if applicable) represent an exercise of the Debtors' sound business judgment and will facilitate an orderly sale process.

10.     For purposes of this Order, the following terms have the following meanings:

"1% Expense Reimbursement"  means cash or other immediately available funds in an amount equal to the aggregate reasonable and actual out-of-pocket costs and expenses incurred by Cornerstone in connection with or relating to:  (a) the negotiation and drafting of the Prior Agreement and/or the Agreement, (b) Cornerstone's due diligence investigation regarding the Assets and the Business, (c) the bankruptcy cases of UGHS, the Debtors and/or their affiliated debtors ("Bankruptcy Cases"), and/or (d) the proposed acquisition by Cornerstone of the Assets (whether pursuant to the Prior Agreement or the Agreement), including all fees and expenses of counsel, accountants, consultants and

8

other advisers and professionals; provided, however, the amount of the 1% Expense Reimbursement shall not exceed $247,500.00.

"2% Expense Reimbursement"  means cash or other immediately available funds in an amount equal to the aggregate reasonable and actual out-of-pocket costs and expenses incurred by Cornerstone in connection with or relating to:  (a) the negotiation and drafting of the Prior Agreement and/or the Agreement, (b) Cornerstone's due diligence investigation regarding the Assets and the Business, (c) the Bankruptcy Cases, and/or (d) the proposed acquisition by the Purchasers of the Assets (whether pursuant to the Prior Agreement or the Agreement), including all fees and expenses of counsel, accountants, consultants and other advisers and professionals; provided, however, the amount of the 2% Expense Reimbursement shall not exceed $495,000.00.

"Alternative Transaction" means (a) a sale or sales (or other direct or indirect transfer) of all or a material portion of the Assets to a third party other than Cornerstone, (b) the sale, transfer or issuance of equity securities representing, individually or in the aggregate, a majority of the voting power of any of the Debtors that, individually or in the aggregate, own a material portion of the Assets, or (c) any merger, consolidation or other change of control transaction involving any one or more of the Debtors that, individually or in the aggregate, own a material portion of the Assets.  An Alternative Transaction shall include any such transaction occurring pursuant to a plan of reorganization or liquidation that does not contemplate the sale of the Assets to Cornerstone substantially in accordance with the terms of the Agreement.  Notwithstanding anything in the previous sentence, none of the transactions or actions relating solely to the Retained Assets (as defined in the Agreement) or a transaction consummated by a Chapter 7 trustee if the Court has converted the Bankruptcy Cases to Chapter 7 shall be deemed to be an Alternative Transaction.

"Breakup Fee" means cash or other immediately available funds in an amount equal to $742,500.

"Prior Agreement" means that certain Purchase Agreement, dated December 12, 2014, between University General Health System, Inc. ("UGHS") (as Seller Parent), the Debtors other than UGHS Senior Living, Inc. (as Sellers), Cornerstone Healthcare Group Holding, Inc. (as Purchaser Parent) and the affiliates of Cornerstone Healthcare Group Holding, Inc. party thereto (as Purchasers).

11.     The Debtors shall serve a copy of this Order as contemplated in the Motion.

**SO ORDERED.**

SIGNED this _____ day of _____, 2015.

_____
**THE HONORABLE LETITIA PAUL,**
**UNITED STATES BANKRUPTCY JUDGE**

9

<u>Exhibit C</u>
**Working Capital Guidelines**

Net Working Capital will be calculated in accordance with GAAP as follows:

<u>**At Closing**</u>

Current assets of the Sellers (only to include items and amounts that constitute Purchased Assets)

*Accounts Receivable* [1]
*Due from Others*
*Prepaid Insurance*
*Prepaid Liability Insurance*
*Prepaid Flood Insurance*
*Prepaid MIP*
*Prepaid Franchise Tax*
*Prepaid Other*
*Prepaid Expense*
*Undeposited Funds*
*Inventory*
*HUD Reserves*
    *Reserve for Replacement*
    *Escrowed Property Tax*
    *Escrowed Insurance Premiums*
    *Escrowed Mortgage Insurance*
*Notes Receivable* [2]
*Greenhouse Receivable*
*Deposits Utilities*
*Deposits*

Current liabilities of the Sellers (only to include items and amounts that constitute Assumed Liabilities)

*Accounts Payable* [3] [4]
*Accrued Payroll* [4] [5]
*Accrued Bonuses* [4] [5]
*Unearned Resident Fees*
*Accrued Expenses*
*Other Accrued Expenses*

*Accrued Interest Payable*
*Insurance Payable*
*Insurance Financing Payable*
*Accrued Property Taxes*
*Accruded Franchise Taxes*
*Accrued Audit and Tax Fees*

_____

### *TOTAL NET WORKING CAPITAL AT CLOSING*

**<u>Notes</u>**

(1) Net of Allowance for Bad Debt and excluding Intercompany Accounts Receivable.

(2) Excluding the notes receivable from UGHS and Seniors in Touch.

(3) Excluding Intercompany Accounts Payable.

(4) Only including amounts arising in the Ordinary Course after the Petition Date, which are not more than thirty (30) days past due as of the Closing Date, and which are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables shall not include any fees or expenses due to professional persons retained by any Seller).

(5) Excluding any liabilities or obligations with respect to Withholding Taxes for Sellers' employees with respect to any period prior to Closing.  And excluding any liability arising from or related to any Company Benefit Plan.

**EXHIBIT D**
**(Form of Sale Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **UGHS SENIOR LIVING, INC., et al.,** | § | |
| | § | **Case No. 15-_____** |
| Debtors.[1] | § | |
| | § | **Joint Administration Requested** |
| | § | |

**ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OF THE SENIOR CARE DEBTORS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

Upon the Motion (the "Sale Motion") of UGHS Senior Living, Inc. and its affiliated debtors that are engaged in the senior care living business (collectively, the "Senior Care Debtors" or "Sellers") for, among other things, the entry of an order pursuant to Section 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the Senior Care Debtors to: (a) enter into an asset purchase agreement with the party submitting the highest and/or best bid for the Senior Care Debtors' assets in connection with the Senior Care Debtors' sale and bidding process; (b) sell the Purchased Assets,[2] which include

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: UGHS Senior Living, Inc. (___); TrinityCare Senior Living, LLC (___), UGHS Senior Living Real Estate of Port Lavaca, LLC (___), UGHS Senior Living Real Estate of Pearland, LLC (___), UGHS Senior Living Real Estate of Knoxville, LLC (___), UGHS Senior Living of Pearland, LLC (___), UGHS Senior Living of Port Lavaca, LLC (-___), UGHS Senior Living of Knoxville, LLC (____), TrinityCare Senior Living of Covington, LLC (___),UGHS Senior Living Real Estate, LLC (___), and TrinityCare Lighthouse of Pearland, LLC (___).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement, dated November [10], 2015, by and among Cornerstone Healthcare Group Holding, Inc., the Affiliates

substantially all of the Senior Care Debtors' assets, free and clear of all Liens (as used in this Order, the term "Liens" shall have the meaning ascribed to it below) other than Permitted Liens and Assumed Liabilities, with such sale to be in accordance with the terms and conditions of the Agreement; (c) assume and sell and assign certain executory contracts and unexpired leases; and (d) granting related relief; and this Court having entered an order on November __, 2015 (the "Bidding Procedures Order") authorizing the Senior Care Debtors to conduct, and approving the terms and conditions of, an auction (the "Auction") as set forth in the Bidding Procedures Order to consider offers for the Purchased Assets, establishing a date for the Auction, and approving, among other things: (i) certain Bidding Procedures to be used in connection with the sale of the Senior Care Debtors' assets, including the Auction; (ii) the form and manner of notice of the Auction and Bidding Procedures; (iii) procedures relating to certain unexpired leases and executory contracts, including notice of proposed cure amounts; and (iv) payment of the Break-Up Fee, the 1% Expense Reimbursement and the 2% Expense Reimbursement in accordance with Section 11.2(b) of the Agreement; and the Court having established the date of the hearing on the Sale Motion (the "Sale Hearing"); and the Auction having been held on January ____, 2016; and at the conclusion of the Auction, the Senior Care Debtors having determined that the Purchaser submitted the highest and/or best bid for the Purchased Assets; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. § § 157(b)(2) and 1334; and in consideration of the Sale Motion, the relief requested therein, and the responses thereto being a core proceeding in accordance with 28 U.S.C. § 157(b); and the Sale Hearing having been held on January ___, 2016; and the appearance of all

---

of Cornerstone Healthcare Group Holding, Inc. listed on Annex A thereto (collectively, together with their respective successors and assigns, the "Purchaser") and the Senior Care Debtors other than UGHS Senior Living, Inc. (the "Agreement").

interested parties and all responses and objections to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing and all other pleadings and proceedings in these Bankruptcy Cases, including (without limitation) the Sale Motion and the certificate of service regarding the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interests of the Senior Care Debtors, their estates, their creditors, their residents, their employees, their other stakeholders and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT**:[3]

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    The Court has jurisdiction over this matter and over the property of the Senior Care Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Agreement, pursuant to 28 U.S.C. § § 157 and 1334.  This matter is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Bankruptcy Cases and the Sale Motion in this district is proper pursuant to 28 U.S.C. § § 1408 and 1409.

D.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court

---

[3] All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith.

expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.      The statutory bases for the relief requested in the Sale Motion and for the approvals and authorizations herein are (i) Bankruptcy Code § § 102, 105, 362, 363 and 365, and (ii) Bankruptcy Rules 2002, 4001, 6004, 6006, and 9014.

F.      On November __, 2015 (the "<u>Petition Date</u>"), the Senior Care Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Senior Care Debtors have continued in possession and management of their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code § § 1107(a) and 1108.

G.      As evidenced by the certificates of service filed with the Court (docket nos. __, ___, and ___), proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all Liens, and the transactions contemplated by the Agreement (the "<u>Transactions</u>") has been provided in accordance with Bankruptcy Code § § 102(1) and 363(b), Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008, and 9014, the local rules of the Court, the procedural due process requirements of the United States Constitution, and in compliance with the Bidding Procedures Order.  The Senior Care Debtors also gave due and proper notice of the assumption, sale, and assignment of each contract, lease or agreement listed in the Cure Notice (as such term is defined in the Bidding Procedures Order) to each non-debtor party under each such contract, lease or agreement.[4]  Such notice was good and sufficient and appropriate under the particular circumstances.  No other or further notice of the Sale Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all

---

[4] The contracts, leases and agreements listed in the Cure Notice that are included in the Purchased Assets are referred to in this Order as the "<u>Desired 365 Contracts</u>".

