IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

ENTERED
11/18/2015

```
                                    )
IN RE                               )
                                    )
UGHS SENIOR LIVING, INC., ET AL.)     CASE NO. 15-80399-G3-11
                                    )
          Debtors,[1]               )
                                    )
```

MEMORANDUM OPINION

The court has held an evidentiary hearing on the "Emergency Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. §§ 363, 364, and 507(b); (II) Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. §362; (III) Granting Related Relief; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001" (Docket No. 10).

In the instant motion, the Debtors seek entry of an interim order approving $1.4 million in postpetition financing. Debtors have submitted a 26-page proposed interim order containing extensive findings of fact and conclusions of law, and

---

[1]The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  UGHS Senior Living, Inc. (9334); TrinityCare Senior Living, LLC (1655), UGHS Senior Living Real Estate of Port Lavaca, LLC (0012), UGHS Senior Living Real Estate of Pearland, LLC (0653), UGHS Senior Living Real Estate of Knoxville, LLC (2405), UGHS Senior Living of Pearland, LLC (0704), UGHS Senior Living of Port Lavaca, LLC (0762), UGHS Senior Living of Knoxville, LLC (0826), TrinityCare Senior Living of Covington, LLC (4360),UGHS Senior Living Real Estate, LLC (5553), and TrinityCare Lighthouse of Pearland, LLC (2681).

detailed ordering paragraphs which would, <u>inter</u> <u>alia</u>, approve in full the proposed 109-page loan agreement between the Debtors and White Oak Asset Finance, LLC ("White Oak").

The instant motion was filed on November 10, 2015, the date on which the Debtors' filed their voluntary petitions.  The court held a hearing on November 13, 2015.  Schedules and a statement of financial affairs are not yet filed.

The Debtors in the instant jointly administered case are all direct or indirect subsidiaries of University General Health System, Inc. ("UGH").  UGH is the lead debtor in a jointly administered Chapter 11 case, commenced on February 27, 2015, in Case No. 15-31086-H3-11.

At the first hearing in the UGH Chapter 11 case, which was held on March 2, 2015, counsel for UGH announced that UGH had previously engaged investment bankers to seek a sale of the business of the Debtors in the instant case, entered into an asset purchase agreement for sale of the Debtors' facilities, and anticipated a need to file Chapter 11 cases for the entities which are Debtors in the instant case.

UGH began marketing Debtors for sale during the second half of 2013.  The sale process during 2013 led to the execution, during December, 2014, of an asset purchase agreement to sell the Debtor entities to Cornerstone Health Care Group Holding, Inc. ("Cornerstone").  The UGH debtors moved, in the UGH Chapter 11

2

case, for approval of the sale of the Debtors to Cornerstone. (Docket No. 195, Case No. 15-31086-H3-11). That motion ultimately was withdrawn. (Docket No. 267, Case No. 15-31086-H3-11).

The proposed loan agreement, which the proposed interim order would approve in full, requires as conditions precedent that this court approve various findings, conclusions, advisory opinions, and procedures in the instant cases. The court has determined to grant at this time less than the entirety of the relief requested.

As set forth below, the court acknowledges the stipulations and agreements between the Debtors and White Oak. The court does not make Findings of Fact or Conclusions of Law as to these stipulations and agreements. The court's Findings of Fact and Conclusions of Law are set forth below the court's recital of the stipulations and agreements between the Debtors and White Oak. A separate Judgment will be entered granting in part the requested relief. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Stipulations and Agreements</u>[2]