Liens, the Transactions, the assumption and assignment of the Desired 365 Contracts, or of the entry of this Order is necessary or shall be required.

H.     Notice and a reasonable opportunity to object and/or be heard regarding the Sale Motion, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all Liens (other than Permitted Liens and Assumed Liabilities), the Transactions, the assumption and assignment of the Desired 365 Contracts, and the entry of this Order have been provided to all interested Persons, including, without limitation (a) the Office of the United States Trustee for the Southern District of Texas; (b) all non-debtor parties to the Desired 365 Contracts; (c) all Persons who have asserted any Liens (other than Permitted Liens) in or upon any of the Purchased Assets; (d) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any Seller; (e) the "Master Service List" established in the Bankruptcy Cases; (f) all Governmental Entities exercising jurisdiction with respect to environmental matters affecting or relating to the Purchased Assets; (g) the twenty (20) largest (by amount owed by such Seller to such creditor) unsecured creditors of each Seller; and (h) the Department of Health and Human Services and its Centers for Medicare and Medicaid Services, TDADS, TDH and the Tennessee Board for Licensing Health Facilities.

I.     The Purchased Assets are property of the Senior Care Debtors' estates and title thereto is vested in the Senior Care Debtors' estates.  All assets (if any) previously held by UGHS Behavioral Health Management Services, Inc. and related to, used or held for use in connection with the Business are included in the Purchased Assets, and any and all Liens asserted against (or that could be asserted against) such assets and/or UGHS Behavioral Health Management Services, Inc. are (and shall constitute) Excluded Liabilities.

J.      The Senior Care Debtors have demonstrated a sufficient basis and the existence of reasonable and appropriate circumstances requiring them to enter into the Agreement, sell the Purchased Assets, and assume and assign the Desired 365 Contracts under Bankruptcy Code § § 363 and 365, and such actions are appropriate exercises of the Senior Care Debtors' business judgment, are consistent in all respects with the Senior Care Debtors' fiduciary duties, and are in the best interests of the Senior Care Debtors, their estates, their creditors, their residents, their employees, and their other stakeholders.  Such circumstances include, but are not limited to, the fact that (i) there is a substantial risk of deterioration of the value of the Purchased Assets if the Transactions are not consummated quickly, (ii) the Agreement and the Closing present the best opportunity to realize the value of the Purchased Assets on a going concern basis and to avoid a decline and devaluation of the Senior Care Debtors' businesses, (iii) the Agreement constitutes the highest and/or best offer for the Purchased Assets, (iv) the Closing will preserve continuity of service to the Senior Care Debtors' elderly residents; and (v) unless the sale of the Purchased Assets is concluded expeditiously as provided for in the Sale Motion and the Agreement, the stakeholders' recoveries will likely be diminished.

K.      The Bidding Procedures were non-collusive, substantively and procedurally fair to all parties, and were the result of arm's length negotiations between the Senior Care Debtors and the Purchaser.

L.      The Senior Care Debtors and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and the hearing held in this Court on November ____, 2015 to consider entry of the Bidding Procedures Order (the "Bidding Procedures Hearing"), and (ii) the representations of counsel made on the record at

the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Senior Care Debtors (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest and/or otherwise best offer to purchase all of the Senior Care Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (c) considered in good faith any bids submitted on or before the deadline to submit bids as set forth in the Bidding Procedures (the "Bid Deadline").

M.     There were [___] Qualified Bidders (as such term is defined in the Bidding Procedures Order) that participated in the Auction.  The Purchaser submitted the highest and/or otherwise best offer and the Purchaser is the bidder that submitted the "Prevailing Bid" for the Purchased Assets in accordance with the Bidding Procedures Order.  The Bidding Procedures obtained the highest value for the Purchased Assets for the Senior Care Debtors and their estates. [Add Back-Up Bidder language if necessary after Auction or delete references to Auction if not conducted]

N.     The offer of the Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Senior Care Debtors pursuant to the Agreement, (i) is the highest and/or best offer received by the Senior Care Debtors, (ii) is fair and reasonable, (iii) is in the best interests of the Senior Care Debtors' creditors, residents, employees, stakeholders and estates, (iv) constitutes full and fair consideration and reasonably equivalent value for the Purchased Assets, and (v) will provide a greater recovery for the Senior Care Debtors' creditors, stakeholders and other interested parties than would be provided by any other practically available alternative.   In reaching this

determination, the Court has taken into account both the consideration to be realized directly by the Senior Care Debtors, including the Purchaser's agreement to satisfy (or to provide funds to enable the Senior Care Debtors to satisfy) certain claims against the Senior Care Debtors and the assumption by Purchaser of the Assumed Liabilities, and the indirect benefits of the Transactions for the Senior Care Debtors' employees and residents.

O.      The Purchaser is not an "insider" or "affiliate" of the Senior Care Debtors as those terms are defined in the Bankruptcy Code and the decisions thereunder.  The Purchaser is a purchaser in "good faith," as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of Bankruptcy Code § 363(m) with respect to all of the Purchased Assets.  The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind.  Neither the Senior Care Debtors nor the Purchaser have engaged in any conduct that would prevent the application of Bankruptcy Code § 363(m) or cause the application of, or implicate, Bankruptcy Code § 363(n) to the Agreement or to the consummation of the Transactions and transfer of the Purchased Assets and Desired 365 Contracts to the Purchaser.  The Purchaser is purchasing the Purchased Assets (including the Desired 365 Contracts) in good faith, is a good faith purchaser within the meaning of Bankruptcy Code § 363(m), is an assignee in good faith of the Desired 365 Contracts, and is, therefore, together with the Senior Care Debtors, entitled to the protection of Bankruptcy Code § 363(m).  Additionally, the Purchaser otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (i) the Purchaser recognized that the Senior Care Debtors were free to deal with any other party interested in acquiring the Purchased Assets, (ii) the Purchaser complied with the Bidding Procedures, (iii) all consideration to be  paid by the Purchaser and other agreements or arrangements entered into by the Purchaser in

connection with the sale have been disclosed, (iv) the Purchaser has not violated Bankruptcy Code § 363(n) by any action or inaction, and (v) the negotiation and execution of the Agreement and any other agreements or instruments related thereto was in good faith.

P.      The Senior Care Debtors have full corporate, limited liability company and other power and authority to execute the Agreement (and all other documents contemplated thereby) and to consummate the Transactions, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate, limited liability company and other actions on the part of the Senior Care Debtors.  No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Senior Care Debtors to consummate such Transactions.

Q.      The Senior Care Debtors have advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and sell and assign the Purchased Assets, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Senior Care Debtors' business judgment to sell the Purchased Assets and to consummate the Transactions contemplated by the Agreement.  Notwithstanding any requirement for approval or consent by any Person, the transfer of the Purchased Assets to the Purchaser and the assumption and assignment of the Desired 365 Contracts is a legal, valid, and effective transfer of the Purchased Assets (including the Desired 365 Contracts).

R.      The terms and conditions of the Agreement, including the total consideration to be realized by the Senior Care Debtors pursuant to the Agreement, are fair and reasonable, and the Transactions contemplated by the Agreement are in the best interests of the Senior Care Debtors' estates.

S.      The Purchased Assets shall be sold free and clear of any and all liens, claims (as used in this Order, the term "claims" shall have the definition set forth in the Bankruptcy Code), liabilities, encumbrances and interests of any kind or nature whatsoever including, without limitation, all liens, mechanics' liens, materialmens' liens, warehousemans' liens, consensual liens, non-consensual liens, statutory liens, hypothecations, encumbrances, security interests, mortgages, security deeds, deeds of trust, debts, levies, indentures, pledges, restrictions (whether on voting, sale, transfer, disposition or otherwise), charges, leases, licenses, easements, rights of way, instruments, preferences, priorities, security agreements, conditional sales agreements, title retention contracts, options, judgments, offsets, rights of recovery, rights of pre-emption, rights of setoff or recoupment, rights of first refusal, other third party rights, other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever, claims for reimbursement, claims for contribution, claims for indemnity, claims for exoneration, products liability claims, alter-ego claims, successor-in-interest claims, successor liability claims, substantial continuation claims, COBRA claims, withdrawal liability claims (including under any Employee Benefit Plan), environmental claims, claims under or relating to any Company Benefit Plan or ERISA Affiliate plan (including any pension or retirement plan), Tax claims (including claims for any and all foreign, federal, state and local Taxes), decrees of any court or foreign or domestic Governmental Entity, orders and claims of any Governmental Entity, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security devise, and (iii) any claim based on any theory that the Purchaser is a successor, successor-in-interest, continuation or a substantial continuation of the Senior Care Debtors or the Senior Care Debtors' business), reclamation claims, obligations, liabilities,

- 10 -

demands, and guaranties, whether any of the foregoing are known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, secured or unsecured, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Bankruptcy Cases, and whether imposed by agreement, understanding, Law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, successor-in-interest liability, continuation liability or substantial continuation liability including, without limitation, that Purchaser is in any way a successor, successor-in-interest, continuation or substantial continuation of the Senior Care Debtors or their businesses (collectively, the "Liens"), other than the Permitted  Liens and Assumed Liabilities.  Purchaser would not have entered into the Agreement, and would not have agreed to purchase and acquire the Purchased Assets, if the sale of the Purchased Assets was not free and clear of any and all Liens (other than Permitted Liens and Assumed Liabilities).

T.      All Liens (other than the Permitted Liens and Assumed Liabilities) shall attach to the consideration to be received by the Senior Care Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing.

U.      The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets and shall vest Purchaser with all right, title, and interest of the Senior Care Debtors to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens and Assumed Liabilities).  Except as specifically provided in the Agreement, the Purchaser shall not assume or become liable for any Liens other than the Permitted Liens and Assumed Liabilities.

V.      The transfer of the Purchased Assets to the Purchaser free and clear of all Liens (other than the Permitted Liens and Assumed Liabilities) will not result in any undue burden or prejudice to any holders of any Liens, because all such Liens of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Senior Care Debtors in the order of their priority, with the same validity, force, and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Senior Care Debtors or other parties may possess with respect thereto.  All persons having Liens of any kind or nature whatsoever against or in any of the Senior Care Debtors or the Purchased Assets are and shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens (other than the Assumed Liabilities and Permitted Liens) against the Purchaser, any of its assets, property, successors or assigns, or the Purchased Assets.