1.   Prior to the Filing Date,[3] UGH entered into that certain Loan and Security Agreement dated as of March 17, 2014, as amended, modified, or supplemented from time to time (collectively, the "Prepetition Loan Agreement"), among UGH, the several entities party thereto as lenders (the "Prepetition Lenders") and White Oak, as administrative agent (the "Prepetition Agent"), as amended by that certain First Amendment to Loan and Security Agreement and Waiver, dated as of April 23, 2014, that certain Second Amendment to Loan and Security Agreement, dated as of May 1, 2014, and that certain Third Amendment to Loan and Security Agreement dated as of May 22, 2014, (collectively, the "Prepetition Loan Agreement" and with all related documents including the Pledge Agreements discussed below, the "Prepetition Loan Documents").  Pursuant to the Prepetition Loan Agreement, UGH is indebted to the Prepetition Agent in a principal amount of $6,035,000, plus accrued, but unpaid interest, fees, including attorneys' fees, expenses and other costs (the "Prepetition Obligations").  With respect to the

---

[2]Except as provided below in separate footnotes, capitalized terms not immediately defined in the text of the Stipulations and Agreements at their first occurrence are defined in the text of the Stipulations and Agreements or the Findings of Fact and Conclusions of Law below.

[3]This is defined in the proposed interim order as February 27, 2015, the date on which UGH filed its voluntary petition in Case No. 15-31086-H3-11.

Collateral[4] securing the Prepetition Loan Agreement, the Prepetition Agent, entered into that certain Pledge Agreement, dated as of March 17, 2014 (the "UGH Pledge Agreement"), made among UGH, the other parties as may become "Pledgors" thereunder after the date of such agreement, and the Prepetition Agent concerning the pledge by UGH in favor of the Prepetition Agent of a security interest in and lien upon (a) all Ancillary Services Equity Interests[5] and all Proceeds[6] of the foregoing and (b) all Senior Living Equity Interests[7] and all Proceeds of the foregoing; in each of the foregoing cases,[8] as more fully described in the UGH Pledge Agreement. Specifically, pursuant to the UGH Pledge Agreement, UGH pledged to the Prepetition Agent all of its record and beneficial ownership interests in UGHS Ancillary Services, Inc. and UGHS Senior Living, Inc. ("UGHS Senior Living").  In turn, also on March 17, 2014, UGHS Senior Living and UGHS Ancillary Services, Inc. entered into a Pledge

---

[4]Defined in the proposed interim order to be all assets of the Loan Parties as described in the New Loan Agreement.

[5]This term is not defined in the documents submitted to the court.

[6]Defined in the proposed New Loan Agreement to be proceeds, as that term is defined under the UCC.

[7]This term is not defined in the documents submitted to the court.

[8]This appears to refer to the instant case, plus the Chapter 11 case of UGH.

Agreement with the Prepetition Agent (the "Senior Living Pledge Agreement" and together with the UGH Pledge Agreement, the "Pledge Agreements"), pledging all of their record and beneficial ownership interests in certain pledged companies, including, but not limited to the following Debtors: UGHS Senior Living of Pearland, LLC; UGHS Senior Living of Port Lavaca, LLC and UGHS Senior Living of Knoxville, LLC (the "Senior Living Collateral").

2.   As of the date on which UGH commenced its bankruptcy proceeding, the Prepetition Agent asserts a secured claim against UGH in the aggregate amount of $6,035,000, plus accrued and unpaid pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the Prepetition Loan Documents.

3.   The Debtors, but not UGH, admit and stipulate that as security for repayment of the Prepetition Obligations, the Prepetition Agent holds valid, perfected, and enforceable liens and security interests in the Senior Living Collateral, including all of the record and beneficial interests in the Senior Living Collateral.

4.   Each Debtor has acknowledged that, pursuant to the Judgment to be issued with respect to the instant motion, the liens granted in favor of Administrative Agent (on behalf of the

Lenders)[9] in all of the collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment.