W.      The Senior Care Debtors may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities) because, in each case, one or more of the standards set forth in Bankruptcy Code § 363(f) has been satisfied.  Those (i) holders of Liens in or with respect to the Purchased Assets and (ii) non-debtor parties to the Desired 365 Contracts, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to Bankruptcy Code § 363(f)(2).  All objections to the Sale Motion have been overruled or resolved.  Those holders of Liens in or with respect to the Purchased Assets who did object fall within one or more of the other subsections of Bankruptcy Code § 363(f) and are adequately protected by having their Liens, if any, attach to the proceeds of the sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may

claim any Liens, with such Liens being subject to treatment as may be prescribed in the Senior Care Debtors' chapter 11 plan or by separate order of this Court.

      X.     Not selling the Purchased Assets free and clear of all Liens (other than the Permitted Liens and Assumed Liabilities) would adversely impact the Senior Care Debtors' estates, and the sale of Purchased Assets other than one free and clear of all Liens (other than the Permitted Liens and Assumed Liabilities) would be of substantially less value to the Senior Care Debtors' estates.

      Y.     The Senior Care Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of Bankruptcy Code § 365, including Bankruptcy Code § § 365(b)(1)(A), (B) and 365(f), in connection with the sale and the assumption and assignment of the Desired 365 Contracts. The Purchaser has demonstrated adequate assurance of future performance with respect to the Desired 365 Contracts pursuant to Bankruptcy Code § 365(b)(1)(C). The assumption and assignment of the Desired 365 Contracts pursuant to the terms of this Order are integral to the Agreement and are in the best interests of the Senior Care Debtors, their estates, their creditors, their residents, their employees, their stakeholders and other parties in interest, and represent the exercise of sound and prudent business judgment by the Senior Care Debtors.

      Z.     The Desired 365 Contracts are assignable notwithstanding any provisions contained therein to the contrary. The Senior Care Debtors shall have sole responsibility for paying all Cure Costs required to assume and assign the Desired 365 Contracts to the Purchaser.

      AA.     The Purchaser has and will be acting in good faith, pursuant to Bankruptcy Code § 363(m), at all times including in closing the Transactions and at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

BB.     The Transactions do not amount to or constitute a consolidation, merger, or *de facto* merger of the Purchaser and the Senior Care Debtors or the Senior Care Debtors' estates, there is not substantial continuity between the Purchaser and the Senior Care Debtors or the Senior Care Debtors' estates, there is no continuity of enterprise between the Purchaser and the Senior Care Debtors or the Senior Care Debtors' estates, the Purchaser is not a continuation or substantial continuation of the Senior Care Debtors or their estates, and the Purchaser is not a successor or successor-in-interest to the Senior Care Debtors or their estates.

CC.     The total consideration provided by the Purchaser for the Purchased Assets was the highest and/or best offer received by the Senior Care Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

DD.     Time is of the essence in consummating the sale.  There is no credible basis for concluding that a delay in the sale of the Purchased Assets would result in a higher or better offer for the Purchased Assets than the offer reflected in the Agreement.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d).

EE.     At and effective as of the Closing, the Purchaser shall assume sole responsibility for paying and satisfying the Assumed Liabilities as provided in the Agreement.  For the avoidance of doubt, nothing in this Order (including, without limitation, any provisions in this

Order regarding the sale, transfer or conveyance of the Purchased Assets free and clear of Liens) nor in the Agreement shall be construed to mean that the Purchaser is not assuming from the Senior Care Debtors and thereafter becoming solely responsible for the payment, performance and discharge of the Assumed Liabilities as provided in the Agreement.  After the Closing, the Senior Care Debtors shall have no liability whatsoever with respect to the Assumed Liabilities. The Purchaser shall have no obligations or responsibility whatsoever with respect to any claims against the Senior Care Debtors (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities.

**NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The relief requested in the Sale Motion is granted in its entirety, and the Agreement and the provisions thereof are approved in their entirety, subject to the terms and conditions contained herein.

2.      All objections, responses, reservations of rights, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, or settled, it is overruled and denied on the merits.

3.      Notice of the Sale Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Agreement, the sale of the Purchased Assets free and clear of all Liens, the Transactions, and the assumption and assignment of the Desired 365 Contracts was reasonable, fair and equitable under the circumstances and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004, and 6006.

4.      The sale of the Purchased Assets, the terms and conditions of the Agreement

(including all schedules and exhibits affixed thereto), and the Transactions be, and hereby are, authorized and approved in all respects.

5.      The sale of the Purchased Assets and the consideration provided by the Purchaser under the Agreement are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable Law.

6.      The Purchaser is hereby granted and is entitled to all of the protections provided to a good faith purchaser under Bankruptcy Code § 363(m), including, without limitation, with respect to all of the Transactions (part of which includes the transfer of the Desired 365 Contracts as part of the sale of the Purchased Assets pursuant to Bankruptcy Code § 365 and this Order).

7.      The Senior Care Debtors shall be, and hereby are, authorized and directed to fully assume, perform under, consummate, and implement the terms of the Agreement together with any and all additional instruments and documents that may be necessary or desirable in connection with implementing and effectuating the terms of the Agreement, this Order, and/or the sale of the Purchased Assets including, without limitation, bills of sale, certificates, deeds, assignments, and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession, any or all of the Purchased Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Senior Care Debtors' obligations as contemplated by the Agreement, without any further corporate, limited liability company, or other action or orders of this Court.

8.      The Senior Care Debtors and each other Person having duties or responsibilities

- 16 -

under the Agreement, any agreements or instruments related thereto or this Order, and their respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys, are authorized, directed and empowered, subject to the terms and conditions contained in the Agreement and this Order, to carry out all of the provisions of the Agreement and any related agreements or instruments; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement and any related agreements or instruments; to take any and all actions contemplated by the Agreement, any related agreements or instruments, or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, termination statements, indentures, mortgages, quitclaim deeds, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary, desirable or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements or instruments, this Order and the Transactions, all without further application to, or order of, the Court or further action by their respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, managers, partners, agents, representatives, and attorneys of such entities.  The secretary or any assistant secretary of each Debtor (or any comparable officer) shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Senior Care Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable Governmental Entity any and all certificates, agreements, or amendments necessary or

appropriate to effectuate the Transactions and this Order, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable Laws of all applicable Governmental Entities or as any of the officers of the Senior Care Debtors may determine are necessary, desirable or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporate and limited liability company Laws of the State of Texas and all other applicable business, corporation, non-profit, limited liability company, trust, and other Laws of the applicable Governmental Entities with respect to the implementation and consummation of the Agreement, any related agreements or instruments, this Order, and the Transactions.

9.     Effective as of the Closing, (a) the sale of the Purchased Assets by the Senior Care Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any Person and shall vest the Purchaser with good, valid and marketable title in and to the Purchased Assets, free and clear of any and all Liens of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities) pursuant to Bankruptcy Code § 363(f), and (b) the assumption of the Assumed Liabilities by the Purchaser shall constitute a legal, valid and effective delegation and assignment of all Assumed Liabilities to the Purchaser and shall divest the Senior Care Debtors of all liability with respect to any Assumed Liabilities.

10.    The sale of the Purchased Assets is not subject to avoidance pursuant to Bankruptcy Code § 363(n).

11.    At the Closing, the Senior Care Debtors shall be, and hereby are, authorized,

empowered, and directed, pursuant to Bankruptcy Code § § 105, 363(b), 363(f) and 365, to sell the Purchased Assets and to assume and assign the Desired 365 Contracts to the Purchaser.  The sale of the Purchased Assets shall vest the Purchaser with all right, title and interest of the Senior Care Debtors to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens and Assumed Liabilities), with all such Liens to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and defenses the Senior Care Debtors may possess with respect thereto.  Following the Closing Date, no holder of any Liens in the Purchased Assets (other than the Permitted Liens and Assumed Liabilities) shall interfere with the Purchaser's use and enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Senior Care Debtors may take in the Bankruptcy Cases.  All Persons having Liens of any kind or nature whatsoever against or in any of the Senior Care Debtors or the Purchased Assets are forever barred, estopped and permanently enjoined from pursuing or asserting any such Liens (other than the Permitted Liens and the Assumed Liabilities) against the Purchaser, any of Purchaser's assets, property, successors or assigns, or the Purchased Assets.  No Person shall take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions.

12.    The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Liens (other than the Permitted Liens and Assumed Liabilities) shall be self-executing, and neither the Senior Care Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order.  However, the Senior Care Debtors and the Purchaser, and each of their respective officers, employees, and agents, are hereby authorized and empowered to take all actions and to execute and deliver any and all

documents and instruments that either the Senior Care Debtors or the Purchaser deem necessary, desirable or appropriate to implement and effectuate the terms of the Agreement and this Order.

13.     On or before the Closing Date, the Senior Care Debtors' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release any Liens (other than the Permitted Liens) of any kind against the Purchased Assets, as such Liens may have been recorded or may otherwise exist, and deliver such executed documents to the Senior Care Debtors' counsel to be held in escrow.  If any Person that has filed financing statements, mortgages or other documents, instruments or agreements evidencing any Liens in or against the Purchased Assets (other than the Permitted Liens) shall not have delivered to the Senior Care Debtors' counsel prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens that such Person has with respect to the Purchased Assets, the Senior Care Debtors and each of the Senior Care Debtors' officers are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of such Person with respect to such Purchased Assets at Closing, and the Purchaser and each of the Purchaser's officers are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such Person with respect to such Purchased Assets after the Closing.  In addition, after Closing, the Purchaser and the Senior Care Debtors are authorized to file a copy of this Order in the appropriate real estate records, the secretary of state records and any other filing location selected by the Purchaser or the Senior Care Debtors and, once filed, this Order shall constitute conclusive evidence of the release of all Liens (other than Permitted Liens) from the Purchased Assets.

14.     To the greatest extent available under applicable Law, (a) the Purchaser shall be authorized, as of the Closing Date, to operate under any License, permit, approval, certificate of occupancy, certificate of need, authorization, accreditation, operating permit, registration, plan and the like of any Governmental Entity relating to the Purchased Assets (collectively, the "Permits"), (b) all such Permits are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date, and (c) each Governmental Entity that has issued or granted a Permit and who did not object to the sale of the Purchased Assets shall be deemed to have consented to the transfer of such Permit to the Purchaser as of the Closing Date.