     5.  As long as any portion of the Obligations[10] or the Prepetition Obligations remains unpaid, or any of the New Loan Documents[11] or Prepetition Loan Documents remain in effect, the Debtors shall not request any order approving or authorizing (under Bankruptcy Code §§ 105 or 364, or otherwise) (i) the granting of any lien or security interest in any of the Collateral in favor of any party other than the Administrative Agent, or (ii) the obtaining of credit or the incurring of indebtedness that is entitled to super-priority administrative status, in either case equal or superior to that granted to the Administrative Agent pursuant to this Order, unless, in connection with any transaction cited in clause (i) or (ii) of

---

[9]This term is defined in the proposed New Loan Agreement to include each person designated as a lender on a schedule of lenders attached to the New Loan Agreement. The only lender therein identified is White Oak.

[10]Defined in the proposed interim order to include loans made under the New Loan Agreement, plus interest, fees, costs, expenses, indebtedness, obligations and liabilities of the Debtors to the Administrative Agent under or in respect of the New Loan Documents and the proposed interim order.

[11]Defined in the proposed interim order to incorporate the New Loan Agreement and any promissory notes and all ancillary documents at any time executed in connection therewith.

this Paragraph, such request by the Loan Parties[12] seeks to authorize and direct and such Order requires that the full amount of the Obligations and the Prepetition Obligations shall first be paid indefeasibly and in full.

6.   The Administrative Agent has reserved its rights to take any and all actions permitted by the New Loan Documents and this Order on or after the Maturity Date.[13]

7.   Until all obligations and indebtedness owing the Administrative Agent and the Lenders shall have been indefeasibly paid in full in cash and satisfied in the manner provided in this Order and the New Loan Agreement,[14] no Debtor shall, among other things, and it shall constitute an Event of Default under the New Loan Agreement, seek (i) an order dismissing any of the Debtors' bankruptcy cases without the consent of the Administrative Agent; (ii) confirmation of a plan that does not provide for payment in full in cash of the Obligations[15] on the

---

[12]Defined in the proposed interim order as the Debtors in this case.

[13]Defined generally in the proposed New Loan Agreement as the earliest of the closing of a sale, proposal of a plan not approved by White Oak, confirmation of a plan, or termination after an event of default.

[14]Defined as the proposed loan agreement of which Debtors seek approval in the instant motion.

[15]Defined generally in the proposed interim order to include all loans made under the New Loan Agreement and the proposed interim order.

effective date of such plan of reorganization or liquidation, or
any other order shall be entered that dismisses any of the
Debtors' bankruptcy cases and which order does not provide for
payment in full of the Obligations; or (iii) any motion involving
the sale of substantially all of the Loan Parties' assets that
does not provide for payment in full of the Obligations, without
the prior written consent of the Administrative Agent obtained in
accordance with the New Loan Agreement.  If an order dismissing
any of the Chapter 11 Cases under Bankruptcy Code § 1112 or
otherwise is at any time entered, such order shall provide (in
accordance with §§ 105 and 349(b)) that (i) the claims and Liens
granted pursuant to this Order and any subsequent order shall
continue in full force and effect and shall maintain their
perfection and priorities as provided in this Order and the Final
Order until all obligations shall have been indefeasibly paid
in full in cash and satisfied in a manner as provided by this
Order or the New Loan Agreement and (ii) to the extent permitted
by applicable law, this Court shall retain jurisdiction,
notwithstanding such dismissal, for the purposes of enforcing
such claims and Liens.

       8.   The Debtors shall provide for payment and
performance in full of all of the Obligations upon the earlier of
(i) the closing date of the sale of all or substantially all of
the Debtors' assets pursuant to Section 363(d); (ii) 180 days

after the Closing Date; (iii) the date on which any Loan Party proposes to this Court (a) a sale of all or substantially all of its assets without the consent of the Administrative Agent or (b) a plan of reorganization not approved by the Administrative Agent; (iv) the date of confirmation of any plan of reorganization; and (v) the date on which the Administrative Agent or any of the lenders terminate the Postpetition Financing due to the occurrence of an Event of Default. Nothing in the New Loan Agreement or this Order shall be construed as a consent by the Administrative Agent, or an approval by the Administrative Agent, of the terms of any plan of reorganization or any amendment or modification thereto.