15.     All of the Senior Care Debtors' interests in the Purchased Assets to be acquired by the Purchaser under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser.  Upon the occurrence of the Closing, this Order shall be considered and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets acquired by the Purchaser under the Agreement and/or a bill of sale, deed, or assignment transferring good, valid and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser.

16.     Except as expressly provided in the Agreement, the Purchaser is not assuming nor shall it or any Affiliate of the Purchaser be in any way liable or responsible, as a successor, successor-in-interest, continuation, substantial continuation, or otherwise, for any claims, debts, or obligations of the Senior Care Debtors in any way whatsoever relating to or arising from the Senior Care Debtors' ownership or use of the Purchased Assets prior to the consummation of the Transactions, or any claims or liabilities calculable by reference to the Senior Care Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to consummation of the Transactions, which liabilities, claims, debts, and obligations are

hereby extinguished insofar as they may give rise to liability, successor, successor-in-interest, continuation, substantial continuation, or otherwise, against the Purchaser or any Affiliate of the Purchaser.

17.     On the Closing Date, each of the Senior Care Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Liens (other than the Permitted Liens) against the Purchased Assets, if any, as may have been recorded or may otherwise exist.

18.     All Persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.

19.     Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Senior Care Debtors of the Desired 365 Contracts and the sale and assignment of such agreements and unexpired leases to the Purchaser, as provided for or contemplated by the Agreement, be, and hereby are, authorized and approved pursuant to Bankruptcy Code § § 363 and 365.

20.     The Desired 365 Contracts shall be deemed valid and binding and in full force and effect and assumed by the Senior Care Debtors and sold and assigned to the Purchaser at the Closing, pursuant to Bankruptcy Code § § 363 and 365, subject only to the payment of the Cure Costs.

21.     Upon the Closing, in accordance with Bankruptcy Code § § 363 and 365, the Purchaser shall be fully and irrevocably vested in all right, title, and interest in and to each Desired 365 Contract.  The Senior Care Debtors shall reasonably cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

22.     Pursuant to Bankruptcy Code § § 365(b)(l)(A) and (B), the Senior Care Debtors shall promptly pay at Closing or cause to be paid at Closing to the non-debtor parties to any Desired 365 Contracts the requisite Cure Costs, if any, set forth on the Cure Notice, except to the extent that a Cure Cost was amended on the record of the Sale Hearing, following the assumption and assignment thereof.  The Cure Costs are hereby fixed at the amounts set forth on the Cure Notice, or the amounts set forth on the record of the Sale Hearing, as the case may be, and the non-debtor parties to the Desired 365 Contracts are forever bound by such Cure Costs.

23.     All defaults or other obligations under the Desired 365 Contracts arising prior to the Closing (without giving effect to any acceleration clauses, assignment fees, increases, advertising rates, or any other default provisions of the kind specified in Bankruptcy Code § 365(b)(2)) shall be deemed cured by payment of the Cure Costs.

24.     Any provision in any Desired 365 Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Senior Care Debtors is unenforceable, and all Desired 365 Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Costs, if any.  No sections or provisions of any Desired 365 Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor party to the Desired 365 Contract shall have any force and effect with respect to the Transactions and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code § 365(f) and/or are otherwise unenforceable under Bankruptcy Code § 365(e) and no assignment of any Desired 365 Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Desired 365 Contract. The non-debtor party to each Desired 365 Contract shall be deemed to have consented to such

- 23 -

assignment under Bankruptcy Code § 365(c)(1)(B), and the Purchaser shall enjoy all of the Senior Care Debtors' rights and benefits under each such Desired 365 Contract as of the applicable date of assumption without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof.

25.     The Purchaser has satisfied all requirements under Bankruptcy Code § § 365(b)(1)(C) and 365(f)(2)(b) to provide adequate assurance of future performance under the Desired 365 Contracts.

26.     The Senior Care Debtors and their estates shall be relieved of any liability for any breach of any of the Desired 365 Contracts occurring from and after Closing, pursuant to and in accordance with Bankruptcy Code § 365(k).

27.     Pursuant to Bankruptcy Code § § 105(a), 363, and 365, all parties to the Desired 365 Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Desired 365 Contracts existing as of the Closing or arising by reason of the Closing, except for any amounts that are Assumed Liabilities being assumed by the Purchaser under the Agreement.

28.     Each and every federal, state, and local governmental agency or department (including each Governmental Entity) is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Agreement and this Order.  This Order and the Agreement shall govern the acts of all such federal, state, and local governmental agencies and departments, including any filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of Law, the duties of their office, or contract, to

accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets, and each such entity is hereby directed to accept this Order for recordation as conclusive evidence of the free, clear, and unencumbered transfer of title to the Purchased Assets conveyed to Purchaser pursuant to the Agreement.

29.     To the maximum extent permitted by Bankruptcy Code § 525, no Governmental Entity may revoke or suspend any Permit relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Bankruptcy Cases or the consummation of the Transactions.

30.     The Purchaser has not assumed and is not otherwise obligated for any of the claims against the Senior Care Debtors (including, without limitation, the Excluded Liabilities) other than the Assumed Liabilities as set forth in the Agreement, and the Purchaser has not purchased any of the Retained Assets as set forth in the Agreement.  Consequently, all Persons, Governmental Units (as defined in Bankruptcy Code § § 101(27) and 101(41)) and all holders of Liens (other than the Permitted Liens) based upon or arising out of claims retained by the Senior Care Debtors are hereby enjoined from taking any action against the Purchaser or the Purchased Assets to recover any Liens or on account of any claims against the Senior Care Debtors other than Permitted Liens and Assumed Liabilities pursuant to the Agreement.  All Persons holding or asserting any Liens in or relating to the Retained Assets are hereby enjoined from asserting or prosecuting such Liens or any cause of action against the Purchaser or the Purchased Assets for any Liens associated with the Retained Assets.

31.     The Purchaser is not a "successor," "successor-in-interest," "continuation," or "substantial continuation" to or of the Senior Care Debtors or their estates by reason of any

theory of Law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability, claim or obligation of any of the Senior Care Debtors and/or their estates including, but not limited to, any bulk sales Law, successor liability, successor-in-interest liability, substantial continuation liability, or similar liability except to the extent expressly included in the Assumed Liabilities or provided in the Agreement.  Neither the purchase of the Purchased Assets by the Purchaser, nor the fact that the Purchaser is using any of the Purchased Assets previously operated by the Senior Care Debtors, will cause the Purchaser or any of its affiliates to be deemed a successor, successor-in-interest, continuation, or substantial continuation in any respect to the Senior Care Debtors' business within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Family and Medical Leave Act ("FMLA"), WARN, Tax, labor, employment, environmental, or other Law, rule or regulation (including, without limitation, filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to the Senior Care Debtors' liability under such Law, rule or regulation or doctrine, except to the extent expressly included in the Assumed Liabilities or provided in the Agreement.

32.     For the avoidance of doubt, transfer of title and possession of the Purchased Assets shall be free and clear of any claims and other Liens pursuant to any successor, successor-in-interest, continuation, or substantial continuation theory, including the following:  (a) any employment or labor agreements, (b) all deeds of trust, security deeds, mortgages, liens, financing statements, and security interests, (c) any pension or medical benefit plan of the Senior Care Debtors, compensation or other Employee Benefit Plan of the Senior Care Debtors, welfare, agreements, practices and programs, (d) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without

limitation, claims and other Liens that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) WARN, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), (x) state discrimination Laws, (xi) state unemployment compensation Laws or any other similar state Laws, or (xii) any other state or federal benefits or claims and other Liens relating to any employment with the Senior Care Debtors or any predecessors, (e) environmental or other claims and other Liens arising from existing conditions on or prior to the Closing (including, without limitation, the presence of Hazardous Materials) that may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") or any other state or federal statute, (f) any bulk sales or similar Law, (g) any Tax statutes or ordinances, including, without limitation, the Code, and (h) any and all theories of successor liability, including any theories on successor products liability grounds or otherwise.

33.     Except to the extent expressly included in the Assumed Liabilities or provided in the Agreement, the Purchaser and its affiliates shall have no liability, obligation, or responsibility under WARN or CERCLA, or any foreign, federal, state or local labor, employment, or environmental Law by virtue of the Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

34.     Except to the extent expressly included in the Assumed Liabilities, pursuant to Bankruptcy Code § § 105 and 363, all Persons including, but not limited to, the Senior Care Debtors, the official committee of unsecured creditors, all debt holders, equity security holders,

the Senior Care Debtors' employees or former employees, Governmental Entities, lenders, parties to or beneficiaries under any Company Benefit Plan, trade and other creditors asserting or holding a Lien of any kind or nature whatsoever against, in, or with respect to any of the Senior Care Debtors or the Purchased Assets (other than the Permitted Liens and Assumed Liabilities), arising under or out of, in connection with, or in any way relating to the Senior Care Debtors, the Purchased Assets, the operation of the Senior Care Debtors' businesses prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Lien, including assertion of any right of setoff, recoupment or subrogation, and enforcement, attachment, or collection of any judgment, award, decree, or order, against the Purchaser or any affiliate, successor or assign thereof and each of their respective current and former shareholders, members, managers, officers, directors, attorneys, employees, partners, affiliates, financial advisors, and representatives (each of the foregoing in its individual capacity), or the Purchased Assets.

35.     Without limiting the generality of the foregoing, the Purchaser shall not assume or be obligated to pay, perform or otherwise discharge any workers' compensation debts, obligations, and liabilities of the Senior Care Debtors arising pursuant to state Law or otherwise. This Order is intended to be all inclusive and shall encompass, but not be limited to, workers' compensation claims or suits of any type, whether now known or unknown, whenever incurred or filed, which have occurred or which arise from work-related injuries, diseases, death, exposures, intentional torts, acts of discrimination, or other incidents, acts, or injuries prior to the Closing Date, including, but not limited to, any and all workers' compensation claims filed or to be filed, or reopenings of those claims, by or on behalf of any of the Senior Care Debtors'

current or former employees, persons on laid-off, inactive or retired status, or their respective dependents, heirs or assigns, as well as any and all premiums, assessments, or other obligations of any nature whatsoever of the Senior Care Debtors relating in any way to workers' compensation liability.