9.    The Administrative Agent has reserved its rights to seek additional adequate protection with respect to the Collateral. Additionally, each Lender has reserved its rights to assign all of its rights, claims and obligations under the New Loan Agreement and the Prepetition Loan Documents.

10.   Each Loan Party, but not its parent, affiliates or related entities, forever releases, waives and discharges the Prepetition Agent and lenders, together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, assigns and/or successors (collectively, the "Released Parties"), from any and all claims and causes of action under Federal or State law, or otherwise, arising out of, based

10

upon or related to, in whole or in part, any of the Prepetition
Financing Documents, any aspect of the prepetition relationship
between any Debtor relating to any of the Prepetition Financing
Documents, on the one hand, and any or all of the Released
Parties, on the other hand, or any other acts or omissions by any
or all of the Released Parties in connection with any of the
Prepetition Financing Documents or their prepetition relationship
with any Debtor or any affiliate thereof relating to any of the
Prepetition Financing Documents, including, without limitation,
any claims or defenses as to the extent, validity, priority or
perfection of the Prepetition Liens or the Prepetition
Obligations, "lender liability" claims and causes of action, any
actions, claims or defenses under chapter 5 of the Bankruptcy
Code, or any other claims and causes of action, subject only to
the Lien Validation Process.

        11.   The Debtors waive and release, and shall be
forever barred from asserting, any right to object to, challenge
or seek to avoid, the amount, validity, or enforceability
of the Prepetition Obligations or the Administrative Agent's
liens and security interests in the collateral securing the
Prepetition Obligations.  Notwithstanding the foregoing, no
objection or other action by any Committee or by any other party
shall affect in any way the validity, enforceability or amount of
the Postpetition Obligations owing under the New Loan Documents,

11

or the validity, enforceability, perfection or priority of the Administrative Agent's Liens granted to the Administrative Agent under the New Loan Documents and the Judgment entered on the instant motion.

12.   Prior to the Petition Date, UGHS Senior Living Real Estate of Port Lavaca, LLC ("Port Lavaca PropCo"), UGHS Senior Living Real Estate of Pearland, LLC ("Pearland PropCo"), and UGHS Senior Living Real Estate of Knoxville, LLC ("Knoxville PropCo") (collectively referred to herein as the "Real Estate Debtors") entered into three loan transactions (the "Port Lavaca PropCo Loan", the "Pearland PropCo Loan", and the "Knoxville PropCo Loan" and, together, the "LP Loans") with Lancaster Pollard Mortgage Company, LLC, a Delaware limited liability company f/k/a Lancaster Pollard Mortgage Company, an Ohio corporation ("Lancaster Pollard") in connection with the refinancing of three senior living facilities owned by the Real Estate Debtors located in Port Lavaca, Texas, Pearland, Texas and Knoxville, Tennessee. UGHS Senior Living of Port Lavaca, LLC ("Port Lavaca OpCo"), UGHS Senior Living of Pearland, LLC ("Pearland OpCo"), and UGHS Senior Living of Knoxville, LLC ("Knoxville OpCo") (collectively referred to herein as the "OpCo Debtors") are the licensed operators of the respective senior living facilities.

12

13.   Each of the LP Loans is insured by the United
States Department of Housing and Urban Development ("HUD")
pursuant to Sections 232 and 223(f) of the National Housing
Act.  HUD also is an additional secured party under the LP Loans.
The Real Estate Debtors each lease the senior living facilities
to UGHS Senior Living Real Estate, LLC ("Master Tenant") pursuant
to a HUD Facilities Master Lease Agreement.  Master Tenant
subleases the facilities to the Opco Debtors pursuant to three
separate HUD Facility Sublease Agreements between Master Tenant
and each of the respective Opco Debtors.