36.    Subject to the terms of the Agreement, the Agreement and any related agreements and/or instruments may be waived, modified, amended, or supplemented by agreement of the Senior Care Debtors and the Purchaser, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not materially adverse to the Senior Care Debtors.

37.    The failure specifically to include any particular provisions of the Agreement or any related agreements or instruments in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court, the Senior Care Debtors, and the Purchaser that the Agreement and any related agreements and instruments are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing.

38.    Nothing in this Order or the Agreement releases, nullifies, precludes, or enjoins the United States' enforcement of any liability under environmental Laws against the Purchaser or other future owner or operator as the current owner or operator of the Purchased Assets from and after the Closing Date.

39.    No bulk sale Law or any similar Law of any state or other jurisdiction shall apply in any way to the sale and the Transactions contemplated by the Agreement.

40.     Other than as explicitly set forth in Paragraph 41 below, nothing in this Order shall alter or amend the Agreement and the obligations of the Senior Care Debtors and the Purchaser thereunder.

41.     Notwithstanding anything to the contrary set forth in Section 3.3 of the Agreement, (i) the Closing Payment shall be made to the Designated Account (as such term is defined in the Loan Agreement, dated November **[9]**, 2015, among the Sellers and White Oak Asset Finance, LLC) and shall be held by Sellers in the Designated Account pending the entry of a final order of the Court authorizing distribution of the Closing Payment, and (ii) any allocation of the Closing Payment between and among the Sellers in Section 3.3 of the Agreement shall be subject to the rights of any party in interest to object to such allocation of the Closing Payment, which rights are hereby reserved.

42.     This Order and the Agreement shall be binding upon and govern the acts of all Persons including, without limitation, the Senior Care Debtors, the Senior Care Debtors' estates, the Purchaser, and each of their respective directors, officers, employees, agents, successors, and permitted assigns, including, without limitation, any Chapter 11 trustee hereinafter appointed for the Senior Care Debtors' estates, any trustee appointed in a Chapter 7 case if these Bankruptcy Cases are converted from Chapter 11, any Chapter 11 plan agent or trustee, liquidating agent or trustee, or any other agent or trustee charged with administering any assets of the Senior Care Debtors or their estates, all creditors of each Debtor (whether known or unknown), the official committee of unsecured creditors and its professionals, holders of Liens in or with respect to the Purchased Assets, filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other Persons who may be required by operation of Law, the duties of their office,

or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title in or to the Purchased Assets.

43.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in these Bankruptcy Cases, or in any subsequent or converted cases of the Senior Care Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

44.     The stays imposed by Bankruptcy Rules 6004(h), 6006(d), and 7062 are hereby waived, and this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any Person obtaining a stay pending appeal, the Senior Care Debtors and the Purchaser are free to close under the Agreement at any time, subject to the terms of the Agreement.  In the absence of any Person obtaining a stay pending appeal, if the Senior Care Debtors and the Purchaser close under the Agreement, the Purchaser shall be deemed to be acting in "good faith" and shall be entitled to the protections of Bankruptcy Code § 363(m) as to all aspects of the Transactions if this Order or any authorization contained herein is reversed or modified on appeal.

45.     The sale of the Purchased Assets to the Purchaser outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Senior Care Debtors' creditors nor impermissibly dictates the terms of a liquidating plan or plan of reorganization of the Senior Care Debtors.  The Transactions do not constitute a *sub rosa* Chapter 11 plan.

46.     The automatic stay provisions of Bankruptcy Code § 362 are vacated and modified to the extent necessary to implement the terms and conditions of the Agreement and the

provisions of this Order, and the stay imposed by Bankruptcy Rule 4001(a)(3) is hereby waived with respect thereto.

47.     This Court shall retain jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Agreement (including, without limitation, all documents and instruments executed in connection with the Closing) in all respects and to decide any disputes concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Desired 365 Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of any and all Liens (except Permitted Liens and Assumed Liabilities).

48.     The provisions of this Order are non-severable and mutually dependent.  The terms and conditions of the Agreement (including all schedules, annexes and exhibits thereto) constitute a single, integrated transaction and are mutually dependent and non-severable.

49.     As soon as practicable after the Closing, the Senior Care Debtors shall file a report of sale in accordance with Bankruptcy Rule 6004(f)(1).

SIGNED this _____ day of January, 2016.


_____
**THE HONORABLE LETITIA PAUL,**
**UNITED STATES BANKRUPTCY JUDGE**

<u>Exhibit E</u>
**Persons with Knowledge**

1. Donald W. Sapaugh
2. Dr. Hassan Chahadeh
3. Edward T. Laborde, Jr.
4. Melynda Steed
5. Laura King
6. Lauren S. Appel
7. Donald A. Tull

1

Exhibit F

ESTOPPEL CERTIFICATE

To:  _____
     _____
     _____

Re:   Lease dated _____ __, 20__ by and between _____
      ("Owner/Landlord"), and _____ ("Tenant"), with respect to a
      portion (the "Leased Premises") of the project known as _____,
      located at _____, FHA Project No. _____ (the "Project").

Gentlemen:

This Estoppel Certificate is furnished by Owner/Landlord and Tenant to Lancaster Pollard
Mortgage Company, LLC (the "Lender") and the _____ ("Purchaser") in
connection with the Project.  Owner/Landlord and Tenant understand that the Lender and
Purchaser are relying upon this Estoppel Certificate in connection with purchasing the Project.

A.    Certifications of Tenant.  Tenant hereby represents and certifies to the Lender and
Purchaser and their respective successors and assigns that, except as set forth in Exhibit A attached
hereto:

1.    "Lease" means the following documents, true and correct copies of which are
attached hereto as Exhibit B:

      Lease dated _____ __, 20__ between Owner/Landlord and Tenant or
      predecessor in interest;

2.    Tenant is the tenant under the Lease and has not assigned, pledged, encumbered or
transferred any of its rights or obligations thereunder.  Tenant has not subleased all or any portion
of the Leased Premises.

3.    The Lease sets forth the full and complete agreement between Owner/Landlord and
Tenant with respect to the Leased Premises.  The Lease has not been amended (except as may be
shown in Exhibit B), is in full force and effect according to its terms, and is valid and binding
upon Tenant.

4.    Tenant is not in default under the Lease.  No state of facts exists which, with the
passage of time or the giving of notice, or both, could constitute a default by Tenant under the
Lease.  All rent, charges and other payments due to Owner/Landlord from Tenant under the Lease
on or before the date hereof have been paid.

5.      To the best of Tenant's knowledge; (a) Owner/Landlord is not in default under the Lease and (b) no state of facts exist which, with the passage of time or the giving of notice, or both, could constitute a default by Owner/Landlord under the Lease.

6.      Tenant has not paid any rent, charges or other payments due to Owner/Landlord from Tenant under the Lease more than thirty (30) days in advance.  Base rent is currently payable in the amount of $_____ per month.  The amount of the security deposit held by Landlord is $_____.

7.      The Lease expires on _____ and Tenant has no renewal or extension options.

8.      To the best of Tenant's knowledge, all conditions under the Lease to be satisfied by Owner/Landlord or Tenant as of the date hereof have been satisfied.

9.      All improvements, alterations and other work, if any, to be performed or constructed by Owner/Landlord under the Lease have been completed and have been accepted by Tenant. All contributions, if any, required to be paid to Tenant by Owner/Landlord for improvements to the Leased Premises have been paid.

10.      The Tenant has no rights or options to purchase the Project.

11.      Other than case no. _____ pending in the United States Bankruptcy Court for the Southern District of Texas, there are no actions, voluntary or involuntary, pending against Tenant under any bankruptcy, receivership, insolvency or similar laws of the United States or any State thereof.

B.      Certifications of Owner/Landlord.  Owner/Landlord hereby represents and certifies to the Lender and Purchaser and their respective successors and assigns that, except as set forth in Exhibit A attached hereto:

1.      "Lease" means the following documents, true and correct copies of which are attached hereto as Exhibit B:

        Lease dated _____ __, 20__ between Owner/Landlord and Tenant or predecessor in interest;

2.      Owner/Landlord is the landlord under the Lease and has not assigned, pledged, encumbered or transferred any of its rights or obligations thereunder.  Tenant is the tenant under the Lease.  To the best of Owner/Landlord's knowledge, Tenant has not subleased all or any portion of the Leased Premises.

3.      The Lease sets forth the full and complete agreement between Owner/Landlord and Tenant with respect to the Leased Premises.  The Lease has not been amended (except as may be shown in Exhibit B), is in full force and effect according to its terms, and is valid and binding upon Owner/Landlord.

      4.     To the best of Owner/Landlord's knowledge; (a) Tenant is not in default under the Lease and (b) no state of facts exists which, with the passage of time or the giving of notice, or both, could constitute a default by Tenant under the Lease.  All rent, charges and other payments due to Owner/Landlord from Tenant under the Lease on or before the date hereof have been paid.

      5.     Owner/Landlord is not in default under the Lease.  No state of facts exists which, with the passage of time or the giving of notice, or both, could constitute a default by Owner/Landlord under the Lease.

      6.     Tenant has not paid any rent, charges or other payments due to Owner/Landlord from Tenant under the Lease more than thirty (30) days in advance.  Base rent is currently payable in the amount of $_____ per month.  The amount of the security deposit held by Landlord is $_____.

      7.     The Lease expires on _____ and Tenant has no renewal or extension options.

      8.     To the best of Owner/Landlord's knowledge, all conditions under the Lease to be satisfied by Owner/Landlord or Tenant as of the date hereof have been satisfied.

      9.     All improvements, alterations and other work, if any, to be performed or constructed by Owner/Landlord under the Lease have been completed and have been accepted by Tenant. All contributions, if any, required to be paid to Tenant by Owner/Landlord for improvements to the Leased Premises have been paid.

      10.    There are no actions, voluntary or involuntary, pending against Owner/Landlord under any bankruptcy, receivership, insolvency or similar laws of the United States or any State thereof.

      DATED as of _____ ___, 2015.


                [SEE ATTACHED COUNTERPART SIGNATURE PAGES]

## COUNTERPART SIGNATURE PAGE TO
## ESTOPPEL CERTIFICATE

TENANT:

_____

By: _____
Name: _____
Title: _____

## <u>COUNTERPART SIGNATURE PAGE TO</u>
## <u>ESTOPPEL CERTIFICATE</u>

OWNER/LANDLORD:

_____

By: _____

Name: _____

Title: _____

## **Exhibit A**

Exceptions:

The filing of case no. _____ pending in the United States Bankruptcy Court for the Southern District of Texas.