14.   Each of the LP Loans is secured by, among other
things, (i) deed of trusts covering the real property and
improvements and (ii) security agreements covering all of the
assets of the respective Real Estate Debtors, OpCo Debtor and
Master Tenant, and any and all proceeds, product, profits or
offspring of the foregoing (the "Collateral"), all as more fully
described in the LP Loan Documents (defined below).  The LP Loans
are further secured by assignments to Lancaster Pollard of the
aforementioned HUD Facility Master Lease Agreement and HUD
Facility Sublease Agreements.  Together, the deeds of trust,
security agreements, UCC financing statements, deposit account
control agreements, and all other documents evidencing
and proving security for the Loans are referred to herein as the
"LP Loan Documents."

13

15.   The Debtors stipulate and agree that, as of the Petition Date, Lancaster Pollard holds valid, enforceable, properly-perfected, first-priority liens and security interest in (i) all of the assets of the Real Estate Debtors, the OpCo Debtors, and the Master Tenant, including, but not limited to, the three senior living facilities, the leases of these facilities, and (ii) any and all proceeds, product, or offspring therefrom which is described in more detail in the LP Loan Documents (collectively referred to herein as the "LP Pre-Petition Collateral").   Together, the Real Estate Debtors, the OpCo Debtors, and the Master Tenant are referred to herein as the "LP Debtors."

16.   The Debtors stipulate and agree that, as of the Petition Date, the unpaid principal balance due on the Pearland PropCo Loan was $6,116,118.26, the unpaid principal balance due on the Port Lavaca PropCo Loan was $3,768,877.14, and the unpaid principal balance due on the Knoxville PropCo Loan was $6,046,101.90.

17.   Based upon the foregoing, the Debtors stipulate that the LP Debtors are indebted to Lancaster Pollard without defense, counterclaim, recoupment or offset of any kind and that, as of the Petition Date, the LP Debtors are liable to Lancaster Pollard in the aggregate amount of not less than $15,931,097.30, plus legal fees and other charges incurred by Lancaster Pollard

14

as of the Petition Date (the "LP Pre-Petition Debt"), along with
interest as it continues to accrue, as well as those reasonable
fees and expenses provided for in the LP Loan Documents and
otherwise allowable under 11 U.S.C. §506(b), in respect to loans
made by Lancaster Pollard pursuant to the LP Loan Documents.

18.   The Debtors further stipulate and agree that the
Loan Documents are genuine, valid, existing and legally
enforceable.

### Findings of Fact

Each of the Debtors filed a voluntary petition under
Chapter 11 of the Bankruptcy Code on November 10, 2015.  The
cases were jointly administered under Case No. 15-80399-H3-11 by
order entered on November 13, 2015.[16]

This Court has jurisdiction over the instant case and
the instant motion pursuant to 28 U.S.C. §§ 157(b) and 1334.  The
instant motion presents a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2).

Chad Shandler, who has acted as Debtors' chief
restructuring officer in advance of the instant case, testified
that Debtors acquired their businesses, which own and operate
three assisted living facilities, located in Pearland, Texas,

---

[16]The court has treated the instant cases under the court's
complex Chapter 11 procedures.  Accordingly, the court refers to
a single "case," though there are eleven separate cases commenced
by the Debtors.

Port Lavaca, Texas, and Knoxville, Tennessee, during 2011.

Shandler testified that Debtors began seeking a buyer for their businesses during 2013, and signed an asset purchase agreement with Cornerstone in December, 2014.

Shandler testified that the largest asserted unsecured debt is held by Hillair Capital Investments, LP ("Hillair"). He testified that the Hillair debt arises from Debtors' guaranty of UGH's debt. He testified that he anticipates Hillair's debt will be contested. He testified that the next largest unsecured debt is that owed to the seller from which Debtors purchased their businesses. He testified that there are no significant trade creditors in the instant case.

Shandler testified that the proposed sale to Cornerstone under the December, 2014 asset purchase agreement did not close, due to opposition from Hillair.