## **Exhibit B**

(Copy of Lease and all supplements, amendments or modifications thereto and assignments thereof)

**Exhibit G**

**FORM OF
BILL OF SALE**

This BILL OF SALE (this "Bill of Sale"), dated as of [__], is made and entered into by and among **[SELLER],** a [STATE] [corporation] (the "Seller"), and **[BUYER]**, a Texas limited liability company (the "Purchaser").  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of November 10, 2015, by and among Cornerstone Healthcare Group Holding, Inc., a Delaware corporation, University General Health System, Inc., a Nevada corporation, certain "Sellers" (as defined in the Purchase Agreement), including the Seller, and certain "Purchasers" (as defined in the Purchase Agreement), including the Purchaser.

**W I T N E S S E T H:**

WHEREAS, pursuant to, and subject to the terms and conditions of, the Purchase Agreement, the Seller has agreed to sell, transfer and deliver to the Purchaser, and the Purchaser has agreed to purchase and acquire from the Seller, all of the Seller's right, title and interest in, to and under the Purchased Assets held for use by the Seller in connection with the Business (the "Seller's Purchased Assets"); and

WHEREAS, the Seller desires to sell, transfer and deliver to the Purchaser the Seller's Purchased Assets in accordance with the terms and conditions of the Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.     Conveyance.   Subject to the terms and conditions of the Purchase Agreement, the Seller hereby sells, transfers and delivers to the Purchaser all of Seller's right, title and interest in, to and under the Seller's Purchased Assets, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities).

Section 2.     Liabilities.   Subject to the terms and conditions of the Purchase Agreement, the Purchaser does not and will not by acceptance hereof assume any liabilities or obligations whatsoever of the Seller except with respect to Assumed Liabilities as provided in the Purchase Agreement or in any applicable Transaction Document.

Section 3.     Conflict with Purchase Agreement.   Notwithstanding anything herein to the contrary, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter the representations, warranties, covenants or obligations of the parties contained in the Purchase Agreement.   To the extent any terms and provisions of this Bill of Sale are in any way inconsistent with or in conflict with any term, condition or provision of the Purchase Agreement, the Purchase Agreement shall govern and control.

Section 4.      <u>Binding Effect</u>.  This Bill of Sale will be binding upon and will inure to the benefit of the parties hereto and their successors and assigns.

Section 5.      <u>No Third Party Beneficiaries</u>.  This Bill of Sale is solely for the benefit of the Purchaser and its respective successors and assigns, and this Bill of Sale shall not be deemed to confer upon or give to any other third party any remedy, claim, cause of action or other right.

Section 6.      <u>Captions</u>.  The Section headings contained in this Bill of Sale are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Bill of Sale or the intent of any provision of this Bill of Sale.

Section 7.      <u>Further Assurances</u>.  Subject to the terms and conditions of the Purchase Agreement, the Seller shall, from time to time after the date hereof at the reasonable request of the Purchaser and without further consideration, execute and deliver to the Purchaser such additional instruments of conveyance in addition to this Bill of Sale as the Purchaser shall reasonably request to evidence more fully the transfer by the Seller to the Purchaser of the Seller's Purchased Assets.

Section 8.      <u>Controlling Law</u>.  This Bill of Sale will be governed by and construed and enforced in accordance with the internal laws of the State of Texas without reference to its choice of law rules.

Section 9.      <u>Counterparts</u>.  This Bill of Sale may be executed in two (2) or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Bill of Sale or the terms hereof to produce or account for more than one (1) of such counterparts.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each undersigned party has executed this Bill of Sale as of the date first above written.

**SELLER:**

**[SELLER]**


By:_____
Name: _____
Title: _____

**PURCHASER:**

**[PURCHASER]**


By:_____
Name: _____
Title: _____

**Exhibit H**

**FORM OF
ASSUMPTION AGREEMENT**

This ASSUMPTION AGREEMENT (this "Agreement"), dated as of [__], is made and entered into by and among **[SELLER]**, a [STATE] [corporation/limited liability company] (the "Seller"), and **[BUYER]**, a Texas limited liability company (the "Purchaser").  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of November 10, 2015, by and among Cornerstone Healthcare Group Holding, Inc., a Delaware corporation, University General Health System, Inc., a Nevada corporation, certain "Sellers" (as defined in the Purchase Agreement), including the Seller, and certain "Purchasers" (as defined in the Purchase Agreement), including the Purchaser.

**W I T N E S S E T H:**

WHEREAS, in accordance with the terms and conditions of the Purchase Agreement, the Seller desires to assign to the Purchaser, and the Purchaser desires to assume, only the Assumed Liabilities of the Seller (the "Purchaser's Assumed Liabilities").

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.      Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement, the Seller hereby assigns to the Purchaser the Purchaser's Assumed Liabilities, and the Purchaser hereby assumes and agrees to timely pay, duly perform and discharge when due the Purchaser's Assumed Liabilities.

Section 2.      Excluded Liabilities.  Notwithstanding anything to the contrary in this Agreement but subject to the terms and conditions of the Purchase Agreement, other than the Purchaser's Assumed Liabilities, the Purchaser shall not assume, agree to pay, discharge or satisfy, or otherwise have any responsibility for any liability or obligation of the Seller of any kind, character or description whatsoever, whether direct or indirect, known or unknown, absolute or contingent, matured or unmatured, and currently existing or hereinafter arising, including any liability or obligation of the Seller related to the Acquisition, this Agreement or arising from the conduct of the Business or the ownership of the Purchased Assets prior to the Closing, whether or not accrued and whether or not such liability or obligation is disclosed in this Agreement.

Section 3.      Conflict with Purchase Agreement.  Notwithstanding anything herein to the contrary, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement.  To the extent any terms and provisions of this Agreement are in any way

inconsistent with or in conflict with any term, condition or provision of the Purchase Agreement, the Purchase Agreement shall govern and control.

Section 4.  Binding Effect.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their successors and assigns.

Section 5.  Enforcement of Certain Rights.  Nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person other than the parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such person being deemed a third party beneficiary of this Agreement.

Section 6.  No Third Party Beneficiaries.  This Agreement is solely for the benefit of the Purchaser and its respective successors and assigns, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, cause of action or other right.

Section 7.  Captions.  The Section headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

Section 8.  Further Assurances.  Subject to the terms and conditions of the Purchase Agreement, if at any time after the delivery of this instrument any further action is necessary to carry out the purposes of this Agreement, Seller will take such further actions (including the execution and delivery of such further instruments and documents) as Purchaser may reasonably request.

Section 9.  Controlling Law.  This Agreement will be governed by and construed and enforced in accordance with the internal laws of the State of Texas without reference to its choice of law rules.

Section 10.  Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or the terms hereof to produce or account for more than one (1) of such counterparts.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each undersigned party has executed this Agreement as of the date first above written.

**SELLER:**

**[SELLER]**


By:_____
Name: _____
Title: _____


**PURCHASER:**

**[PURCHASER]**


By:_____
Name: _____
Title: _____

**Exhibit I**

**<u>Special Warranty Deeds</u>**

## SPECIAL WARRANTY DEED BY CORPORATION

This instrument prepared by:
Glenn Rogers, PLLC 11610 Bee Caves Road, Suite 220, Austin, Texas 78738

**GRANTOR**:  UGHS Senior Living Real Estate of Knoxville, LLC,
        a Texas limited liability company
ADDRESS:   227 E. Edgewood Drive, Friendswood, Texas 77456

| KNOX COUNTY TRUSTEE |
| --- |
| Property ID:  _____ |
| Same_____ PO_____ |

**GRANTEE**:  CHG Senior Living Real Estate of Knoxville, LLC,
        a Texas limited liability company
ADDRESS:   _____

Person or agency responsible for payment of taxes:
Name: UGHS Senior Living Real Estate of Knoxville, LLC
Address: 227 E. Edgewood Drive, Friendswood, Texas 77456

### APPENDIX II
### FORM FOR OATH

I, or we, hereby swear of affirm that the actual consideration for this transfer, or value of the property or interest in property transferred, whichever is greater, is $_____ which amount is equal to or greater than the amount which the property or interest in property transferred would command at a fair and voluntary sale.

_____
AFFIANT

Sworn to and subscribed before me this _____day of _____,
201_.

_____
Notary Public or Register

My Commission Expires:_____

THIS INDENTURE made and entered into this __ day of _____, 201_, by and between
**UGHS Senior Living Real Estate of Knoxville, LLC, a Texas limited liability company qualified to do business in the state of Tennessee** known hereinafter as First Party (Grantor); and:

**CHG Senior Living Real Estate of Knoxville, LLC, a Texas limited liability company qualified to do business in the state of Tennessee** known hereinafter as Second Party (Grantee);

<div align="center">WITNESSETH:</div>

That for and in consideration of One Dollar ($1.00) and other good and valuable consideration in hand paid, receipt of which is hereby acknowledged,

The First Party has granted, bargained, sold and conveyed and does hereby grant, bargain, sell and convey unto the Second Party the following described premises, to-wit:

SITUATE in the Seventh (7th) Civil District (formerly the Second (2nd) Civil District) of Knox County Tennessee, within the 31st Ward of the City of Knoxville, and being a 6.30 acre tract, more or less, more particularly bounded and described in Exhibit A attached hereto and incorporated herein by reference; and

BEING the same property conveyed to UGHS Senior Living of Knoxville, LLC by Warranty Deed by Corporation from TrinityCare Senior Living of Knoxville, LLC of record in Instrument No. 201111070025211, Register's Office for Knox County, Tennessee and further conveyed via Quitclaim Deed recorded in Instrument No. 201308220013372, Register's Office for Knox County, Tennessee.

With the hereditaments and appurtenances thereto appertaining, hereby releasing all claim to homestead and dower therein.

TO HAVE AND TO HOLD the same premises to the Second Party, its successors and assigns, forever.