Shandler testified that Debtors owe approximately $16 million in the aggregate to Lancaster Pollard, secured by Debtors' interest in the three assisted living facilities and the personal property associated with those facilities. He testified that Debtors have no other secured debt. On cross-examination, he testified that HUD is an additional secured party under the pertinent documents.

Shandler testified that White Oak is not a creditor of Debtors. He testified that White Oak loaned money to UGH, and

16

received as security for its loan a pledge of UGH's equity
interests in Debtors.

Debtors have sought (Docket No. 5) and obtained (Docket
No. 55) authority to delay the filing of schedules and statements
of financial affairs until December 24, 2015, 44 days after the
date of filing of the petitions in the instant case.

The Port Lavaca PropCo, the Pearland PropCo, and the
Knoxville PropCo each executed a regulatory agreement with HUD.
The regulatory agreements require notice to HUD of, <u>inter</u> <u>alia</u>,
the retention of attorneys or other professionals in anticipation
of a bankruptcy filing. (Lancaster Pollard Exhibits 4, 18, and
31). Shandler testified that Debtors did not notify HUD when
they engaged professionals in anticipation of filing the instant
cases. He testified that Debtors mailed notice of commencement
of the cases to HUD.

Debtors' certificate of service indicates that the
instant motion was served on HUD by first class mail on November
12, 2015, one day before the date of the hearing on the instant
motion. (Docket No. 34).

At the hearing on the instant motion, HUD did not
appear.[17]

---

[17]The court notes that counsel for the United States
appeared, on behalf of the Department of Health and Human
Services. He announced that he was not appearing on behalf of
HUD.

17

Debtors' counsel announced, at the hearing on the instant motion, that Debtors have negotiated a new asset purchase agreement with Cornerstone.  He announced that the asset purchase agreement requires that the court approve bid procedures no later than 15 days after the date of filing of the petition in the instant case.[18]

Shandler testified that the new asset purchase agreement calls for Cornerstone to pay $24,750,000 for Debtors' assets.  He testified that Cornerstone has deposited $2,475,000 in an escrow account toward the purchase.

Shandler testified that Debtors need $270,000 on an interim basis to fund operations for approximately three weeks.  He testified that, in the absence of postpetition financing, Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses.  He testified that those expenditures are necessary to prevent immediate and irreparable harm of Debtors' businesses, and to the residents of Debtors' assisted living facilities.  He testified that Debtors are unable to sustain their operation with the use of cash collateral, and are unable to obtain unsecured

---

[18]Debtors filed a motion for approval of bid procedures on the same day they filed the petitions in the instant case.  The proposed procedures lead to a proposed hearing to approve a sale of substantially all of Debtors' assets on January 21, 2016, 72 days after the date of filing of the petitions in the instant case.  (Docket No. 11).

18

credit allowable as an administrative expense.

Shandler testified that Debtors sought proposals for postpetition financing from "multiple parties whom we know either lend in this space or may otherwise have interest in lending in this space."  He testified that Hillair and Lancaster Pollard declined to propose a loan.  He testified that both Cornerstone and White Oak proposed loans.[19]  He testified that Debtors determined to seek financing from White Oak because White Oak proposed a higher amount of financing and a longer maturity, and because Shandler believed that obtaining postpetition financing from Cornerstone may chill the bidding process for sale of Debtors' assets.

Shandler testified that the proposed financing is a term loan for the total face amount of $1.4 million, in two tranches.  He testified that the first tranche is approximately $420,700, and the remainder is to be advanced in the second tranche.[20]  He testified that the financing calls for a maturity date of approximately May 15, 2016, an interest rate of 12 percent over LIBOR, and additional fees, including a 1.5 percent origination fee, 1 percent exit fee, $35,000 investigation fee,

---

[19]Shandler testified that Debtors contacted three other entities:  Lapis, Senior Care Development, and MidCap Financial.