And the said First Party, for itself and for its successors and assigns, hereby covenants with Second Party, its assigns, that First Party is lawfully seized in fee simple of the premises above conveyed, has full power, right and authority to convey the same, that said premises are free from all encumbrances except matters described on Exhibit B attached hereto and incorporated herein by this reference (collectively, the "*Permitted Encumbrances*"), and current taxes for the year 201_ which are to be prorated as of the date of closing and assumed by the Grantee herein, and that First Party will forever warrant and defend the said premises and the title thereto against the lawful claims of all persons claiming by or through the First Party, but no further or otherwise, subject to the Permitted Encumbrances.

<div align="center">[Signature on following page]</div>

IN WITNESS WHEREOF, First Party has hereunto caused this instrument to be executed the day and year first hereinabove written.

UGHS Senior Living Real Estate of Knoxville, LLC, a Texas limited liability company

By:_____

Donald W. Sapaugh, Manager

THE STATE OF TEXAS

COUNTY OF _____

Before me, the undersigned authority, a Notary Public in and for the State and County aforesaid, personally appeared Donald Sapaugh, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence) and whom I am personally acknowledged himself or herself to be  the Manager , of **UGHS Senior Living Real Estate of Knoxville, LLC,** the within named bargainor, and he or she as such Manager, being authorized so to do, executed the foregoing instrument for the purpose therein contained, by signing the name of the entity by himself or herself as Manager.

WITNESS my hand and official Seal at office in said State and County this _____day  of _____, 201_.

_____

Notary Public

My Commission Expires:_____

5137662v3

# EXHIBIT A

Parcel 1:

Situate in the Seventh (7th) Civil District (formerly the Second (2nd) Civil District) of Knox County Tennessee, within the 31st Ward of the City of Knoxville, and being a 6.30 acre tract, more or less, as shown on plat recorded as Instrument No. 200508190016226, Register's Office for Knox County, Tennessee, to which plat specific reference is hereby made for a more particular description.

Being the same property conveyed to UGHS Senior Living of Knoxville, LLC by Warranty Deed by Corporation from TrinityCare Senior Living of Knoxville, LLC of record in Instrument No. 201111070025211, Register's Office for Knox County, Tennessee and further conveyed via Quitclaim Deed recorded in Instrument No. 201308220013872, Register's Office for Knox County, Tennessee.

TOGETHER WITH

Parcel 2:

a 40' Joint Permanent Easement for Ingress and Egress created by the Dedication of Easement and Maintenance Agreement filed on August 18, 2005 as Instrument No. 200508180015812, Register's Office for Knox County, Tennessee.

EXHIBIT B
PERMITTED ENCUMBRANCES

[To list existing encumbrances on property as disclosed in title commitment, including mortgage related to HUD Indebtedness, if any, but only to the extent such existing encumbrances are Permitted Liens (as defined in the Asset Purchase Agreement).]

| | |
|---|---|
| NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER. | **RECORDING INFORMATION** |

# SPECIAL WARRANTY DEED

The UGHS Senior Living Real Estate of Port Lavaca, LLC, a Texas limited liability company ("*Grantor*"), for the consideration hereinafter stated, does GRANT, SELL, AND CONVEY unto CHG Senior Living Real Estate of Port Lavaca, LLC, a Texas limited liability company ("*Grantee*"), the following described real property, together with all improvements thereon, situated in Calhoun County, Texas (the "*Property*"):

**Tract 1:**
Lot 1 in the Final Plat Of Trinity Shores Subdivision, a 12.04 Acre Tract of Land, being part of a 53.09 acre tract in the Maximo Sanchez League, A-35, according to the plat thereof recorded in Volume Z, Page 738, Slide 486AB, Calhoun County, Texas, and containing 447,700 square feet, or 10.278 acres, more or less.

**Tract II:**
Non-exclusive Easement Agreement for Access with Vendor's Lien filed in Volume 280, Page 279, Official Records of Calhoun County, Texas.

This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to the matters described in Exhibit "A" attached hereto and incorporated herein by this reference (collectively, the "*Permitted Encumbrances*").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee, Grantee's heirs, executors, administrators, successors, and assigns, forever and Grantor does hereby bind Grantor, Grantor's heirs, assigns, and successors to WARRANT AND FOREVER DEFEND, all and singular, the title to the Property unto Grantee, Grantee's heirs, successors, and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof by, through, or under Grantor, but not otherwise, subject to the Permitted Encumbrances. Grantee assumes the responsibility for the payment of the 201_ ad valorem taxes, standby fees, and other assessments and all subsequent ad valorem taxes, standby fees, and other assessments assessed against the Property.

The consideration for this conveyance, receipt of which Grantor acknowledges, is Ten Dollars ($10.00) and other valuable consideration paid to Grantor for which no lien either express or implied is retained.

Grantee's Mailing Address:   CHG Senior Living Real Estate of
Port Lavaca, LLC
c/o _____
_____
_____
Attention:   _____

Executed this ___ day of _____, 201_.

G‍RANTOR:

UGHS SENIOR LIVING REAL ESTATE OF
PORT LAVACA, LLC, a Texas limited liability
company

By: _____
　　　Donald W. Sapaugh, Manager

THE STATE OF TEXAS　　　§
　　　　　　　　　　　　§
COUNTY OF _____　　§

　　　Before me, the undersigned, a Notary Public, on this _____ day of _____, 201_,
personally appeared Donald Sapaugh, the Manager of UGHS Senior Living Real Estate of Port
Lavaca, LLC, on behalf of said company.

_____
Notary Public -State of Texas
Notary's Printed Name:_____
My commission expires:_____

Exhibit "A"
Permitted Encumbrances


[To list existing encumbrances on property as disclosed in title commitment, including mortgage related to HUD Indebtedness, if any, but only to the extent such existing encumbrances are Permitted Liens (as defined in the Asset Purchase Agreement).]

<table>
<tr><td>

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

</td><td>

**RECORDING INFORMATION**

</td></tr>
</table>

# SPECIAL WARRANTY DEED

The UGHS Senior Living Real Estate of Pearland, LLC, a Texas limited liability company ("*Grantor*"), for the consideration hereinafter stated, does GRANT, SELL, AND CONVEY unto CHG Senior Living Real Estate of Pearland, LLC, a Texas limited liability company ("*Grantee*"), the following described real property, together with all improvements thereon, situated in Brazoria County, Texas (the "*Property*"):

Being a 4.967 acre tract in the THOMAS J. GREEN SURVEY, ABSTRACT NO. 198 in Brazoria County, Texas. Said 4.967 acre tract is a part of RESTRICTED RESERVE "G" of the AMENDING PLAT OF REHOBOTH ACRES as recorded in Volume 22, Page 85 of the Brazoria County Plat Records and is further described as being a part of a tract described in a deed to Premierecare Senior Living of Pearland, LLC as recorded in Clerk's File No. 00005430 of the Brazoria County Official Records and is more particularly described by metes and bounds in Exhibit "A" attached hereto and incorporated herein by this reference.

This Special Warranty Deed and the conveyance hereinabove set forth is executed by Grantor and accepted by Grantee subject to the matters described in Exhibit "B" attached hereto and incorporated herein by this reference (collectively, the "*Permitted Encumbrances*").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee, Grantee's heirs, executors, administrators, successors, and assigns, forever and Grantor does hereby bind Grantor, Grantor's heirs, assigns, and successors to WARRANT AND FOREVER DEFEND, all and singular, the title to the Property unto Grantee, Grantee's heirs, successors, and assigns, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof by, through, or under Grantor, but not otherwise, subject to the Permitted Encumbrances. Grantee assumes the responsibility for the payment of the 201_ ad valorem taxes, standby fees, and other assessments and all subsequent ad valorem taxes, standby fees, and other assessments assessed against the Property.

The consideration for this conveyance, receipt of which Grantor acknowledges, is Ten Dollars ($10.00) and other valuable consideration paid to Grantor for which no lien either express or implied is retained.

Grantee's Mailing Address:   CHG Senior Living Real Estate of
Pearland, LLC
c/o _____
_____
_____
Attention: _____

Executed this ___ day of _____, 201_.

G‍RANTOR:

UGHS SENIOR LIVING REAL ESTATE OF
PEARLAND, LLC, a Texas limited liability
company

By: _____
     Donald W. Sapaugh, Manager

THE STATE OF TEXAS      §
                         §
COUNTY OF _____      §

Before me, the undersigned, a Notary Public, on this _____ day of _____, 201_,
personally appeared Donald Sapaugh, the Manager of UGHS Senior Living Real Estate of
Pearland, LLC, on behalf of said company.

_____
Notary Public -State of Texas
Notary's Printed Name:_____
My commission expires:_____

Exhibit "A"
Property

METES AND BOUNDS DESCRIPTION of a 4.967 acre tract in the Thomas J. Green Survey, Abstract No. 198 in Brazoria County, Texas. Said 4.967 acre tract is part of Restricted Reserve "G" of the Amending Plat of Rehoboth Acres as recorded in Volume 22, Page 85 of the Brazoria County Plat Records and is further described as being a part of a tract described in a deed to Premiercare Senior Living of Pearland, LLC as recorded in Clerks File No. 00 005430 of the Brazoria County Official Records and is more particularly described by metes and bounds as follows:

COMMENCING at a 1/2-inch iron rod found at the Intersection of the southeasterly line of Pearland Parkway (based on a width of 140-feet) with the southerly line of East Broadway (a.k.a. FM 518, based on a width of 100-feet);

THENCE, South 44° 27' 48" West, along the said southeasterly line of Pearland Parkway for a distance of 1,369.58 feet to a 5/8-inch iron rod found for the northeast corner and the POINT OF BEGINNING of the herein described tract, said point also being the northeast corner of the aforesaid Restricted Reserve "G";

THENCE, South 45° 32' 12" East, along the northeasterly line of said Restricted Reserve "G", same being the southwesterly line of Restricted Reserve "E", for a distance of 743.74 feet to a 5/8-inch iron rod found for the southeast corner of said Restricted Reserve "G" and of the herein described tract;

THENCE, South 44° 01' 23" West, along the southeasterly line of said Restricted Reserve "G" for a distance of 216.74 feet to a 5/8-inch iron rod set on the Limits of Floodway line as per a Conditional Letter of Map Revision (CLOMR) dated December 11, 2001 for the southwest corner of the herein described tract;

THENCE, along the said Limits of Floodway line the following nine (9) courses and distances;

    (1.) North 46° 15' 18" West, 3.91 feet to a 5/8-inch iron rod set for corner;
    (2.) North 61° 52' 41" West, 86.20 feet to a 5/8-inch iron rod set for corner;
    (3.) North 73° 14' 04" West, 82.89 feet to a 5/8-inch iron rod set for corner;
    (4.) North 70° 52' 20" West, 28.62 feet to a 5/8-inch iron rod set for corner;
    (5.) North 60° 54' 17" West, 36.47 feet to a 5/8-inch iron rod set for corner;
    (6.) North 46° 28' 05" West, 433.95 feet to a 5/8-inch iron rod set for corner;
    (7.) North 41° 47' 17" West, 40.07 feet to a 5/8-inch iron rod set for corner;
    (8.) North 36° 05' 48" West, 41.56 feet to a 5/8-inch iron rod set for corner;
    (9.) North 25° 50' 37" West, 10.08 feet to a 5/8-inch iron rod set in the southeasterly line of Pearland Parkway, same being the northwesterly line of said Restricted Reserve "G" for the northwest corner of the herein described tract;

THENCE North 44° 27' 48" East, along the said southeasterly line of Pearland Parkway for a distance of 295.70 feet to the POINT OF BEGINNING containing a computed area of 4.967 acres (216,370) square feet, more or less.

Exhibit "B"
Permitted Encumbrances


[To list existing encumbrances on property as disclosed in title commitment, including mortgage related to HUD Indebtedness, if any, but only to the extent such existing encumbrances are Permitted Liens (as defined in the Asset Purchase Agreement).]

## SPECIAL WARRANTY DEED BY CORPORATION

This instrument prepared by:
Glenn Rogers, PLLC 11610 Bee Caves Road, Suite 220, Austin, Texas 78738

**GRANTOR**:  Trinity Care Senior Living, LLC,
              a Texas limited liability company
ADDRESS:   227 E. Edgewood Drive, Friendswood, Texas 77456

```
SEVLER COUNTY TRUSTEE

Property ID: _____

Same_____ PO_____
```

**GRANTEE**:  CHG Senior Living, LLC,
              a Texas limited liability company
ADDRESS:  _____

Person or agency responsible for payment of taxes:
Name: Trinity Care Senior Living, LLC
Address: 227 E. Edgewood Drive, Friendswood, Texas 77456

## APPENDIX II
## FORM FOR OATH

I, or we, hereby swear of affirm that the actual consideration for this transfer, or value of the property or interest in property transferred, whichever is greater, is $_____ which amount is equal to or greater than the amount which the property or interest in property transferred would command at a fair and voluntary sale.

_____
AFFIANT

Sworn to and subscribed before me this _____day of _____,
201_.

_____
Notary Public or Register

My Commission Expires:_____

THIS INDENTURE made and entered into this __ day of _____, 201_, by and between **Trinity Care Senior Living, LLC, a Texas limited liability company qualified to do business in the state of Tennessee** known hereinafter as First Party (Grantor); and:

**CHG Senior Living, LLC, a Texas limited liability company qualified to do business in the state of Tennessee** known hereinafter as Second Party (Grantee);

5153290v1

WITNESSETH:

That for and in consideration of One Dollar ($1.00) and other good and valuable consideration in hand paid, receipt of which is hereby acknowledged,

The First Party has granted, bargained, sold and conveyed and does hereby grant, bargain, sell and convey unto the Second Party the following described premises, to-wit:

SITUATED in the Fourth (4th) Civil District of Sevler County Tennessee, and being a portion of Lot 01 of Ridgewood Estate Subdivision (P.B. 7, PG 168), more particularly bounded and described in Exhibit A attached hereto and incorporated herein by reference; and

BEING the same property conveyed [INSERT PRIOR DEED INFORMATION].

With the hereditaments and appurtenances thereto appertaining, hereby releasing all claim to homestead and dower therein.

TO HAVE AND TO HOLD the same premises to the Second Party, its successors and assigns, forever.

And the said First Party, for itself and for its successors and assigns, hereby covenants with Second Party, its assigns, that First Party is lawfully seized in fee simple of the premises above conveyed, has full power, right and authority to convey the same, that said premises are free from all encumbrances except matters described on Exhibit B attached hereto and incorporated herein by this reference (collectively, the "*Permitted Encumbrances*"), and current taxes for the year 201_ which are to be prorated as of the date of closing and assumed by the Grantee herein, and that First Party will forever warrant and defend the said premises and the title thereto against the lawful claims of all persons claiming by or through the First Party, but no further or otherwise, subject to the Permitted Encumbrances.

[Signature on following page]

IN WITNESS WHEREOF, First Party has hereunto caused this instrument to be executed the day and year first hereinabove written.

Trinity Care Senior Living, LLC, a Texas limited liability company

By:_____

Donald W. Sapaugh, Manager

THE STATE OF TEXAS
COUNTY OF _____

Before me, the undersigned authority, a Notary Public in and for the State and County aforesaid, personally appeared Donald Sapaugh, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence) and whom I am personally acknowledged himself or herself to be  the Manager , of **Trinity Care Senior Living, LLC,** the within named bargainor, and he or she as such Manager, being authorized so to do, executed the foregoing instrument for the purpose therein contained, by signing the name of the entity by himself or herself as Manager.

WITNESS my hand and official Seal at office in said State and County this _____day  of _____, 201_.

_____

Notary Public

My Commission Expires:_____

5153290v1

# EXHIBIT A

SITUATED in the Fourth (4th) Civil District of Sevier County, Tennessee, and being a portion of Lot D1 of Ridgewood Estates Subdivision (P.B. 7, PG 168) and being more particularly bounded and described as follows:

BEGINNING at an iron rod set in the northern right-of-way of Long Springs Road, said point being located N 49°30' W a distance of 134.44' from the centerline intersection of Long Springs Road and Ally Lane; Thence, with a curve turning to the right with an arc length of 77.73', with a radius of 1553.26', with a chord bearing of N 56°21' W, with a chord length of 77.72' to an iron rod set;   Thence N 57°07' E a distance of 38.24' to an iron rod found; Thence, S 71°15' E a distance of 33.00' to an iron rod found; Thence, S 57°47' E a distance of 29.50' to an iron rod set; Thence, S 32°13' W a distance of 44.31' to the POINT OF BEGINNING, having an area of 2,866 square feet or 0.066 acres. According to the survey by Abbott Land Surveying LLC, Steven W Abbott Jr, RLS 2029. All bearings in this description are reference to Tennessee Grid NAD83.

BEING Part of the same property conveyed to Ridgewood Property Owner's Association, INC. by deed dated July 27th, 2007, of record in Deed Book 2959, Page 507 as shown in the Sevier County Register's Office.

EXHIBIT B
PERMITTED ENCUMBRANCES


[To list existing encumbrances on property as disclosed in title commitment, including mortgage related to HUD Indebtedness, if any, but only to the extent such existing encumbrances are Permitted Liens (as defined in the Asset Purchase Agreement).]

**Exhibit J**

**FORM OF
ASSIGNMENT AGREEMENT**

This ASSIGNMENT AGREEMENT (this "Agreement"), dated as of [__], is made and entered into by and among **[SELLER],** a [STATE] [corporation] (the "Seller"), and **[BUYER]**, a Texas limited liability company (the "Purchaser").  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement (the "Purchase Agreement"), dated as of November 10, 2015, by and among Cornerstone Healthcare Group Holding, Inc., a Delaware corporation, University General Health System, Inc., a Nevada corporation, certain "Sellers" (as defined in the Purchase Agreement), including the Seller, and certain "Purchasers" (as defined in the Purchase Agreement), including the Purchaser.

**W I T N E S S E T H:**

WHEREAS, in accordance with the terms and conditions of the Purchase Agreement, the Seller desires to assign to the Purchaser all of the Seller's right, title and interest in and to the Desired 365 Contracts to which the Seller is a party (the "Assigned Contracts"), and the Purchaser desires to assume all liabilities of the Seller under the Assigned Contracts arising and accruing, and first coming due, following the Closing Date and only to the extent not related to any default, breach or other obligation relating to or arising prior to Closing.

NOW THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions set forth herein and in the Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.     Assignment.     Subject to the terms and conditions of the Purchase Agreement, the Seller hereby assigns to the Purchaser, pursuant to Section 365 of the Bankruptcy Code, all of the Seller's right, title and interest in and to the Assigned Contracts free and clear of Liens (other than Permitted Liens and Assumed Liabilities), including all of Seller's right, title, benefit, privileges and interest in and to each of the Assigned Contracts.

Section 2.     Assumption.     Subject to the terms and conditions of the Purchase Agreement, the Purchaser hereby assumes and agrees to pay, perform and discharge when due all liabilities of the Seller under the Assigned Contracts arising and accruing, and first coming due, following the Closing Date and only to the extent not related to any default, breach or other obligation relating to or arising prior to Closing.

Section 3.     Conflict with Purchase Agreement.  Notwithstanding anything herein to the contrary, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter the representations, warranties, covenants and obligations of the parties contained in the Purchase Agreement.   To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of the Purchase Agreement, the Purchase Agreement shall govern and control.

5137666v2

Section 4.      <u>Binding Effect</u>.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their successors and assigns.

Section 5.      <u>Enforcement of Certain Rights</u>.   Nothing expressed or implied in this Agreement is intended, or will be construed, to confer upon or give any Person other than the parties, and their successors or permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such person being deemed a third party beneficiary of this Agreement.

Section 6.      <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the Purchaser and its respective successors and assigns, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, cause of action or other right.

Section 7.      <u>Captions</u>.  The Section headings contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision of this Agreement.

Section 8.      <u>Further Assurances</u>.  Subject to the terms and conditions of the Purchase Agreement, the Seller shall, from time to time after the date hereof at the reasonable request of the Purchaser and without further consideration, execute and deliver to the Purchaser such additional instruments of conveyance in addition to this Agreement as the Purchaser shall reasonably request to evidence more fully the transfer by the Seller to the Purchaser of the Purchased Assets used or held for use by the Seller in connection with the Business.

Section 9.      <u>Controlling Law</u>.  This Agreement will be governed by and construed and enforced in accordance with the internal laws of the State of Texas without reference to its choice of law rules.

Section 10.     <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement or the terms hereof to produce or account for more than one (1) of such counterparts.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each undersigned party has executed this Agreement as of the date first above written.

**SELLER:**

**[SELLER]**

By:_____
Name: _____
Title: _____

**PURCHASER:**

**[PURCHASER]**

By:_____
Name: _____
Title: _____