[20]The court notes that the amount of the first tranche differs from both the amount sought for an interim amount in the instant motion, and from Shandler's testimony as to the amount Debtors need during the instant period.

and annual fees of $7,700 for loan servicing and $7,000 for loan administration.  He testified that the proposal is to provide a priming lien against all assets except those as to which Lancaster Pollard asserts a security interest, and a second lien as to those assets in which Lancaster Pollard asserts a security interest.  He testified that there are no circumstances under which Lancaster Pollard's liens would be primed by the proposed financing.

Shandler testified that the proposed financing is subject to a carve out of $75,000.

Shandler testified that the petitions in the instant case were filed when they were filed because Debtors were running out of cash and needed access to the proposed financing, and Debtors reached a conclusion of the new asset purchase agreement and postpetition financing agreements.

Shandler testified that, on a consolidated basis, Debtors had sufficient cash flow from operations to pay all operating expenses prior to the filing of the petitions in the instant case.  He testified that Debtors had approximately $140,000 on hand on the petition date.  He testified that Debtors had payroll due of approximately $118,000 on the petition date.

Shandler testified that he was retained as chief restructuring officer during July, 2015.  He testified that he had been retained prior to that time as Debtors' financial

20

advisor.

Shandler testified that Debtors paid approximately $260,000 to $270,000 during the third quarter of 2015 to Shandler's firm and the law firm representing Debtors for restructuring costs.  He testified that, after October 1, 2015, Debtors paid approximately $150,000 to the same entities for restructuring costs.

The instant motion is opposed by Lancaster Pollard. Although Lancaster Pollard asserts it presently favors the proposed sale, it opposes the terms of the proposed financing. Lancaster Pollard argues that the court should not approve the full agreement without the consent of HUD.  Lancaster Pollard seeks a limitation to approval of the $270,000 needed to fund Debtors' expenditures until the final hearing.

The court finds on a preliminary basis that notice of the preliminary hearing was sufficient as to the parties set forth in the certificate of service, except as to HUD.

The court finds that there is preliminary evidence that the Debtors and White Oak reached their agreement as to the proposed financing in good faith.  The court will not enter an advisory opinion so concluding, on the limited record before the court, particularly in light of the absence of HUD from the process.

<u>Conclusions of Law</u>

Section 364 of the Bankruptcy Code provides:

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.


(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

    (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

        (A) the trustee is unable to obtain such credit otherwise; and

        (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

22

> (2) In any hearing under this subsection, the trustee
> has the burden of proof on the issue of adequate
> protection.

11 U.S.C. § 364.

In the instant case, Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without postpetition financing. The ability of the Debtors to pay employees, maintain business relationships with vendors and suppliers, purchase new inventory, and otherwise care for their patients and finance their operations is essential to the Debtors' continued viability. Shandler's testimony indicates that Debtors sought to obtain unsecured credit allowable as an administrative expense, or credit secured by a non-priming lien, but were unable to obtain such terms.

On a preliminary basis, the court concludes that Lancaster Pollard is adequately protected through the maintenance of its liens, and subordination of White Oak to Lancaster Pollard as to the property on which Lancaster Pollard asserts a lien.

On a preliminary basis, this court finds and concludes that the adequate protection of Lancaster Pollard with respect to their asserted liens is sufficient to protect HUD with respect to its lien pursuant to the applicable documents.  However, the court is troubled by Debtors' failure to keep HUD apprised of its efforts toward reorganization, in violation of its prepetition

23

loan and regulatory documents, as well as Debtors' failure to promptly notify HUD in such a way as to enable it to participate at the preliminary hearing on the instant motion.  The court will consider the question of adequate protection as to HUD at the final hearing on the instant motion.

Based on the foregoing, the court will enter a separate Judgment granting in part the "Emergency Motion for Interim and Final Orders (I) Authorizing Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. §§ 363, 364, and 507(b); (II) Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. §362; (III) Granting Related Relief; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001" (Docket No. 10).

Signed at Houston, Texas on November 18, 2015.


LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE